Andrew Gould (No. 013234)
Drew C. Ensign (No. 025463)
Dallin B. Holt (No. 037419)
Brennan A.R. Bowen (No. 036639)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2575 East Camelback Road, Suite 860
Phoenix, Arizona 85016
(602) 388-1262
agould@holtzmanvogel.com
densign@holtzmanvogel.com
dholt@holtzmanvogel.com
bbowen@holtzmanvogel.com
minuteentries@holtzmanvogel.com

Michael D. Berry (*pro hac vice forthcoming*)
Jessica H. Steinmann (*pro hac vice forthcoming*)
Richard P. Lawson (*pro hac vice forthcoming*)
Patricia Nation (*pro hac vice forthcoming*)
AMERICA FIRST POLICY INSTITUTE
1001 Pennsylvania Ave., N.W., Suite 530
Washington, D.C. 2004
(813) 952-8882
mberry@americafirstpolicy.com
jsteinmann@americafirstpolicy.com
rlawson@americafirstpolicy.com
pnation@americafirstpolicy.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| American Encore, an Arizona non-profit corporation; Karen Glennon, an Arizona individual; America First Policy Institute, a non-profit corporation,<br><br>Plaintiffs,<br>vs.<br><br>Adrian Fontes, in his official capacity as Arizona Secretary of State; Kris Mayes, in her official capacity as Arizona Attorney General; Katie Hobbs, in her official capacity as Governor or Arizona,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT** |

Plaintiffs bring this Complaint against Defendant Adrian Fontes, in his official capacity as Arizona Secretary of State (the "Secretary"); Kris Mayes, in her official capacity as Arizona Attorney General (the "Attorney General"); and Katie Hobbs, in her official capacity as Governor of Arizona (the "Governor") (collectively, "Defendants" or the "State") and allege as follows:

**INTRODUCTION**

1.     This suit challenges two provisions of Arizona election law, both of which are included in the 2023 Arizona Election Procedure Manual ("2023 EPM" or "EPM"). The EPM governs how elections are conducted and has the force of law in Arizona. Any violation of a provision of the EPM by any person is a class-two misdemeanor. *See* A.R.S. § 16-452(C) ("A person who violates any rule adopted pursuant to this section is guilty of a class 2 misdemeanor."); *Arizona Pub. Integrity All. v. Fontes*, 250 Ariz. 58, 63 ¶ 16 (2020) ("Once adopted, the EPM has the force of law; any violation of an EPM rule is punishable as a class two misdemeanor.")

2.     The first challenged regulation, the "Vote Nullification Provision," is a vote-nullification provision that *mandates* that *all votes* cast *by all voters* in a county will *not be counted* (*i.e.*, will be thrown out and not included in the statewide totals) if the Board of Supervisors for that county fails or refuses to certify the canvas election results for that county. The Vote Nullification Provision thus provides that "[i]f the official canvass of any county has not been received by [the] deadline, the Secretary of State must proceed with the state canvass *without including the votes of the missing county*." EPM, Chpt. 13, § II(B)(2) (emphasis added).

3.     The second challenged provision, the "Speech Restriction," is a broad curtailment of speech. It purports to criminalize "*any activity*" taken "with the intent *or effect* of threatening, harassing, intimidating or coercing voters." EPM Chpt. 9, § III(D) (emphasis added). The Speech Restriction further makes clear that this criminal prohibition reaches actions as ubiquitous as simply "raising one's voice" or "using . . . insulting or offensive language to a voter." EPM at 182.

2

4.     The Speech Restriction is nearly unrestrained in its application. There is no temporal limitation: it applies equally on election day and all other 365 days of the year. *Id.* There is also no geographic limitation: it applies both "inside *or outside* the 75-foot limit [of electioneering activity] at … voting location[s]," *id.* (emphasis added)—*i.e.*, on every square inch of territory within Arizona's borders. It further does not require any connection of the allegedly offending speech to voting.

5.     As explained below, both the Vote Nullification Provision and Speech Restriction violate the United States Constitution. The former is an unconstitutionally severe burden on the right to vote under the Supreme Court's *Anderson-Burdick* framework.  The latter is an egregious violation of the First and Fourteenth Amendments.

LEGAL BACKGROUND

6.     Every odd-numbered year, the Secretary has the statutory responsibility to "prescribe rules" for administering federal and state elections in Arizona. A.R.S. § 16-452. The rules are meant "to achieve and maintain the maximum degree of correctness, impartiality, uniformity[,] and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating[,] and storing ballots." *Id.*

7.     These rules are then outlined in "an official instructions and procedure manual"—*i.e.*, the EPM or Elections Procedures Manual.

8.     Violation of any provision of the EPM is a criminal act under Arizona law. Specifically, "[a] person who violates any rule adopted pursuant to this section is guilty of a class 2 misdemeanor." A.R.S. § 16-452(C).

9.     Because of the EPM's unconstitutional restrictions on Free Speech, parties like Plaintiffs—who participate in elections and election activities—must chill (and have chilled) their otherwise lawful speech to comply with the EPM.

10.     Moreover, Plaintiffs and similarly situated Arizonans risk having their votes diluted (or nullified) if county boards of supervisors trigger the EPM's Vote Nullification Provision—which, as alleged in ¶¶ 50-52, *infra*, would only require the exact circumstances of the 2022 election to reoccur.

### THE PARTIES

11.     Plaintiff American Encore is a 501(c)(4) nonprofit organization that is based in Arizona. American Encore is regularly involved in election-related activity in Arizona. American Encore defends freedom, promotes free markets, works to expand economic opportunity and makes the case for the American ideals of liberty and democracy.

12.     American Encore advances its mission by supporting and opposing political candidates, policies, and initiatives. American Encore does this by engaging in electioneering communications—including in Arizona.

13.     As part of these electioneering communications, American Encore regularly speaks with voters through advertising and person-to-person contact.

14.     American Encore will continue to engage in voter contact in Arizona for the upcoming 2024 election cycle and beyond.

15.     American Encore has incurred and will continue to incur additional legal and other costs to ensure compliance with the 2023 EPM, specifically, but not limited to, the Speech Restriction.

16.     If the 2023 EPM had not included the broad and undefined provisions governing forms of voter contact that it typically engages in, American Encore would not have had to otherwise incur these additional compliance costs beyond what it typically incurs.

17.     As part of these additional compliance costs, American Encore has trained, and will continue train, volunteers and others who will assist with contacting voters in Arizona to ensure compliance with the Speech Restriction of the 2023 EPM.

