Andrew Gould (No. 013234)
Drew C. Ensign (No. 025463)
Dallin B. Holt (No. 037419)
Brennan A.R. Bowen (No. 036639)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2575 East Camelback Road, Suite 860
Phoenix, Arizona 85016
(602) 388-1262
agould@holtzmanvogel.com
densign@holtzmanvogel.com
dholt@holtzmanvogel.com
bbowen@holtzmanvogel.com
minuteentries@holtzmanvogel.com

Michael Berry (*pro hac vice forthcoming*)
Richard P. Lawson (*pro hac vice forthcoming*)
Jessica H. Steinmann (*pro hac vice forthcoming*)
Patricia Nation *(pro hac vice forthcoming)*
AMERICA FIRST POLICY INSTITUTE
1001 Pennsylvania Ave., N.W., Suite 530
Washington, D.C. 2004
(813) 952-8882
rlawson@americafirstpolicy.com
jsteinmann@americafirstpolicy.com
pnation@americafirstpolicy.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| American Encore, an Arizona non-profit corporation; Karen Glennon, an Arizona individual; America First Policy Institute, a non-profit corporation,<br><br>                              Plaintiffs,<br>vs.<br><br>Adrian Fontes, in his official capacity as Arizona Secretary of State; Kris Mayes, in her official capacity as Arizona Attorney General; Katie Hobbs, in her official capacity as Governor or Arizona,<br>Defendants. | Case No.: 2:24-cv-01673-PHX-MTL<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION REGARDING EPM VOTE NULLIFICATION PROVISION**<br><br>**Oral Argument Scheduled For September 12** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ........................................................................................... 1

LEGAL STANDARD ..................................................................................... 1

BACKGROUND ............................................................................................. 2

ARGUMENT ................................................................................................... 4

   I.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE VOTE NULLIFICATION
PROVISION ...................................................................................................... 4

      A.   The Vote Nullification Provision Is Inflicting Current And Ongoing Injury
4

      B.   Plaintiffs Face A Credible Threat Of Enforcement of the Challenged
Provision .......................................................................................................... 8

   II.   THE VOTE NULLIFICATION PROVISION IS UNCONSTITUTIONAL UNDER THE
*ANDERSON-BURDICK* DOCTRINE ............................................................... 9

      A.   Overview of the *Anderson-Burdick* Doctrine ............................... 10

      B.   The Vote Nullification Provision Imposes a Severe Burden on the Right to
Vote  10

      C.   The Vote Nullification Provision Is Not Narrowly Tailored .................... 11

   III.   THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF ARE SATISFIED ... 15

      A.   Plaintiffs Are Likely To Suffer Irreparable Harm Absent An Injunction 15

      B.   The Balance of Harms and Public Interest Support Injunctive Relief .... 16

CONCLUSION .............................................................................................. 17

CERTIFICATE OF SERVICE ..................................................................... 18

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Angle v. Miller*,
 673 F.3d 1122 (9th Cir. 2012) ...................................................... 10

*Ariz. Democratic Party v. Hobbs*,
 18 F.4th 1179 (9th Cir. 2021) ...................................................... 10

*Ariz. Democratic Party v. Hobbs*,
 485 F. Supp. 3d 1073 (D. Ariz. 2020) ........................................... 7

*Ariz. Dream Act Coal. v. Brewer*,
 855 F.3d 957 (9th Cir. 2017) ....................................................... 16

*Ariz. Green Party v. Reagan*,
 838 F.3d 983 (9th Cir. 2016) ....................................................... 10

*Ariz. Pub. Integrity All. v. Fontes*,
 250 Ariz. 58 (2020) ................................................................... 13

*Arizonans for Second Chances, Rehab., & Pub. Safety v. Hobbs* ,
 249 Ariz. 396 (2020) ................................................................. 12

*Baird v. Bonta*,
 81 F.4th 1036 (9th Cir. 2023) ................................................... 2, 16

*Boos v. Barry*,
 485 U.S. 312 (1988) ................................................................... 12

*Cal. Trucking Ass'n v. Bonta*,
 996 F.3d 644 (9th Cir. 2021) ......................................................... 9

*De Jesus Ortega Melendres v. Arpaio*,
 695 F.3d 990 (9th Cir. 2012) .................................................... 15, 16

*Democratic Exec. Comm. v. Lee*,
 915 F.3d 1312 (11th Cir. 2019) ................................................. 9, 11

*Democratic Exec. Comm. v. Detzner*,
 347 F. Supp. 3d 1017 (N.D. Fla. 2018) ........................................... 7

*El-Amin v. McDonnell*,
 2013 U.S. Dist. LEXIS 40461 (E.D. Va. Mar. 22, 2013) ..................... 6