18.     The vast majority of American Encore's voter contact in Arizona takes place more than 75 feet from voting locations.

19.     Plaintiff Karen Glennon is an individual domiciled in Apache County, Arizona, registered to vote, and who plans on voting in the 2024 elections.

20.     Plaintiff Glennon's vote is now open to disqualification through no fault of her own, based solely on the discretion of the Apache County Board of Supervisors to

decide whether to canvas and certify the election results in the timeframe imposed by statute and the EPM.

21. Plaintiff Glennon is harmed by the Vote Nullification Provision because her right to vote is now subject to qualifications that are wholly outside of her control.

22. Plaintiff Glennon is also harmed by the Speech Restriction because her otherwise protected political speech is now subject to criminal penalty based on the arbitrary and discriminatory decisions of the government officials who are enforcing its vague terms.

23. Plaintiff America First Policy Institute ("AFPI") is a 501(c)(3) non-profit organization. The organization works at the state level to advance or oppose legislation, which necessarily involves promoting elections and raising awareness of issues at elections.

24. AFPI trains volunteers and poll workers on how to focus on election integrity at polling locations before and during election day, how to be poll watchers, etc., which requires credentialing and specific processes.

25. AFPI has conducted poll-worker training sessions in Arizona in the past and intends to conduct at least two additional sessions in 2024.

26. Unless the provisions of the EPM regulating speech are enjoined or otherwise invalidated, AFPI will be forced to include in those training sessions about how to comply with the EPM's speech provisions. In doing so, AFPI will incur compliance costs as a result of its need to design and conduct EPM-specific training.

27. AFPI has also conducted grassroots workshops about election related issues in Arizona in the past and intends to do so in the future. In doing so, AFPI engages in communications with Arizona voters. For example, AFPI conducted a workshop on ranked-choice voting in Mesa in January 2024.

28.     As part of its policy objectives, AFPI regularly communicates with adults throughout Arizona—many of whom are voters.[1] Many of those adults/voters are supportive of AFPI's policy positions. Others may oppose AFPI's positions and may even be offended by AFPI's messages about them, particularly in this recent era known for an increasingly easily offended populace and strategic weaponization of offense to silence opposing viewpoints. As a result of the EPM's provisions, AFPI has had to alter how it conducts its operations and communications in Arizona to avoid potential EPM violations, and further, has had to do so in a manner that is not required in other states.

29.     AFPI also has about 300,000 members, who are widely dispersed throughout the United States. Many of those members routinely advocate for governmental policies to their peers, including in Arizona. Those members also face a risk of enforcement from the EPM's provisions.

30.     Therefore, AFPI faces a real threat and controversy with the 2023 EPM because of how it directly conflicts with the Free Speech guarantee of the U.S. Constitution.

31.     Defendant Adrian Fontes is the Secretary of State and is named in this action in his official capacity only. The Secretary is a constitutional officer who is part of the Executive Branch of the State of Arizona. His primary address is in Maricopa County.

32.     Under A.R.S. § 16-452, the Secretary is responsible for promulgating an EPM every two years, which, upon approval by the Governor and the Attorney General, has the force of law. In addition, the Secretary is the chief state election officer. *See* A.R.S. § 16-142(A)(1).

33.     Defendant Kris Mayes is the Attorney General and is named in this action in her official capacity only. The Attorney General is a constitutional officer who is part of the Executive Branch of the State of Arizona. She has her primary address in Maricopa County. The Attorney General has the statutory authority to enforce and prosecute election

---

[1] Although America First regularly communicates with individuals in Arizona, many of whom are registered voters, it does not advocate for the election of specific candidates or adoption or rejection of particular ballot measures.

violations found in Title 16 under A.R.S. § 16-1021. She is also statutorily tasked with approving the final EPM. *See* A.R.S. § 16-452(B).

34.     Defendant Katie Hobbs is the Governor of Arizona and is named in this action in her official capacity only. The Governor is a constitutional officer who is the head of the Executive Branch of the State of Arizona. She has her primary address in Maricopa County. She is statutorily tasked with approving the final EPM. *See id.*

## JURISDICTION AND VENUE

35.      This Court has subject matter jurisdiction because this case alleges violations of the United States Constitution. 28 U.S.C. §1331.

36.     Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred in this County and because Defendants "reside" here. 28 U.S.C. §1391.

## GENERAL ALLEGATIONS

37.     The Arizona Legislature has delegated limited authority to the Secretary to "prescribe rules to achieve and maintain the maximum degree of correctness, impartiality, uniformity[,] and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating[,] and storing ballots." A.R.S. § 16-452(A).

38.     The EPM must be "issued not later than December 31 of each odd-numbered year immediately preceding the general election." § 16-452(B).

39.     Before issuing the EPM, the Secretary must submit a draft to the Governor and the Attorney General, and each must approve it. *Id.*

40.     "Once adopted, the EPM has the force of law; any violation of an EPM rule is punishable as a class two misdemeanor." *Fontes*, 250 Ariz. 63 ¶ 16 (citing § 16-452(C)).

41.     In Arizona, the officer in charge of elections for each county—usually a county recorder—is responsible for tabulating votes, and sending those unofficial county election returns to their respective county board of supervisors. *See generally* A.R.S. §§ 16-621, 16-622, 16-624.

42.     In turn, the county boards are tasked with conducting an official canvas, declaring results, and certifying those results. *See generally* A.R.S. §§ 11-251(3), 16-642, 16-645, 16-646(C), 16-647.

43.     The Secretary then uses those official certifications from county boards to certify the results for the statewide elections. *See generally* A.R.S. §§ 16-642(A)(3), 16-643; 16-645, 16-648.

### THE 2022 COCHISE COUNTY BOARD OF SUPERVISOR'S ELECTION CERTIFICATION DELAY

44.     Events surrounding the 2022 election impacted the provisions that the State included in the 2023 EPM.

45.     For example, following the 2022 election, the Cochise County Board of Supervisors refused to certify the election results for Cochise County for a time, resulting in a delay for the Secretary's certification. *See* Jonathan J. Cooper, *Republican-Controlled Arizona County Refuses To Certify 2022 Election*, Arizona PBS (Nov. 28, 2022) https://www.pbs.org/newshour/politics/republican-controlled-arizona-county-refuses-to-certify-2022-election.

46.     Eventually, the Cochise County Board certified the results, as did the Secretary. *See* Musadiq Bidar, *Last Arizona County Certifies Election Results*, CBS News (Dec. 1, 2022) https://www.cbsnews.com/news/2022-midterm-elections-cochise-county-arizona-election-results-certification/.