*Env't Prot. Info. Ctr. v. Carlson*,
 968 F.3d 985 (9th Cir. 2020) ......................................................... 2

*Fla. Democratic Party v. Detzner*,
   2016 U.S. Dist. LEXIS 143620 (N.D. Fla. Oct. 16, 2016) .................................. 10-11

*Frederick v. Lawson*,
   481 F. Supp. 3d 774 (S.D. Ind. 2020) ......................................................... 7

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ................................................................................... 7

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ....................................................... 10, 15, 16

*Martin v. Kemp*,
   341 F. Supp. 3d 1326 (N.D. Ga. 2018) ...................................................... 7

*Nader v. Brewer*,
   531 F.3d 1028 (9th Cir. 2008) .............................................................. 10, 12

*Ne. Ohio Coal. v. Husted*,
   696 F.3d 580 (6th Cir. 2012) ................................................................... 11

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) ................................................................... 15

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) ..................................................................................... 16

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ................................................................................ 4, 5

*Stewart v. Blackwell*,
   444 F.3d 843 (6th Cir. 2006) ................................................................... 11

*Stewart v. Blackwell*,
   473 F.3d 692 (6th Cir. 2007) ................................................................... 11

*Stewart v. City & Cnty. of S.F.*,
   2023 U.S. App. LEXIS 3811 (9th Cir. Feb. 17, 2023) .............................. 8

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ................................................................................... 9

*Taniguchi v. Schultz*,
   303 F.3d 950 (9th Cir. 2002) ................................................................. 7-8

*Touchston v. McDermott*,
   234 F.3d 1133 (11th Cir. 2000) .............................................................. 15

*Williams v. Taylor*,
   677 F.2d 510 (5th Cir. 1982) ..................................................................... 6

iv

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) ............................................................................................ 2

**Statutes**

A.R.S. § 11-251(3) ............................................................................................ 2

A.R.S. § 16-452(C) .......................................................................................... 13

A.R.S. § 16-602(J) ........................................................................................... 13

A.R.S. § 16-642 ................................................................................................. 2

A.R.S. § 16-645 ................................................................................................. 2

A.R.S. § 16-646(C) ........................................................................................... 2

A.R.S. § 16-647 ................................................................................................. 2

**Rules**

Fed. R. Civ. P. 65 ............................................................................................. 1

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs American Encore, Karen Glennon, and America First Policy Institute ("AFPI") (collectively, "Plaintiffs") respectfully move for a preliminary injunction prohibiting implementation and enforcement of the 2023 Elections Procedures Manual's ("EPM" or "2023 EPM") Vote Nullification Provision. *See* 2023 EPM Ch. 13, § II(B)(2), p. 252.

## INTRODUCTION

The Vote Nullification Provision challenged here is one of the most aggressive—and *unusual*—disenfranchisement laws in the United States. To Plaintiffs' knowledge, not even a single sister state has adopted anything close to it.

Under the Vote Nullification Provision, a tiny number of governmental actors can effect *mass* disenfranchisement. If a majority of a county board of supervisors fails or refuses to certify election results, the votes of *each and every one* of the voters in that County are simply thrown out entirely. The scale of that potential disenfranchisement is unprecedented: for example, through the non- or malfeasance of a mere 3 members of the Maricopa Board of Supervisors, all *2.4. million* active registered voters in that county could be disenfranchised: roughly an 800,000-to-1 ratio.

Unsurprisingly, such sweeping disenfranchisement of faultless voters does not comport with the Constitution. Under the Supreme Court's *Anderson-Burdick* framework, the Vote Nullification Provision is subject to strict scrutiny because it imposes a severe burden on the right to vote—indeed, the *severest possible*: total disenfranchisement. And the provision flunks strict scrutiny because it is not narrowly tailored: there are multiple other alternatives to ensuring certification of election results that do not rely on wholesale disenfranchisement of all voters in an entire county.

This Court should therefore issue a preliminary injunction against enforcement of the Vote Nullification Provision.

## LEGAL STANDARD

In general, a party seeking a preliminary injunction must demonstrate that "(1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent

the preliminary injunction, (3) the balance of equities tips in his favor, and (4) a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When, as here, "the nonmovant is the government, the last two *Winter* factors "'merge.'" *Id.* (citation omitted).

"The first factor 'is a threshold inquiry and is the most important factor.'" *Id.* (quoting *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)). And "[i]t is well-established that the first factor is especially important when a plaintiff alleges a constitutional violation and injury." *Id.* Consequently, "[i]f a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation." *Id.* Additionally, such a plaintiff's "likelihood of succeeding on the merits also tips the public interest sharply in his favor because it is 'always in the public interest to prevent the violation of a party's constitutional rights.'" *Id.* (citation omitted).