47.     Since then, the Arizona Attorney General has indicted two of the Cochise County Supervisors for their alleged role in delaying the certification. *See* Jen Fifield, *Two Cochise County Supervisors Indicted For Refusing To Certify Midterm Election*, Votebeat (Nov. 29 2023) https://www.votebeat.org/arizona/2023/11/29/arizona-cochise-county-supervisors-indicted-refusing-certify-2022-election/.

### THE 2023 EPM

48.     On or around July 31, 2023, the Secretary published a 268-page draft EPM for public comment.

49.     The Secretary permitted only 14 days to provide comments on the draft EPM. Despite that limited time for review, individuals and organizations submitted comments opposing provisions of the draft EPM.

50.     In particular, on August 14, 2023, Ben Toma, Speaker of the Arizona House of Representatives, and Warren Peterson, President of the Arizona Senate, submitted comments opposing provisions of the draft EPM. A copy of the Legislature's comments is attached as Exhibit A. Among other comments, the legislative leaders argued that the Speech Restriction violated Arizona statutory law, the First Amendment, and the Free Speech and Due Process Clauses of the Arizona Constitution. *See* Ex. A at 6–7.

51.     After receiving public comment, the Secretary published an updated draft EPM and transmitted the same to the Governor and the Attorney General for their review and approval under § 16-452.

52.     The Speech Restriction of Chapter 9, § III(D), was not changed in response to the statutory and constitutional concerns raised by the legislative leaders.

53.     By refusing to make any changes to the Speech Restriction in response to the comments objecting to it, the Secretary has refused to disavow enforcement of the provision as written.

54.     On January 11, 2024, the Secretary published an updated "final" EPM, which corrected and added dates in Chapter 15. This "final" EPM, however, still did not change the Speech Restriction. This is the EPM at issue, and which the Secretary and Attorney General seek to enforce.

## THREAT OF ENFORCEMENT OF SPEECH RESTRICTION

55.     The constitutional violations occasioned by the Speech Restriction are not mere drafting accidents, but rather intentional policy choices made by the Secretary and approved by the Governor and Attorney General. In addition to the Secretary's retention of the Speech Restriction as written after the Legislature specifically raised First Amendment concerns, a subsequent letter exchange with the Secretary and Attorney

General further confirms that Plaintiffs face a credible threat of enforcement of the Speech Restriction against them.

56.     Specifically, the Secretary and Attorney General were sent a letter on May 21, 2024, asking them to disavow enforcement of the Speech Restriction. A copy of that letter is attached as Exhibit B.

57.     In his May 31 response, the Secretary did not address the request that "Secretary Fontes provide a binding and unequivocal commitment to forego making any criminal referrals for alleged violations of the 2023 EPM's Speech Restriction under any circumstances," Ex. B at 1. A copy of the Secretary's May 31, 2024 response is attached as Exhibit C.[2]

58.     In doing so, the Secretary made clear that he intends to make referrals for criminal prosecution to the Attorney General and Arizona County Attorneys for violations of the Speech Restriction. Such a refusal to disavow enforcement strongly supports Plaintiffs' standing here. *See*, *e.g.*, *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2020) (holding that "the state's refusal to disavow enforcement of [the challenged law] against [plaintiffs] during this litigation is strong evidence that the state intends to enforce the law and that [plaintiff's] members face a credible threat" of enforcement.)

59.     In contrast, the Attorney General issued a purported disavowal of enforcement of the Speech Restriction. A copy of her May 31, 2024 response is attached as Exhibit D.

60.     The Attorney General's attempt to disavow is flawed on multiple levels. *First*, it expressly notes that County Attorneys could still enforce the Speech Restriction. Specifically, her letter expressly "note[s] that county attorneys may also enforce provisions of Title 16 and Title 13 as they relate to voting and elections." Ex. D at 2. The Attorney

---

[2]  Plaintiffs contest the accuracy of many of the assertions in the Secretary and Attorney General's letters. They are attached solely to support Plaintiffs' claim that they face a credible threat of enforcement of the Speech Restriction

General's letter thus implicitly recognizes that Plaintiffs here face a threat of enforcement even after her putative (and, as explained next, ineffective) disavowal of enforcement.

61. *Second*, the putative disavowal of enforcement is based on errors of law that are so patent that no person could reasonably rely upon them. For example, Attorney General Mayes's letter claims that the Speech Restriction "does not itself restrict or criminalize anything."

62. Specifically, although the Attorney General claims that the Speech Restriction "does not itself restrict … anything," it clearly does. By its terms, it provides: "Any activity by a person with the intent or effect of threatening, harassing, intimidating, or coercing voters … *is prohibited*." EPM at 181 (emphasis added). And to "prohibit" speech is to "restrict" it. *See*, *e.g.*, *Prohibit*, Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/prohibit (last visited June 18, 2024) (defining "prohibit," in relevant part, as "to officially stop something from being done by making rules or laws that do not allow it"). The Attorney General's contrary contention that the Speech Restrictions does not "restrict[] anything …" is squarely contrary to the Speech Restriction's plain text.

63. Similarly, the Attorney General's contention that the Speech Restriction "does not … criminalize anything" is incorrect. Arizona statutory law explicitly provides that "[a] person who violates any rule adopted pursuant to this section is guilty of a class 2 misdemeanor." Thus, to violate the explicit *prohibitions* of the Speech Restriction is necessarily to commit a class 2 misdemeanor under state law. A.R.S. § 16-452(C); *see also Arizona Pub. Integrity All. v. Fontes*, 250 Ariz. 58, 63 ¶ 16 (2020) ("Once adopted, the EPM has the force of law; *any violation of an EPM rule is punishable as a class two misdemeanor*." (emphasis added)).

64. The Attorney General's position that the EPM "does not … criminalize anything" is incompatible with Arizona statutory law.

65. The Attorney General's assertion appears to be premised on her view that the Speech Restriction is only "for the benefit of local elections officials, such as a polling

place inspector and marshal" and does not apply to private individuals. Ex. D at 1. But A.R.S. § 16-452(C), by its terms, is squarely to the contrary: it explicitly provides that "[a] person who violates any rule adopted pursuant to this section is guilty of a class 2 misdemeanor." An ordinary citizen is equally as much "a person" as "local election officials." And the Speech Restriction is stated as a universal *prohibition* on the conduct of *everyone*—not just election officials. It expressly applies to "[*a*]*ny activity* by *a person*" without limitation and provides that such conduct "is prohibited." EPM at 191 (emphasis added). The Attorney General's assertion that the Speech Restriction only applies to local election officials and not other members of the public is thus indefensible.