## BACKGROUND[1]

In Arizona, the officer in charge of elections for each county—usually a county recorder—is responsible for tabulating votes, and sending those unofficial county election returns to their respective county board of supervisors. *See generally* A.R.S. §§ 16-621, 16-622, 16-624. In turn, the county boards are tasked with conducting an official canvas, declaring results, and certifying those results. *See generally* A.R.S. §§ 11-251(3), 16-642, 16-645, 16-646(C), 16-647. The Secretary then uses those official certifications from county boards to certify the results for the statewide elections. *See generally* A.R.S. §§ 16-642(A)(3), 16-643; 16-645, 16-648. In recent elections, this process has been somewhat turbulent.

For example, following the 2022 general election, the Cochise County Board of Supervisors refused to certify the election results for Cochise County for a period of time, resulting in a delay of the Secretary's certification. *See* Declaration of Brennan A.R. Bowen

---

[1] The facts of this case are also detailed in Plaintiffs' Preliminary Injunction Motion regarding the Speech Striction, (ECF. No. 14), and are incorporated herein by reference.

(attached hereto as Ex. A), at ¶ 3, Attachment 1. Eventually, the Cochise County Board certified the results, as did the Secretary. *Id.* at ¶ 4, Attachment 2.

Since then, the Arizona Attorney General has indicted two of the Cochise County Supervisors for their role in delaying the certification. *Id.* at ¶ 5, Attachment 3. Those prosecutions are ongoing. *Id.* at ¶ 6, Attachment 4.

Likely responding to these events in 2022, the 2023 EPM now includes two provisions regarding canvassing elections results that are almost certainly aimed at addressing the issues that arose in 2022 with Cochise County: (1) the EPM imposes on County Boards of Supervisors "a nondiscretionary duty to canvass the returns as provided by the County Recorder or other officer in charge of elections" and removes from the County Boards any "authority to change vote totals, reject the election results, or delay certifying results without express statutory authority or court order," EPM Chp. XII, § 2(A)(2); and (2) the EPM also imposes a similar non-discretionary canvassing duty on the Secretary, but also provides that "[i]f the official canvass of any county has not been received by [the] deadline, the Secretary of State must proceed with the state canvass *without including the votes of the missing county*," EPM Chp. 13, § II(B)(2) (emphasis added); *see also* 2019 EPM, (attached hereto as Ex. E), at pp. 243 (containing no requirement to throw out the votes for an entire county if that county's Board of Supervisors fails to timely canvas and certify election results).

Only the second mandate, the Vote Nullification Provision, is challenged here. In effect, that provision mandates that all votes cast by all voters in a county will not be counted whatsoever if the Board of Supervisors for that county fails or refuses to certify the canvas election results for that county.

Accordingly, where a county Board of Supervisors refuses or fails to certify election results by the applicable deadline, the Vote Nullification Provision mandates the complete disenfranchisement of every voter in that county. It does so even where the voters in that county have complied with all requirements for exercising their constitutional right to vote (*e.g.*, voting before polls close, presenting identification for in-person voting or signing

their mail-in ballot etc.). That disenfranchisement extends to every single vote cast by the voter from Presidential Electors all the way down to whether to retain a justice of the peace.

Fearing that the Secretary will act on this provision and disenfranchise numerous voters—including Plaintiffs and their members—Plaintiffs sent the Secretary a letter on June 18, 2024, asking the Secretary to disavow enforcement of the Vote Nullification Provision. *See* Reinforcement Letter (attached hereto as Ex. B). They Secretary Responded on July 31, 2024, essentially talking right passed the Plaintiffs' concerns, and asserting that "the Secretary cannot and will not" "disavow this nondiscretionary statutory duty." See Secretary's Response Letter (attached hereto as Ex. C), at 2. The Secretary thus appears to believe that he has a statutory duty to disenfranchise voters if a county is dilatory in canvassing and certifying elections results. *See generally id.*

## ARGUMENT

## I.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE VOTE NULLIFICATION PROVISION

Plaintiffs here have Article III standing to challenge the Vote Nullification Provision both because (1) it inflicts current and ongoing injury and (2) Plaintiffs face a credible threat of enforcement—*i.e.*, complete disenfranchisement—under that provision.