66.     *Third*, the Attorney General's assertion that she "does not view the EPM as broadening the scope of conduct criminally prohibited under A.R.S. §§ 16-1013, 1017 or relevant and applicable criminal statutes," Ex. D at 2, is equally untenable.

67.     The Speech Restriction notably "broadens the scope of conduct criminally prohibited under A.R.S. §§ 16-1013, 1017" in at least three ways.

68.     *First*, the Speech Restriction unlawfully eliminates the *mens rea* requirement adopted by the Legislature. Specifically, A.R.S. § 16-1013 prohibits only acts that are taken "knowingly …" *See* A.R.S. § 16-1013 ("It is unlawful for a person *knowingly*:…" (emphasis added)). Similarly, § 16-1017 requires *knowing* violations. *See* A.R.S. § 16-1017 ("A voter *who knowingly commits* any of the following acts is guilty of a class 2 misdemeanor:…" (emphasis added). The Speech Restriction, however, purports to criminalize actions that have *either* "the intent *or effect* of threatening" voters. In doing so, the Speech Restriction creates a new strict-liability crime where actions are prohibited without any requirement of *mens rea*—even ordinary negligence—as long as they have the "effect" at issue.

69.     *Second*, the Speech Restriction unlawfully adds a prohibition against harassing speech into the prohibition of A.R.S. § 16-1013. By its terms, § 16-1013 prohibits only the actual (1) "use of force, violence or restraint," (2) "threaten[ing to] inflict[] … injury, damage, harm or loss," (3) "intimidation," or (4) use of "abduction, duress or any

forcible or fraudulent device or contrivance." Completely absent from § 16-1013 is any concept of verbal "harassment," which instead was added whole cloth by the Secretary. Similarly, § 16-1017 does not include "harassment" either.

70. *Third*, the Speech Restriction eliminates any requirement that the threatening, harassing, or intimidating actions have any actual nexus to voting itself. Section 16-1013 specifically prohibits only actions that are taken "to induce or compel such person *to vote or refrain from voting* for a particular person or measure at any election provided by law, or on account of such person *having voted or refrained from voting* at an election" or "to impede, prevent or otherwise interfere with the *free exercise of the elective franchise* of any voter, or to compel, induce or to prevail upon a voter either *to cast or refrain from casting his vote* at an election, or *to cast or refrain from casting his vote* for any particular person or measure at an election." A.R.S. § 16-1013 (emphasis added) (hereinafter, "Voting-Nexus Requirement"). Similarly, all of the prohibitions of § 16-1013 involve voting. But the EPM's Speech Restriction dispenses with this Voting-Nexus Requirement entirely, and simply makes it a crime to raise one's voice or use offensive or insulting language concerning *any subject* to *any voter anywhere* in the State.

71. The Attorney General's contention that she would not enforce the Speech Restriction is thus based on a flawed legal construction as to how that legal provision, by its terms, operates. And, because her disavowal of enforcement of the Speech Restriction is not premised the express terms of the Restriction, it is ineffective to dispel Plaintiffs' credible threat of enforcement. Rather, because the Attorney General is ultimately obliged to enforce Arizona law as *actually written*, Plaintiffs cannot rely on her disavowal of prosecution since it is premised on an erroneous construction of the law.

72. The Attorney General and Secretary's refusal to amend the Speech Restriction in response to the First Amendment objections raised to it and their subsequent May 31 responses thus demonstrate that Plaintiffs face a credible threat of enforcement under the Speech Restriction.

73.     Further, apart from the Attorney General's purported disavowal of enforcement, she herself notes that the County Attorneys could still prosecute violations of the Speech Restriction.

74.     Moreover, the Secretary specifically refused to disavow making criminal referrals, including to the County Attorneys, despite the May 21, 2024 (Ex. 2) letter asking him to do so. That refusal further underscores the credible threat of enforcement that Plaintiffs face here.

75.     "[T]he 'credible threat of prosecution' is a 'quite forgiving' requirement that sets up only a 'low threshold' for a plaintiff to surmount" to establish standing. *Antonyuk v. Chiumento*, 89 F.4th 271, 334 (2d Cir. 2023) (citation omitted). "Courts have not placed the burden on the plaintiff to show an intent by the government to enforce the law against it but rather presumed such intent in the absence of a disavowal by the government." *Id.* (cleaned up); *see also California Trucking Ass'n*, 996 F.3d at 653 ("Here, the state's refusal to disavow enforcement is strong evidence that the state intends to enforce the law and that the plaintiffs face a credible threat." (cleaned up)).

76.     Moreover, by providing their assent to the Secretary's EPM, the Attorney General and Governor made a determination that the 2023 EPM complied with federal and Arizona law notwithstanding the objections made to it.

77.     Because the Attorney General and Governor could have exercised a veto over the EPM's publication if they had deemed its provisions to violate the Constitution, their approval of the EPM signals that they believe that the EPM is lawful and that the Attorney General intends to enforce its provisions.

78.     Additionally, the Attorney General's grant of consent to the EPM notwithstanding its legal infirmities constitutes a "refusal to disavow enforcement" of the EPM. *California Trucking Ass'n*, 996 F.3d at 653.

**VOTE NULLIFICATION PROVISION**

79.     The final 2023 EPM also includes two provisions regarding canvassing elections results that are likely intended to addresses the issues that arose in 2022 with

Cochise County (*see supra*, ¶¶ 50-52): (1) the EPM imposes on County Boards of Supervisors "a nondiscretionary duty to canvass the returns as provided by the County Recorder or other officer in charge of elections" and removes from the County Boards any "authority to change vote totals, reject the election results, or delay certifying results without express statutory authority or court order," EPM Chp. 13, § II(A)(2) ("Mandatory-Board-Certification Provision"); and (2) the EPM also imposes a similar non-discretionary canvassing duty on the Secretary, but also provides that "[i]f the official canvass of any county has not been received by [the] deadline, the Secretary of State must proceed with the state canvass without including the votes of the missing county," EPM Chp. 13, § II(B)(2) ("Vote Nullification Provision").