### A.  The Vote Nullification Provision Is Inflicting Current And Ongoing Injury

Here Plaintiffs have standing because the Vote Nullification Provision inflicts current and ongoing injury upon voters, including Ms. Glennon and thousands of AFPI's members. It does so by changing the nature of their right to vote—including the right to have their votes counted—from an unqualified right to one subject to potential disqualification by the actions of governmental officials. By downgrading voters' right to vote, the Vote Nullification Provision inflicts current and ongoing injury that establishes Plaintiffs' standing here. *See* Complaint, at ¶¶ 19–21, 29; *see also Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

Without the Vote Nullification Provision, voters have an essentially absolute right

to vote—and have those votes counted—so long as they comply with applicable rules. For example, before the 2023 EPM, so long as in-person voters showed voter identification, followed ballot instructions, and cast a ballot by poll-close time, their right to have that vote counted was unconditional. Similarly, mail-in voters that signed their ballot affidavit, followed ballot instructions, and ensured receipt of their ballots by the close of polls, had a vested right to have their vote counted that cannot be taken away by a governmental official.

In sum, before the 2023 EPM, *no* elected official in Arizona could disenfranchise voters and refuse to count their votes. Voters that followed applicable procedures had an unconditional right to have their vote counted that could not be obstructed by any elected official.

The Vote Nullification Provision changes all of that. Now, through misfeasance or failure to assemble a quorum, *all* votes in Arizona are subject to potential nullification if the applicable county Board of Supervisors fails or refuses to certify election results. *See* EPM at 252. Indeed, the Vote Nullification Provision *ensures* those voters' votes will not be counted by creating a non-discretionary *mandate* for the Secretary to throw out all such affected votes. *Id.* ("[T]he Secretary of State must proceed with the state canvass *without including the votes of the missing county*[.]" (emphasis added)).

By downgrading voters' right to vote from (1) an unqualified right as long as applicable rules are followed to (2) a conditional right, subject to potential disqualification by the actions of elected officials, the Vote Nullification Provision inflicts cognizable injury that establishes Article III standing now. Put differently, the Plaintiffs need not wait for their vote to be disqualified to be harmed because they are harmed by the *present* downgrading of their unqualified right to vote to a conditional right to vote.

Indeed, the harm at issue here is akin to the harm inflicted by felony-disenfranchisement laws. In those cases, a would-be voter who is convicted of a felony is not permitted to vote, but may be allowed to do so based on whether a Governor decides to restore his voting rights. Such felony disenfranchisement laws similarly downgrade

citizens' right to vote from unqualified to conditional based on the actions (or inaction) of a government official (specifically, the condition being a favorable exercise of discretion by the relevant Executive).

Federal courts have held that voters suffering such injury have standing to challenge those felony disenfranchisement laws based on that harm: degrading the right to vote by making it subject to the actions of governmental officials. For example, in *Williams v. Taylor*, the Fifth Circuit considered a challenge to Mississippi's felony disenfranchisement statute, which disqualified convicted felons from voting unless the governor granted relief through a pardon. 677 F.2d 510 (5th Cir. 1982). There, the Fifth Circuit held that the plaintiff lacked standing to challenge the pardon procedure, because he had not "tried to procure a pardon from the governor." *Id.* at 517-18. But, as to the felony disenfranchisement law that relegated the plaintiffs' previously unqualified right to vote into one conditional on actions by governmental officials, the Fifth Circuit reached those claims on the merits—considering Article III standing to be so obvious that it need not be analyzed (as it was for the pardon procedure challenge). *Id.* at 514-17.

Similarly, the Eastern District of Virginia recognized an equivalent basis for standing in *El-Amin v. McDonnell*, No. 3:12-cv-00538-JAG, 2013 U.S. Dist. LEXIS 40461 (E.D. Va. Mar. 22, 2013). As in *Williams v. Texas*, the devaluation of El-Amin's right to vote to one conditional on how governmental officials exercised their authority accorded standing to challenge the felony disenfranchisement statute effecting that downgrade. *See id.* at *15 ("While El-Amin is correct that Virginia has deprived him of his voting rights, this injury permits him only to challenge the deprivation itself, which he does in Count I.").

Here, Plaintiffs have standing on the same essential basis: the downgrading of their right to vote from unconditional to conditional, based on how governmental officials act. Ms. Glennon's right to vote is directly affected in this manner, thereby establishing Article III standing. (*See* ECF No. 13-4, at ¶¶1–4) (providing that Ms. Glennan resides in Arizona and is registered to vote and intends to vote in Arizona). And AFPI has over 2,600 active members—the majority of whom are registered voters—who are widely distributed

throughout the State and reside in all 15 of Arizona's counties. *See* Catharine Cypher Declaration (attached hereto as Ex. D), at ¶¶ 8–9. It therefore has representational standing based on the injury to its affected members. *See*, *e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977).