80. Only the second mandate, the Vote Nullification Provision, is challenged here. That provision *mandates* that *all votes* cast *by all voters* in a county will *not be counted whatsoever* if the Board of Supervisors for that county fails or refuses to certify the canvas election results for that county. The Vote Nullification Provision thus provides that "[i]f the official canvass of any county has not been received by this deadline, the Secretary of State must proceed with the state canvass *without including the votes of the missing county*." EPM at 252 (emphasis added).

81. Thus, where a county Board of Supervisors refuses or fails to certify election results by the applicable deadline, the Vote Nullification Provision mandates the *complete disenfranchisement* of every voter in that county. It does so even where the voters in that county themselves are entirely faultless and have complied with *all* requirements for exercising their constitutional right to vote (*e.g.*, voting before polls close, presenting identification for in-person voting or signing their mail-in ballot etc.). That disenfranchisement extends to every single vote cast by the voter from Presidential Electors all the way down to whether to retain a justice of the peace.

82. The Vote Nullification Provision could potentially even permit Boards of Supervisors to continue to serve indefinitely even when the voters attempt to vote them out of office. By refusing to certify results, there would not be any lawful ballots cast for any

of the offices that are limited to that county—such as that county's Board of Supervisors (as well as its Sheriff, County Attorney, Recorder, Treasurer, etc.). As such the Board of Supervisor positions would presumably be deemed vacant. As a result, the Board of Supervisors—the same one that had just refused to certify the results—would be entitled to fill those vacancies, and could presumably do so with themselves. *See* A.R.S. § 11-213 ("When a vacancy occurs in the office of supervisor, the remaining supervisors … shall fill the vacancy by appointment of a resident of the district in which the vacancy occurred.").

83.    The Vote Nullification Provision would also apply in the case of non-feasance or bad acts of third parties. For example, if the bad actions of third parties prevented a quorum of supervisors from assembling and voting to certify canvassed results by the applicable deadline, every voter in that county would be disenfranchised.

84.    The scale of the potential disenfranchisement that could be wrought by the challenged provision is staggering. Maricopa County, for example, is home to over 2.9 million registered voters—a majority of all voters in the State—and had about 2.1 million ballots cast by voters in 2020. But its Board of Supervisors consists only of five members. So, if three of them refuse or are unable to certify election results, millions of voters will suffer total disenfranchisement as a result. Putting such electoral power in the hands of such a small handful of individuals is as unprecedented as it is unconstitutional.

85.    The power conferred upon Boards of Supervisors under the Vote Nullification Provision is particularly problematic and vast given Arizona's status nationally as both a swing and potentially tipping-point state. If Arizona's electoral votes were decisive in the 2024 elections, one or more Boards of Supervisors would potentially wield the power to determine the next President of the United States simply by sitting on their hands and refusing to come to work for a few days during the canvas process.

86.    This potential disenfranchisement is hardly theoretical. In 2022, the Cochise Board of Supervisors, for a time, refused to certify its election results. Although the standoff was eventually resolved, it could easily recur—particularly as the Vote

Nullification Provision (which did not exist in 2022) may now *actively incentivize* Boards of Supervisors to refuse to certify results in order to manipulate electoral winners.

87.     Notably, Defendant Mayes has judged the risk of recurrence sufficiently likely that she has obtained criminal indictments of members of the Cochise Board of Supervisors that briefly refused to certify election results as a deterrent and is actively prosecuting those county supervisors.

88.     Similarly, Defendant Fontes crafted the Vote Nullification Provision specifically to deter another recurrence of Boards of Supervisors (like Cochise County) refusing to certify results. But the provision that he proposed—and to which Governor Hobbs and Attorney General Mayes provided their necessary approvals—is extreme and unconstitutional.

89.     No other state has any remotely equivalent provision. Not a single one of Arizona's 49 sister states judges it necessary to disenfranchise voters *en masse* in order to address the issue of potential refusals or inabilities to certify election results by county officials.

90.     The Vote Nullification violates the U.S. Constitution by imposing an unconstitutionally severe burden on the right to vote of U.S. citizens residing in Arizona under the *Anderson-Burdick* doctrine developed by the Supreme Court.

### HARMS CAUSED BY THE VOTE NULLIFICATION PROVISION

91.     The Vote Nullification Provision inflicts cognizable injury upon voters by changing the nature of their right to vote and have their vote counted from an unqualified right to one subject to potential disqualification by the actions of governmental officials.

92.     Without the Vote Nullification Provision voters have an essentially absolute right to vote—and have those votes counted—so long as they comply with applicable rules. For example, before the 2023 EPM, so long as in-person voters showed voter identification, followed ballot instructions, and casted a ballot by the close of polls, their right to have that vote counted was unconditional.

93.     Similarly, mail-in voters that signed their ballot, followed ballot instructions, and ensured receipt of their ballots by the close of polls, had a near-absolute right to have their vote counted.

94.     Although voters' ballots might be disqualified if their signature did not appear to match, Arizona law gives them the right to cure such a mismatch for up to five business days after the election. *See* A.R.S. § 16-550(A). Indeed, failure to provide such opportunities for curing mismatches—and thus rendering voters' right to vote subject to potential wrongful disqualification at the hands of election officials—has routinely given rise to Article III standing to challenge the failure to provide adequate mismatch curing opportunities. *See*, *e.g.*, *Democratic Exec. Comm. v. Detzner*, 347 F. Supp. 3d 1017, 1024-25 (N.D. Fla. 2018) *aff'd* 915 F.3d 1312 (11th Cir. 2019); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333-35 (N.D. Ga. 2018); *Frederick v. Lawson*, 481 F. Supp. 3d 774, 786-90 (S.D. Ind. 2020); *see also Ariz. Democratic Party v. Hobbs*, 485 F. Supp. 3d 1073, 1085-87 (D. Ariz. 2020) *rev'd* on other grounds 18 F.4th 1179, 1193 (9th Cir. 2021) (same for failure to provide opportunity to cure missing signatures post-election).

95.     Similarly, citizens who have lost their right to vote due to a felony-disenfranchisement statute have standing to challenge that statute even though their right to vote could potentially be restored by the governor as a matter of discretionary clemency. *See*, *e.g.*, *El-Amin v. McDonnell*, No. 3:12-cv-00538-JAG, 2013 U.S. Dist. LEXIS 40461, at *15 (E.D. Va. Mar. 22, 2013) ("While El-Amin is correct that Virginia has deprived him of his voting rights, this injury permits him only to challenge the deprivation itself, which he does in Count I. Since he has not applied for restoration of his voting rights, he has suffered no denial, or other injury, that would allow him to challenge the reinstatement process as well.") (holding that plaintiff disenfranchised by felony-disenfranchisement law that had not applied for restoration of voting rights by the governor had standing to challenge the felony-disenfranchisement statute but not the procedures for restoration of the right to vote by the governor); *Williams v. Taylor*, 677 F.2d 510, 517 (5th Cir. 1982) (holding that disenfranchised felon lacking standing to challenge "pardon procedure" that

could restore voting rights because he had not "tried to procure a pardon from the governor" but considering challenges to felony-disenfranchisement procedures on the merits because standing was sufficiently obvious not to warrant discussion).