Plaintiffs also have standing based on precedent involving signature-mismatch cases. These cases involve election officials who have employed procedures that create a risk of wrongfully disqualifying votes based on putative (but erroneous) signature mismatches. Federal courts have broadly held that plaintiffs have Article III standing to challenge such potential wrongful vote disqualifications where state election officials fail to provide adequate cure opportunities. *See*, *e.g.*, *Democratic Exec. Comm. v. Detzner*, 347 F. Supp. 3d 1017, 1024-25 (N.D. Fla. 2018) *aff'd* 915 F.3d 1312 (11th Cir. 2019); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333-35 (N.D. Ga. 2018); *Frederick v. Lawson*, 481 F. Supp. 3d 774, 786-90 (S.D. Ind. 2020); *see also Ariz. Democratic Party v. Hobbs*, 485 F. Supp. 3d 1073, 1085-87 (D. Ariz. 2020) *rev'd on other grounds* 18 F.4th 1179, 1193 (9th Cir. 2021) (same for failure to provide opportunity to cure missing signatures post-election).

Here, Plaintiffs similarly challenge a provision that potentially subjects their votes to potential disqualification based on the wrongful actions of governmental officials—*i.e.*, refusing or failing to certify election results.

Finally, Plaintiffs here have Article III standing under the principles underlying First Amendment permit cases, where the right to free speech is downgraded by making it subject to actions of governmental officials as to whether they approve a permit. The Ninth Circuit has recognized that the institution of such permit requirements—which relegate the right to free speech to one dependent on how governmental officials act—creates cognizable injury that supplies standing to challenge those permit requirements. *See*, *e.g.*, *Taniguchi v. Schultz*, 303 F.3d 950, 957 (9th Cir. 2002) (Ninth Circuit precedents recognize that plaintiffs "have standing to challenge a permit requirement, even though they did not apply for permits, because applying for a permit would have been futile" (cleaned up));

7

*Stewart v. San Francisco*, No. 22-16018, 2023 U.S. App. LEXIS 3811, at *2 n.3 (9th Cir. Feb. 17, 2023) (recognizing Article III standing to challenge statute that "establish[d] a permit requirement in advance of public speech and ban[ned] an instrumentality of speech absent a permit.'" (citation omitted)).

### B. Plaintiffs Face A Credible Threat Of Enforcement of the Challenged Provision

Plaintiffs also have Article III standing because they face a credible threat of enforcement of the Vote Nullification Provision against them and their members. That provision imposes a non-discretionary *mandate* that the Secretary shall not count any vote of a county without certified results. *See* EPM at 252 ("If the official canvass of any county has not been received by this deadline, the *Secretary of State must proceed* with the state canvass without including the votes of the missing county." (emphasis added)). So, if a county fails or refuses to certify its election results, it is all-but certain that the Vote Nullification Provision *will* be enforced to disenfranchise voters.

The threat of enforcement is further demonstrated by the Secretary's refusal to disavow enforcement of the Vote Nullification Provision. Plaintiffs' counsel sent the Secretary a letter on July 18, requesting that he disavow enforcement of the provision by COB on July 26. Ex. B. Secretary Fontes responded after that deadline and refused to disavow enforcement, stating that "the Secretary cannot and will not" "disavow this nondiscretionary statutory duty" to canvas election results. Ex. C, at 2. Read in context with Plaintiffs' specific request that the Secretary disavow enforcement of the Vote Nullification Provision, the Secretary's response cannot be understood as anything other than a refusal to disavow such enforcement. *Compare* Ex. B, *with* Ex. C. Despite the Secretary' circumlocution, the Secretary's intent to enforce that challenged provision is clear.

A credible threat of enforcement thus exists here as "the state's refusal to disavow enforcement of [the challenged law] against [plaintiffs] during this litigation is strong evidence that the state intends to enforce the law and that [plaintiffs'] members face a

credible threat." *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) (finding credible threat of future enforcement where "respondents have not disavowed enforcement if petitioners make similar statements in the future").

The risk of potential disenfranchisement under the Vote Nullification Provision is further demonstrated by the dispute in Cochise County in 2022, in which the county board of supervisors *did* refuse to certify the results, provoking an electoral crisis. *See supra* at 2–3. Indeed, that standoff ironically is almost certainly the motivation behind the Secretary's creation of the Vote Nullification Provision. That the Secretary did so indicates his own view that the risk of recurrence of a non-certification incident is material. So too does the Attorney General's criminal prosecution of the Cochise County supervisors that refused to certify results, *see supra* at 3, demonstrating her evident view that future deterrence is necessary to address the risk of recurrence.