96.     Thus, because a felony-disenfranchisement statute transformed the plaintiffs' right to vote from (1) an unqualified right so long as voting requirements were met to (2) a qualified right, subject to the discretion of the governor, felony disenfranchisement statutes inflict cognizable injury establishing Article III standing to challenge them.

97.     The Vote Nullification Provision inflicts the same sort of injury: *i.e.*, it transforms voters' unqualified right to vote so long as they comply with applicable requirements, into a qualified right that is subject to potential disqualification and disenfranchisement at the hands of governmental officials. As a result, it inflicts cognizable injury upon Plaintiff Glennon as a voter, as well Plaintiffs AFPI and American Encore's supporters and/or sympathetic voters and Plaintiff AFPI's members who are also voters.

98.     This injury is imminent: Plaintiff Glennon, as well Plaintiffs AFPI and American Encore's supporters and/or sympathetic voters and Plaintiff AFPI's members will vote in the upcoming July 30, 2024 primary, where their votes will be subject to potential disqualification by the actions of County Boards of Supervisors under the Vote Nullification Provision. This potential disenfranchisement thus downgrades their right to vote from unconditional to being subject to disqualification by the actions of third parties.

99.     Plaintiff Glennon, as well Plaintiffs AFPI and American Encore's supporters and/or sympathetic voters and Plaintiff AFPI's members similarly will cast votes in the November 5, 2024 general election, where there right to vote will likewise be downgraded from unconditional to qualified/subject to potential disqualification by actions of governmental officials. *See also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (recognizing cognizable injury under *Anderson-Burdick* doctrine because a statute "subjects vote-by-mail and provisional *electors to the risk of disenfranchisement*" (emphasis added)).

100.    Plaintiffs' injuries here are similarly akin to those occasioned when a state or local government imposes a permit requirement to exercise free speech rights. By changing the character of the speech from being unconditionally allowed to, now, contingent upon the actions of governmental actors granting a permit, a permitting requirement inflicts cognizable injury establishing Article III standing to challenge the permit requirement. *See*, *e.g.*, *Taniguchi v. Schultz*, 303 F.3d 950, 957 (9th Cir. 2002) (Ninth Circuit precedents recognize that plaintiffs "have standing to challenge a permit requirement, even though they did not apply for permits, because applying for a permit would have been futile" (cleaned up)); *Stewart v. San Francisco*, No. 22-16018, 2023 U.S. App. LEXIS 3811, at *2 n.3 (9th Cir. Feb. 17, 2023) (recognizing Article III standing to challenge statute that "establishe[d] a permit requirement in advance of public speech and ban[ned] an instrumentality of speech absent a permit.'" (citation omitted)).

101.    Similarly, by changing an unconditional right for a vote to be counted to one contingent on how governmental officials act, the Vote Nullification Provision establishes Plaintiffs' standing here.

102.    Plaintiffs also have standing because there is a credible threat that the Vote Nullification Provision will be enforced in a manner that disenfranchises them. Notably, Cochise County did refuse to certify election results for a time in 2022, which would have triggered the Vote Nullification Provision if one of the supervisors had not backed away from the ledge at the eleventh hour.

103.    Indeed, Defendant Fontes judged the risk of recurrence to be so sufficiently high that, upon information and belief, specifically drafted the Vote Nullification Provision as a reaction to the events in 2022 and the likelihood that they could recur in 2024 or subsequent elections.

104.    The risk is even greater now because the Vote Nullification Provision actively incentivizes Boards of Supervisors *not* to certify election results because (unless invalidated) it ensures that any efforts by them to manipulate vote counts by refusals to certify *will be effective*.

105.   The risk of enforcement is further underscored by the fact that the Secretary is not merely the officer charged with enforcing the Vote Nullification Provision, but also is *its author*. The Secretary would not have drafted the Vote Nullification Provision if he did not intend to enforce it.

106.   To the extent that they apply here, prudential considerations strongly favor resolving Plaintiffs' claim now, rather than waiting until a crisis arrives when a Board of Supervisors refuses to certify an election. In that posture, there will be a severe time crunch that could prevent thoughtful resolution of the issues presented, as well as potentially dueling opinions from state and federal courts that could create electoral chaos.

107.   In addition, by resolving this claim now, this Court can do so in a posture where the outcome of an election will not directly turn on the ruling here.

### THE 2023 EPM'S VIOLATIONS OF THE UNITED STATES CONSTITUTION

### The Vote Nullification Provision is a Severe and Unconstitutional Burden on Arizonans' Right to Vote

108.   Violations of the right to vote implicate the First and Fourteenth Amendments. *See Anderson v. Celebrezze*, 460 U.S. 780, 787 n.7 (1983) (collecting cases).

109.   Constitutional challenges to electoral statutes and regulations that allege an unconstitutional burden are governed by the *Anderson-Burdick* framework. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189–91 (2008).

110.   Under this framework, "a court evaluating a constitutional challenge to an election regulation [must] weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* at 190 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)) (quotation marks omitted).

111.   And "an election regulation that imposes a severe burden is subject to strict scrutiny." *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008).

112.   The Vote Nullification Provision imposes a severe burden on the right to vote—indeed, it is the severest possible burden: nullification of a citizen's vote through no fault of that citizen and doing so for every voter in a given county. Indeed, when it becomes operative, *all voters* in the affected county are *completely disenfranchised*. For the voters

of the affected county, no more severe burden on their right to vote is even conceivable or possible.

113.   Indeed, the Vote Nullification Provision imposes a more severe burden than other election regulations that have been struck down as overly severe burdens on the right to vote. For example, in *Harper v. Virginia State Bd. of Elections*, the Supreme Court invalidated a $1.50 poll-tax, reasoning that "wealth or fee paying has, in our view, no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened or conditioned." 383 U.S. 663, 670 (1966). Similarly, here, the votes of an entire county are nullified by no fault of voters with no relation to their voting qualifications.