Notably, even the *risk* of potential disenfranchisement is enough to support Article III standing to bring an *Anderson-Burdick* challenge. *See*, *e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (recognizing cognizable injury under *Anderson-Burdick* doctrine because a statute "subjects vote-by-mail and provisional *electors to the risk of disenfranchisement*" (emphasis added)). That risk is manifest here—particularly given the actions of Cochise County in 2022, the Secretary's refusal to disavow enforcement of the Vote Nullification Provision in 2024, and the Attorney General's criminal prosecution of Cochise supervisors to attempt to deter future certification refusals.

## II.   THE VOTE NULLIFICATION PROVISION IS UNCONSTITUTIONAL UNDER THE *ANDERSON-BURDICK* DOCTRINE

The Vote Nullification Provision is an unconstitutionally severe burden on the right to vote under the Supreme Court's *Anderson-Burdick* doctrine. Because it inflicts outright disenfranchisement on voters—who are *faultless*—by the actions of third parties, it inflicts a severe burden that triggers strict scrutiny. And the Vote Nullification Provision fails under strict scrutiny because it is not narrowly tailored—particularly as *multiple*, *obvious*

*alternatives* to outright disenfranchisement are available to address issues of non-certification of election results.

### A. Overview of the *Anderson-Burdick* Doctrine

Challenges to electoral statutes and regulations that allege an unconstitutional burden are governed by the *Anderson-Burdick* framework. That doctrine creates "a sliding scale test, where the more severe the burden, the more compelling the state's interest must be, such that 'a state may justify election regulations imposing a lesser burden by demonstrating the state has important regulatory interests.'" *Ariz. Green Party v. Reagan*, 838 F.3d 983, 988 (9th Cir. 2016) (citation omitted).

Under the *Anderson-Burdick* framework, "an election regulation that imposes a severe burden is subject to strict scrutiny." *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008). In contrast, "'[l]esser burdens trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" *Angle v. Miller*, 673 F.3d 1122, 1132 (9th Cir. 2012) (quoting *Prete*, 438 F.3d at 961) (cleaned up).

### B. The Vote Nullification Provision Imposes a Severe Burden on the Right to Vote

The Vote Nullification Provision imposes a severe burden on the right to vote—indeed the *severest possible burden*: total disenfranchisement. And it does so not based on any fault of the disenfranchised voters, but instead due to the actions of third-party officials over whom the voters have no control. *Cf. Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1188 (9th Cir. 2021) (holding that burden was minimal where it was the product of voters' "own negligence only").

In the context of voting rights, "the basic truth [is] that even one disenfranchised voter—let alone several thousand—is too many[.]" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014). For that reason, "disenfranchising thousands of eligible voters … amount[s] to a severe burden on the right to vote." *Florida Democratic Party v. Detzner*, No. 16-cv-607, 2016 U.S. Dist. LEXIS 143620, at *18 (N.D.

Fla. Oct. 16, 2016); *see also Stewart v. Blackwell*, 444 F.3d 843, 869 (6th Cir. 2006) *vacated as moot* 473 F.3d 692 (6th Cir. 2007) (holding that burden was "severe" where unreliable systems resulted in thousands of votes not being counted). Here, however, the number of voters that could be disenfranchised is in the *millions*. Indeed, under the Vote Nullification Provision, *any three members* of the Maricopa Board of Supervisors collectively possess the ability to disenfranchise *all 2.4 million* registered active voters in the county. *See Northeast Ohio Coal. v. Husted*, 696 F.3d 580, 593 (6th Cir. 2012) (affirming holding that policy that disqualified approximately 0.248% of ballots imposed a "substantial burden on provisional voters"); *Lee*, 915 F.3d at 1319-22 (holding that signature verification policy that affected "only about 4,000 ballots … [*i.e.*,] less than 5 hundredths of a percent of the more than 9 million total ballots cast" imposed "at least a serious burden on the right to vote").

The burden here is particularly severe because the potential vote disqualification is not the product of *any* fault of the voter and instead the product of actions by third parties. "It is one thing to fault a voter if she fails to follow instructions…. But it is quite another to blame a voter when she may have done nothing wrong[.]" *Lee*, 915 F.3d at 1324–25; *accord id.* at 1321 (holding that failure to provide an opportunity to cure a signature mismatch imposed "at least a serious burden on the right to vote"). But the Vote Nullification Provision is just that "quite another" thing that the *Lee* Court cautioned against: throwing out votes even where the voters themselves "have done nothing wrong." *Id.* at 1325. By doing so, it imposes a severe burden on the right to vote.