114.   Again, in *Illinois State Bd. of Elections v. Socialist Workers Party*, the Supreme Court struck down an impermissibly severe burden on the right to vote because the election regulation had the effect of barring a political party from the ballot. 40 U.S. 173, 183–84 (1979). Here, under the Vote Nullification Provision's mandatory nullification of an entire county's electorate, all political parties are effectively barred from the ballot in that county. Thus, the burden here is even more severe than the one struck down by the Supreme Court in *Illinois State Bd. of Elections*.

115.   When, as here, the right to vote is "subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (citation omitted); *see also Nader*, 531 F.3d at 1035.

116.   Although the State has an interest in orderly election procedures and producing timely results, literal disenfranchisement of every voter in the affected county for *all* races is not remotely narrowly tailored to serve those interests.

117.   More narrowly tailored options are obvious. The EPM could, for example, have simply required the Secretary to go to state court if there was a county failure to certify results and ask the court to ascertain what results from that county should be included in the statewide totals. Similarly, the EPM could have instead directed the Secretary to appoint an auditor to determine the correct results in that county. Or the EPM could have

directed the Secretary to include the unofficial results unless a court order directs him to do otherwise.

118. Any one of these options would adequately address the issue of non-certification of county results without the need to completely disenfranchise the votes of all residents in the county. Nor is the threat of such total disenfranchisement necessary—or even remotely appropriate—as a deterrent to misconduct.

119. Indeed, not only is such a "remedy" completely disproportionate to the problem it is attempting to "solve," it may *actively encourage* the very sort of electoral misconduct that it purports to deter. Although styled as a punishment, the Vote Nullification Provision effectively is a back-door grant of authority to disenfranchise voters. After all, unless the Vote Nullification Provision is enjoined or repealed, it ensures that if a Board of Supervisor *wants* to disenfranchise its own voters, its attempt to do so *will be effective* as long as the Board never certifies election results—something readily in its power to accomplish.

120. The Vote Nullification Provision is particularly unnecessary because the EPM already purports to criminalize a Board of Supervisor's refusal to certify election results. Specifically, the EPM provides that "[t]he Board of Supervisors has a non-discretionary duty to canvass the returns as provided by the County Recorder or other officer in charge of elections and has no authority to change vote totals, reject the election results, or delay certifying the results without express statutory authority or a court order." 2023 EPM at 248. Violation of the EPM by "a person" is a class-two misdemeanor. *See* A.R.S. § 16-452(C) ("A person who violates any rule adopted pursuant to this section is guilty of a class 2 misdemeanor.").

121. Criminalizing refusals to certify election results should be sufficient to deter misconduct and Defendants have *never* explained why the additional putative deterrence of the Vote Nullification Provision is necessary to prevent such refusals.

122. In short, the Vote Nullification Provision is far broader than necessary to achieve its purpose. And it results in numerous harmful unintended consequences.

123.   Thus, the Vote Nullification Provision fails strict scrutiny, is overly burdensome under the *Anderson-Burdick* framework, and therefore violates the Fourteenth Amendment.

124.   This Court should enjoin its use and require the Secretary to promulgate a new, more narrowly tailored provision.

### The Speech Restriction is Unconstitutional

125.   The First Amendment states that government "shall make no law ... abridging the freedom of speech."

126.   And the Fourteenth Amendment's Due Process Clause requires that a statute which criminalizes speech or conduct must "provide a person of ordinary intelligence fair notice of what is prohibited," and not be "so standardless that it authorizes or encourages seriously discriminatory enforcement," otherwise it "fails to comport with due process." *United States v. Williams*, 553 U.S. 285, 304 (2008).

127.   The Speech Restriction contained in Chapter 9, section III(D), of the 2023 EPM violates the First Amendment and the Due Process Clause.

128.   That provision purports to ban "[a]ny activity by a person with the intent *or effect* of threatening, harassing, intimidating, or coercing voters (or conspiring with others to do so) *inside or outside the 75-foot limit* at a voting location." (emphasis added).

129.   The Speech Restriction appears in Chapter 9 of the EPM, which addresses "Conduct of Elections/Election Day Operations." Although other provisions in Chapter 9 are explicitly limited to election days, there are no such temporal limitations in the Speech Restriction. The Speech Restriction thus applies on all days, and not merely election days.

130.   The Speech Restriction also has no geographic limitation. It explicitly applies to "any activity . . . inside *or outside* the 75-foot limit at a voting location." (emphasis added). The combination of all spaces inside *or outside* those perimeters is of course the entire universe of land within Arizona's borders.

131.   The Speech Restriction purports to limit or ban many activities that would otherwise be lawful under the First Amendment, claiming that it would constitute

"intimidating conduct." For example, it lists all the following as conduct that "may also be considered intimidating conduct inside or outside the polling place":

- "Aggressive behavior, *such as raising one's voice* or taunting a voter or poll worker";
- "Using threatening, *insulting, or offensive* language to a voter or poll worker";
- "Posting signs or communicating messages about penalties for 'voter fraud' in a harassing or intimidating manner."

2023 EPM at 181–82.

132. But these prohibitions reach a broad swath of activities that are protected under the First Amendment.

133. Indeed, the Speech Restriction the Secretary crafted is patently unconstitutional because it violates both the Free Speech Clause of the First Amendment (as incorporated against the States under the Fourteenth Amendment) and the Due Process Clause of the Fourteenth Amendment.

134. The violations of the First Amendment are numerous and multi-faceted here. *First*, the U.S. Supreme Court has squarely held "the First Amendment … requires proof that the defendant had some subjective understanding of the threatening nature of his statements." *Counterman v. Colorado*, 143 S. Ct. 2106, 2111 (2023). "The State [thus] must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Id.* at 2111-12

135. But the Speech Restriction eliminates the "knowingly" *mens rea* requirements of §16-1013 and §16-1017, and instead makes actions criminal purely based on their "effect"—without any proof of *mens rea* at all. Indeed, by making liability turn on whether an action has the "*effect* of threatening, harassing, intimidating, or coercing voters," even a voter *unreasonably* construing speech to be "harassing" or "intimidating" would now be criminalized. By dispensing with any requirement of *mens rea*, the Speech Restriction violates the First Amendment. *Counterman*, 143 S. Ct. at 2111.

136. *Second*, the State lacks authority to criminalize speech simply because voters might find it "offensive": "the fact that society may find speech offensive is not a sufficient

reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *FCC v. Pacifica Foundation*, 438 U.S. 726, 745-46 (1978); *see also United States v. Williams*, 553 U.S. 285, 306 (2008) ("[W]e have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent.'"). But the Speech Restriction does just that, purporting to prohibit "[u]sing … offensive language to a voter or poll worker." EPM at 182. And that prohibition is not limited to polling places or election day, but instead applies year round and both "inside or outside the 75-foot limit at a voting location." *Id.* at 181-82.