## C. The Vote Nullification Provision Is Not Narrowly Tailored

Even assuming that the Vote Nullification Provision was supported by a compelling state interest (an issue on which Defendants have the burden of proof), it fails strict scrutiny because it is not narrowly tailored. Indeed, there are *multiple, obvious* alternatives to mass disenfranchisement for the State to achieve its objectives. To the extent that complete disenfranchisement *en masse* is *ever* permitted, it could only be as a last resort rather than the first. But the Vote Nullification Provision rejects multiple alternatives and reaches first

for the cudgel of disenfranchisement to "motivate" recalcitrant supervisors. In doing so, the Vote Nullification Provision is not narrowly tailored and thus unconstitutional. *See*, *e.g.*, *Boos v. Barry*, 485 U.S. 312, 329 (1988) (holding that a regulation was "not narrowly tailored [because] a less restrictive alternative [wa]s readily available"); *Nader v. Brewer*, 531 F.3d 1028, 1035-38 (9th Cir. 2008) (holding that residency requirement for petition circulators was not narrowly tailored because more tailored alternative of "requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement" was available).

At least *five* alternatives are readily available that could be employed to deter county malfeasance while enfranchising voters, rather than resorting to disenfranchising faultless voters.

*First*, the Secretary could certify the unofficial vote count provided by the county recorders. *See supra* at 2 (explaining how county recorders are responsible for tabulating votes and sending those unofficial county election returns to their respective county board of supervisors). Put simply, the Secretary could cut out the middle-man (the county board) and certify the returns from the county recorder. This would not require disenfranchising a single voter in the offending county.

*Second*, the Secretary could seek to mandamus a county Board of Supervisors that failed to perform its non-discretionary duty to canvas. In Arizona, county Boards of Supervisors have a non-discretionary duty to canvass the primary and general elections within a specific timeframe after those elections. A.R.S. § 16-642(A)(1)(a)–(b). The EPM further provides expressly that "[t]he Board of Supervisors has a non-discretionary duty to canvass the returns." EPM at 248.

Mandamus actions and special actions (which are essentially the codified procedure for seeking mandamus) exist to compel government officials to perform their non-discretionary duties. *See Arizonans for Second Chances, Rehab., & Pub. Safety v. Hobbs*, 249 Ariz. 396, 404 ¶ 16 (2020) (explaining that "[a]n action is in the nature of mandamus if it seeks to compel a public official to perform a non-discretionary duty imposed by law,"

and that Special Action "Rule 3(a) 'sets forth the traditional functions of the writ of mandamus'" (citations omitted)). And such actions are not only available for election related duties, but are commonplace for them. *See, e.g.*, *id.* (considering a mandamus action in the election context); *Arizona Pub. Integrity All. v. Fontes*, 250 Ariz. 58, 62 ¶¶ 11–12, 64–65 ¶ 27 (2020) (granting mandamus relief against then-Recorder Fontes for violation of the EPM and Arizona statutes). Therefore, the Secretary already has a narrowly tailored way to compel a county board to perform its duty—mandamus the offending board.

*Third*, the Secretary could seek for a court to resolve any dispute over vote counts. He could thus file an action against the Board of Supervisors at issue and seek a declaratory judgment from the court as to the correct election results. This too would have been more narrowly tailored than the Vote Nullification Provision's disenfranchisement of the voters of an entire county.

*Fourth*, and relatedly, a court could provide for the appointment of an auditor or special master to certify the vote totals for a county that fails to do so. Such a mechanism is used in similar election contexts. For example, when a hand-count audit results in an expanded audit that encompasses all precincts in a given county, Arizona law requires that a superior court appoint a "special master to review the computer software" for the tabulations machines in that county. *See* A.R.S. § 16-602(J). The appointment of a special master would be yet another more narrowly tailored way to remedy the actions of a rogue county.

*Fifth*, the Secretary could refer an offending Board of Supervisors to the Attorney General for prosecution, or the Attorney General could initiate prosecution herself. Violations of the EPM are a class 2 misdemeanor. A.R.S. § 16-452(C). And Boards of Supervisors are required by the EPM, at pp. 247–49—and statute, A.R.S. § 16-642(A)(1)— to canvass election results within a certain time after an election. *See also* A.R.S. § 16-1010 ("A person charged with performance of any duty under any law relating to elections who knowingly refuses to perform such duty, or who, in his official capacity, knowingly acts in violation of any provision of such law, is guilty of a class 6 felony unless a different

13

punishment for such act or omission is prescribed by law.").

Moreover, the Secretary may make criminal referrals for any board (or board member) that fails to fulfill this duty, and the Attorney General has authority to prosecute the same. *See* A.R.S. § 16-1021. Indeed, the Attorney General is currently prosecuting members of the Cochise County Board of Supervisors for their failure (or delay) in canvassing elections results. *See supra* at 2–3. Once again, criminal prosecution of bad-faith actors would be more narrowly tailored than the Vote Nullification Provision because it would not involve disenfranchising a single voter.