137. *Third*, by purporting to ban "insulting or offensive speech," EPM at 182, the Speech Restriction is an unlawful content-based and viewpoint-based restriction on speech. *See, e.g., Matal v. Tam*, 582 U.S. 218, 249 (2017) (holding that when a restriction "reflects the Government's disapproval of a subset of messages it finds offensive… [it] is the essence of viewpoint discrimination."). "Giving offense is a viewpoint." *Id.* at 2240. And "[b]y mandating positivity, [speech restrictions] might silence dissent and distort the marketplace of ideas." *Id.*

138. *Fourth*, even as applied to non-public forums such as voting locations, the Speech Restriction violates the First Amendment because it is not reasonable and is not "capable of reasoned application." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 23 (2018); *accord Center for Investigative Reporting v. SEPTA*, 975 F.3d 300, 315 (3d Cir. 2020) ("According to *Mansky*, a prohibition on speech is unreasonable if it fails to 'articulate some sensible basis for distinguishing what may come in from what must stay out.'" (quoting *Mansky*, 585 U.S. at 29)).

139. The Speech Restriction's use of amorphous, open-ended terms like "insulting or offensive language" and "harassing" do not provide reasonable guidance that would distinguish permissible and impermissible speech. For example, would wearing a MAGA hat, an "All Lives Matter" button, or a "I Support the Second Amendment" T-shirt constitute "offensive speech" or be considered "harassing" to a voter that sees them? The

EPM does not provide any guidance as to how to apply its indeterminate terms and thus cannot be justified if the Speech Restriction were limited purely to the non-public forums of voting locations (instead of applying everywhere else in the State, as it does by its plain terms).

140.    The Speech Restriction also violates the Due Process Clause by violating fair notice principles. As an initial matter, by imposing liability directly contrary to § 16-1013's and § 16-1017's actual texts, the Speech Restriction violates due process. States cannot provide citizens notice of a criminal prohibition's elements and requirements by statute and then—having lulled citizens into the belief that the statute only prohibits what, by its terms, it states it actually prohibits—impose liability on a *far broader* basis.

141.    In addition, the Speech Restriction is void on vagueness grounds because it "'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'" and because "'it authorizes or even encourages arbitrary and discriminatory enforcement.'" *Johnson v. United States*, 576 U.S. 591, 612, (2015) (quoting *Hill* v. *Colorado*, 530 U.S. 703, 732 (2000)).

**COUNT I – VOTE NULLIFICATION PROVISION**
**Violations of the First and Fourteenth Amendments Under the *Anderson-Burdick* Doctrine**
**Asserted Under 42 U.S.C. § 1983**
**(Declaratory and Injunctive Relief)**

142.    Plaintiffs incorporate the paragraphs above as if stated here.

143.    The Vote Nullification Provision has the effect of disenfranchising every voter in any county that does not timely certify its election results with the Secretary.

144.    The Secretary's duty to disenfranchise these voters is mandatory under the Vote Nullification Provision.

145.    The Provision is a severe burden on the right to vote—preventing votes from counting through no fault of the voter.

146.    Additionally, it is not narrowly tailored to protect the government's interests in orderly, timely, and legislative elections.

147.    A requirement that the Secretary (1) appoint an auditor, (2) initiate a court action to ascertain the correct results or (3) use the unofficial results would serve the same governmental interests without the need to disenfranchise voters *en masse* as a result of the action/inaction of third-party county board members for which individual voters are blameless.

148.    Thus, the Vote Nullification Provision imposes an unconstitutionally severe burden on the right to vote.

**COUNT II – SPEECH RESTRICTION**
**Violations of the First and Fourteenth Amendments**
**Asserted Under 42 U.S.C. § 1983**
**(Declaratory and Injunctive Relief)**

149.    Plaintiffs incorporate the paragraphs above as if stated here.

150.    The 2023 EPM criminalizes otherwise protected free speech inside or outside a 75-foot limit of a voting location through its Speech Restriction.

151.    Plaintiffs face a real threat of prosecution because the Attorney General and Governor approved this version of the 2023 EPM, meaning that there is a threat of prosecution for violations of the 2023 EPM.

152.    Despite being asked to do so, neither the Attorney General, nor the Secretary have unequivocally disavowed enforcing the Speech Restriction.

153.    Plaintiffs engage in election activities that would otherwise be lawful under the First and Fourteenth Amendment.

154.    But under the current 2023 EPM, such conduct would be considered criminal. Therefore, Plaintiffs' members face an actual threat of prosecution from the Attorney General for actions that are otherwise lawful under the United States Constitution.

155.    Organizations like AFPI have standing to assert their own respective free speech rights as well as that of their respective members.

156.    In sum, the Speech Restriction is unconstitutional because it: (1) requires no proof of *mens rea* for criminal conduct, (2) purports to ban speech based purely on alleged offensiveness, (3) is a viewpoint-based restriction on speech; (4) is overboard, containing

a limitless geographic and temporal scope, and (5) is so vague as to not provide proper notice of the conduct that it criminalizes.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court provide the following expedited relief:

A.      A declaratory judgment providing that that the 2023 EPM provisions challenged in this action violate the First and Fourteenth Amendments of the U.S. Constitution;

D.      A preliminary and permanent injunction prohibiting the Secretary and Attorney General from enforcing or implementing the challenged provisions of the 2023 EPM;

E.      An injunction against the Secretary directing him to promulgate—and the Governor and Attorney General to approve—an EPM that complies with the First and Fourteenth Amendments;

F.      An award of Plaintiffs' reasonable attorneys' fees and costs in accordance with applicable law, including 42 U.S.C. § 1988; and

G.      Any other relief as the court deems necessary, equitable, proper, and just.

RESPECTFULLY SUBMITTED this 8th day of July, 2024.


                              HOLTZMAN VOGEL BARAN
                              TORCHINSKY & JOSEFIAK PLLC

                              By: */s/ Andrew Gould*
                              _____
                                  Andrew Gould
                                  Drew C. Ensign
                                  Dallin B. Holt
                                  Brennan A.R. Bowen
                                  2575 E. Camelback Road, Suite 860
                                  Phoenix, AZ 85016

                                  *Attorneys for Plaintiffs*