The Vote Nullification Provision's remedy is thus wildly disproportionate to the problem it attempts to solve and gratuitous in its resort to disenfranchisement to "cure" the problem. That disproportionality and gratuitousness is particularly apparent when it is compared to the non-disenfranchising alternatives available to the Secretary, which are both numerous and obvious.

Additionally, the lack of narrow tailoring is evident from the perverse incentives that the Vote Nullification Provision creates. Take, for example, a self-interested county Board of Supervisors where all supervisors just lost their respective reelection bids. Such a board members could refuse to canvass the election that they just lost, thereby compelling the Secretary to canvass the official election results without that county. The result? Those board seats would remain technically vacant because no winner was declared, and the malfeasant board would appoint someone to fill the vacant seats. And who better to fill those vacant seats than the current board members? In short, the Vote Nullification provision allows a Board of Supervisors to operate in perpetuity, regardless of elections results.

Likewise, a Board of Supervisors could thwart not just a county-level election, but a national one. Assume that the 2024 Presidential Election came down to winning Arizona. Assume further that Vice President Harris won Arizona and, thereby, the Presidency. In such a scenario, the Maricopa County Board of Supervisors could refuse to canvass the election result for Maricopa—where a large portion of Arizona's Democrat voters live and

vote. With Maricopa voters' voters nullified, Arizona could flip from blue to red, and former President Trump wins the state and, consequently, the Presidency. All this requires is a quorum of politically enterprising supervisors, and the current mandatory operation of the Vote Nullification Provision.

Or take a more morbid scenario, involving harm to election officials by extreme factions to achieve their political ends. The recent assassination attempt on former President Trump illustrates the dangers here. Notably, the complete disenfranchisement of *all* 2.4 million registered active voters in Maricopa County can be accomplished through elimination by kidnapping (or more fatal means) of just three members of the Maricopa Board of Supervisors.

By ensuring that unlawful actions against supervisors *will* be effective in disenfranchising voters as long as they successfully eliminate a quorum necessary to certify election results, the Vote Nullification Provision is not narrowly tailored to serve its putative ends. Instead, it actively thwarts those ends.

## III.   THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF ARE SATISFIED

### A. Plaintiffs Are Likely To Suffer Irreparable Harm Absent An Injunction

As set forth above, the Vote Nullification Provision is inflicting current and ongoing injury by unconstitutionally degrading the right to vote of Plaintiffs and their members. *Supra* §I.C. That alone establishes irreparable harm. *See, e.g.*, *Touchston v. McDermott*, 234 F.3d 1133, 1158–59 (11th Cir. 2000) ("[B]y finding an abridgement to the voters' constitutional right to vote, irreparable harm is presumed and no further showing of injury need be made."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote therefore constitutes irreparable injury.").

More generally, it is "well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted).   Indeed, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). An injunction here would thus prevent

irreparable harm to Plaintiffs' constitutional rights.

### B.  The Balance of Harms and Public Interest Support Injunctive Relief

Because the defendants are governmental officials, the final two *Winter* factors merge here. *Baird*, 81 F.4th at 1040. And both support this request. *See id.* at 1042 ("A plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor.").

As a general matter, "[t]he public interest and the balance of equities favor prevent[ing] the violation of a party's constitutional rights.'" *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) (quoting *Melendres*, 695 F.3d at 1002). This is particularly so where voting rights are at issue because "[t]he public has a 'strong interest in exercising the fundamental right to vote.'" *League of Women Voters of N.C.*, 769 F.3d at 248 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). The potential mass disenfranchisement that the Vote Nullification Provision threatens to effectuate is thus not in the public interest, but an injunction against that outcome is.

**CONCLUSION**

The Court should grant a preliminary injunction prohibiting Defendants from implementing or enforcing the Vote Nullification Provision and directing them to promulgate an updated EPM that eliminates the constitutional infirmities.

Dated this 2nd day of August 2024.

HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC

By: */s/ Andrew Gould*
　　　　Andrew Gould
　　　　Drew C. Ensign
　　　　Dallin B. Holt
　　　　Brennan A.R. Bowen
　　　　2575 E. Camelback Road, Suite 860
　　　　Phoenix, AZ 85016
　　　　*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of August 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system. Counsel for parties that are registered CM/ECF users will be served by the CM/ECF system pursuant to the notice of electronic filing.

*/s/* Andrew Gould
*Attorney for Plaintiffs*