**KRISTIN K. MAYES**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Nathan T. Arrowsmith (No. 031165)
Joshua M. Whitaker (No. 032724)
Luci D. Davis (No. 035347)
Shannon Hawley Mataele (No. 029066)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Nathan.Arrowsmith@azag.gov
Joshua.Whitaker@azag.gov
Luci.Davis@azag.gov
Shannon.Mataele@azag.gov
ACL@azag.gov

*Attorneys for Arizona Attorney General Kristin K. Mayes*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| American Encore, an Arizona non-profit corporation; Karen Glennon, an Arizona individual; America First Policy Institute, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>Adrian Fontes, in his official capacity as Arizona Secretary of State; Kris Mayes, in her official capacity as Arizona Attorney General; Katie Hobbs, in her official capacity as Governor of Arizona,<br><br>Defendants. | No. CV-24-01673-PHX-MTL<br><br>**ATTORNEY GENERAL'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AS TO COUNT TWO** |

| | |
|---|---|
| 1 | **INTRODUCTION** |
| 2 | In Count Two, Plaintiffs challenge the constitutionality of Chapter 9, section III(D) |
| 3 | of the 2023 Election Procedures Manual ("EPM"), titled "Preventing Voter Intimidation." |
| 4 | Plaintiffs' motion for a preliminary injunction as to Count Two (Doc. 14) ("PI Motion") |
| 5 | should be denied for the reasons explained in this response. |
| 6 | At the outset, the Court should answer three threshold questions before considering |
| 7 | the PI Motion. |
| 8 | Question 1: Should the Court dismiss Count Two for lack of standing? The |
| 9 | answer is yes, as explained in the first part of the Attorney General's motion to dismiss, |
| 10 | filed today (Doc. 31). |
| 11 | Question 2: If the Court does not dismiss for lack of standing, should the Court |
| 12 | abstain from considering the merits of Count Two pending resolution of the parallel state |
| 13 | court proceedings? The answer is yes, as explained in the Attorney General's motion to |
| 14 | abstain, filed earlier this week (Doc. 27). |
| 15 | Question 3: If the Court does not abstain from considering the merits of Count |
| 16 | Two, should the Court dismiss Count Two for failure to state a claim? The answer is yes, |
| 17 | as explained in the second part of the Attorney General's motion to dismiss, filed today. |
| 18 | Only if the Court answers all three questions in the negative should the Court |
| 19 | consider the PI Motion. And in that event the Court should deny the motion. As |
| 20 | explained below, Plaintiffs have not made a clear showing of standing for purposes of a |
| 21 | preliminary injunction. Nor have they established the four traditional elements required |
| 22 | for a preliminary injunction: likelihood of success on the merits, likelihood of irreparable |
| 23 | harm, that the balance of equities favors an injunction, or that the public interest favors |
| 24 | an injunction. Laches also bars Plaintiffs' request.[1] |

---

[1] Plaintiffs have also moved for a preliminary injunction as to Count One. Doc. 26. The Secretary of State is responding to that motion because Plaintiffs appear to be asserting Count One against the Secretary rather than the Attorney General. Although the Attorney General is not separately responding, the Attorney General agrees with the Secretary that a preliminary injunction as to Count One is unwarranted.

**LEGAL STANDARD**

**I.     Plaintiffs must make a clear showing of standing.**

To establish standing for a preliminary injunction, Plaintiffs cannot merely rely on allegations. This is because standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

In the Ninth Circuit, "at the preliminary injunction stage, a plaintiff must make a '*clear showing*' of his injury in fact" to establish standing. *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)) (emphasis added).

**II.    Plaintiffs must also establish the four traditional elements for a preliminary injunction.**

Even if Plaintiffs make a clear showing of standing, a "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Rather, a "plaintiff seeking a preliminary injunction must establish

[1] that he is likely to succeed on the merits,

[2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

[3] that the balance of equities tips in his favor, and

[4] that an injunction is in the public interest."

*Id.* at 20.

**ARGUMENT**

**I.     Plaintiffs have not made a clear showing of standing.**

"In order to invoke the jurisdiction of the federal courts, a plaintiff must establish 'the irreducible constitutional minimum of standing,' consisting of three elements: [1] injury in fact, [2] causation, and [3] a likelihood that a favorable decision will redress the plaintiff's alleged injury." *Lopez*, 630 F.3d at 785 (quoting *Lujan*, 504 U.S. at 560-61). "The injury in fact must constitute 'an invasion of a legally protected interest which

is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan,* 504 U.S. at 560) (cleaned up).

Plaintiffs say they have standing to challenge Chapter 9 section III(D) under two theories. The first theory is that the organizational plaintiffs—America First Policy Institute ("AFPI") and American Encore ("Encore")—have direct standing to challenge this EPM subsection because of their "status as regulated parties" and "resulting compliance costs," which they describe as "increased expenses and training costs necessary to comply" with the EPM. Doc. 14 at 12, 14-15. The second theory is that all three plaintiffs, as well as members of one of them, face a "credible threat of enforcement" of the EPM subsection, which "will violate their constitutional rights." *Id.* at 12-14.

Both theories fail. Plaintiffs have not made a "clear showing" of standing as required for a preliminary injunction, *Lopez*, 630 F.3d at 785, under either theory.

### A. The organizational Plaintiffs are not "regulated" by section III(D), nor do they face "compliance costs."

A person or organization whose conduct is directly regulated by a government rule usually has standing to challenge the rule. This is because the rule would "require or forbid some action by the plaintiff," such as requiring the plaintiff to spend money to comply. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024).

But when a person or organization challenges a government rule that regulates "someone else," as Plaintiffs do, standing is "substantially more difficult to establish." *Id.* at 382-83 (citation omitted). Here, Plaintiffs are challenging portions of section III(D) that are guidance for election officials regarding voter intimidation laws, as explained in the Attorney General's motion to dismiss. *See* Doc. 31 at 3-4, 5-7. This guidance does not regulate Plaintiffs nor does it require them to take any action or spend any money.

Tellingly, Plaintiffs are *not* challenging Arizona's voter intimidation laws themselves—which *do* regulate Plaintiffs. *See, e.g.*, A.R.S. §§ 16-1013, -1017. Indeed, Plaintiffs expressly asked the Attorney General to prosecute voter intimidation under the

voter intimidation laws as opposed to the EPM. Doc. 1-2 at 2. And the Attorney General agreed. Doc. 1-4 at 3.

Accordingly, to the extent that AFPI and Encore choose to increase expenses or modify trainings, those costs are voluntarily self-inflicted, not *caused* by section III(D) for purposes of establishing standing. This point is explained in the Attorney General's motion to dismiss. *See* Doc. 31 at 13-15.

AFPI and Encore attach declarations to the PI Motion, but these declarations provide no specifics and merely confirm that any spending decisions are voluntary. For example, AFPI claims that it "must design and conduct new trainings" in light of section III(D), such as "training prospective poll-watchers on how to comply with the speech restrictions" in that subsection. Doc. 14-2 at 3-4 ¶¶ 7-13. But nothing in the EPM requires AFPI to conduct any trainings, and because section III(D) is guidance for election officials and does not actually "restrict" speech of AFPI or its poll watchers, AFPI's decision to allegedly modify its training is voluntary. Likewise, Encore claims that it has incurred "legal and other costs to ensure compliance" with section III(D), including "train[ing] volunteers and others who will assist with contacting voters in Arizona to ensure compliance with the Speech Restrictions." Doc. 14-4 at 3-4 ¶¶ 7-12. But again, nothing in the EPM requires Encore to do anything, and section III(D) does not actually "restrict" speech of Encore or its volunteers, so Encore's decisions to seek legal advice and do training are voluntary. Importantly, aside from these declarations, AFPI and Encore present no other evidence to prove that their so-called "increased compliance costs" are more than *de minimis* or that they have, in fact, spent any money that they would not otherwise spend in the ordinary course of their operations.

At bottom, AFPI and Encore have fears about how section III(D) might be (mis)applied, so they are allegedly spending money based on those fears (although they provide the Court with no way to quantify their harm). But it is black-letter law that a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on

4

their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

At a minimum, the declarations submitted by AFPI and Encore do not constitute a "clear showing," *Lopez*, 630 F.3d at 785, that any spending is more than *de minimis* or is fairly traceable to section III(D) as opposed to their own voluntary choice.

### B. Plaintiffs face no credible threat that section III(D) will be enforced to violate their constitutional rights.

While it is sometimes possible for a person or organization to challenge a government rule before it has been enforced, federal courts place limits on such challenges. In particular, "[t]hree factors must exist for a plaintiff to have standing to bring a pre-enforcement challenge to a law." *Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022). The plaintiff must (1) intend "to engage in a course of conduct arguably affected with a constitutional interest," (2) the intended conduct must be "proscribed by" the law, and (3) "there must be 'a credible threat of prosecution'" under the law. *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

Here, Plaintiffs fail all three elements, and each failure is an independent reason to reject their standing theory. Plaintiffs have not specified the conduct in which they intend to engage. To the extent Plaintiffs identify hypothetical future conduct, such conduct is not proscribed by the guidance in section III(D). And Plaintiffs identify no actual threat of enforcement of the EPM subsection against them. These points are explained in the Attorney General's motion to dismiss. *See* Doc. 31 at 9-13.

All three Plaintiffs attach declarations to the PI Motion, but these declarations merely confirm that the threat-of-enforcement theory lacks evidentiary support. **First**, Plaintiffs were required to specify the conduct in which they intend to engage, "by giving details about their future speech such as 'when, to whom, where, or under what circumstances.'" *Lopez*, 630 F.3d at 787 (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)). None of Plaintiffs' declarations does that. At most, the declarations express general concern about possible scenarios.

5

*See, e.g.*, Doc. 14-2 at 4 ¶ 14 (expressing "concern" about various hypotheticals such as wearing an "All Lives Matter" hat); Doc. 14-3 at 3 ¶ 8 (expressing "fear" of prosecution and stating vaguely that "[t]here are things I have not, and will not, say, that I otherwise would be comfortable saying"); Doc. 14-4 at 3 ¶ 6 (expressing a general plan to "engage in voter contact in Arizona for the upcoming 2024 election cycle and beyond").

**Second**, Plaintiffs were required to identify conduct that is proscribed by section III(D). But when a plaintiff asserts that a law proscribes his or her conduct, this assertion "lack[s] credibility" when the law "by its terms is not applicable to the plaintiff[]" or when "the enforcing authority has disavowed the applicability of the challenged law to the plaintiff[]." *Lopez*, 630 F.3d at 788. Here, the EPM subsection at issue is guidance for election officials and does not regulate Plaintiffs, *and* the enforcing authority (the Attorney General) has disavowed enforcement of the EPM subsection as to Plaintiffs—as explained in the Attorney General's motion to dismiss. *See* Doc. 31 at 10-13. None of Plaintiffs' declarations shows otherwise.

**Third**, Plaintiffs were required to establish a "credible threat" that section III(D) would be enforced against them, which generally means evidence of either a "'history of past prosecution or enforcement'" or a "'specific warning or threat to initiate proceedings'" by the enforcing official. *Lopez*, 630 F.3d at 786-87 (quoting *Thomas*, 220 F.3d at 1139). Critically, "[m]ere 'allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *Id.* at 787 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). In other words, "self-censorship alone is insufficient to show injury." *Id.* at 792.

None of Plaintiffs' declarations establishes the requisite credible threat. No declaration identifies *any* history of enforcement of the EPM subsection at issue—even though the subsection has been in place since 2019. Nor does any declaration identify a specific warning or threat by an enforcing official. Indeed, Plaintiffs do not identify a prosecution of anyone—either an election official or a member of the public—for

violating any EPM provision, even though A.R.S. § 16-452(C) has been on the books in some form for 51 years. *See* 1973 Ariz. Sess. Laws 1861.

At most, one of the declarations attempts to *infer* a threat of enforcement, but the attempt is unpersuasive. Specifically, AFPI points out that the Secretary of State declined to amend section III(D) after criticism from the House Speaker and Senate President, and speculates that the Secretary therefore "intends to make criminal referrals for alleged violations" of that EPM subsection. Doc. 14-2 at 6-7 ¶¶ 22-26. These assertions are baseless.

The criticism from the House Speaker and Senate President expressly assumed that section III(D) "augment[s] criminal statutes" against members of the public. Doc. 14-2 at 16. But it does no such thing. And as for the possibility of criminal referrals, Plaintiffs cite no actual evidence that the Secretary intends to make criminal referrals for violations of section III(D). Indeed, evidence shows the opposite: the Secretary's letter in response to a disavowal request from Plaintiffs' counsel *deferred* to the Attorney General's interpretation, which is appropriate because the Attorney General is the enforcing authority, not the Secretary. Doc. 1, ¶ 3; Doc. 1-3 at 2; Doc. 1-4 at 3; *accord Lopez*, 630 F.3d at 788 (explaining "we have held that plaintiffs did not demonstrate the necessary injury in fact where the *enforcing authority* expressly interpreted the challenged law as not applying to the plaintiffs' activities") (emphasis added).

To the extent Plaintiffs wanted more clarity from the Secretary, they could have sent a follow-up request during the 38-day period between when the Secretary sent his letter (May 31) and when they decided to file this lawsuit (July 8). They did not. In any event, criminal referrals by the Secretary would not be a threat of enforcement, because the Attorney General would exercise her own judgment as to whether to initiate a prosecution—and the Attorney General has made *her* view of the law clear. *Accord Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998) (explaining that

"a state officer, in order to be an appropriate defendant, must, at a minimum, have some connection with enforcement of the provision at issue").[2]

At a minimum, the declarations submitted by Plaintiffs do not constitute a "clear showing," *Lopez*, 630 F.3d at 785, that they face a credible threat that section III(D) will be enforced to violate their constitutional rights.

### C. AFPI lacks standing to raise claims on behalf of unnamed members.

AFPI also asserts "associational standing on behalf of its members" based on "the risk that one or more of its members will be subject to enforcement." Doc. 14 at 14. This argument fails. Even setting aside the absence of a credible threat of enforcement, AFPI cannot sue on behalf of members it does not name. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497-99 (2009).

## II. Plaintiffs have not established the four traditional elements of a preliminary injunction.

Even if Plaintiffs could make a clear showing of standing, they have not established likelihood of success on the merits, likelihood of irreparable harm, a balance of equities favoring an injunction, or public interest favoring an injunction. Each element is necessary. *Winter*, 555 U.S. at 24. Plaintiffs have established none.

### A. Plaintiffs have not established likelihood of success on the merits of their constitutional challenges to section III(D).

Plaintiffs are challenging the constitutionality of section III(D) on its face, not as it has been applied in a specific situation. A facial challenge can succeed only if Plaintiffs show that section III(D) is "unconstitutional in all of its applications," or at minimum, that it has *no* "plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican*

---

[2] Although not mentioned in any declaration, Plaintiffs also argue that "county attorneys" might enforce section III(D) against them. Doc. 14 at 14. Plaintiffs cite no evidence of any county attorney making this threat. If Plaintiffs were truly concerned, they could have named county attorneys as defendants in this case. They did not.

8

*Party*, 552 U.S. 442, 449 (2008) (citation omitted).³ "Facial challenges are disfavored for several reasons," including that they "often rest on speculation" and "run contrary to the fundamental principle of judicial restraint." *Id.* at 449-51.

Plaintiffs are not likely to succeed on the merits of their facial challenges because their claims rely on misinterpretations of both A.R.S. § 16-452(C) and section III(D), as explained in the Attorney General's motion to dismiss. *See* Doc. 31 at 5-8. Indeed, there are plenty of ways in which section III(D) can be constitutionally applied. For example, if a self-appointed poll observer tries to physically block a voter from voting, or points at a voter and shouts "Vote for Harris or I will bury you!", or screams in a voter's face "Vote for Trump you f---ing b--ch!", an election official may ask the poll observer to cut it out. And if the behavior persists, the official may ask law enforcement to help handle the situation. None of these are unconstitutional applications of section III(D).⁴

Plaintiffs' claims are especially unlikely to succeed because it "has long been a tenet of First Amendment law that in determining a facial challenge," a law "will be upheld" if it is "'readily susceptible' to a narrowing construction that would make it constitutional." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) (citations omitted). Similarly, courts normally "avoid absurd results" when interpreting statutes, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 670 (9th Cir. 2021), especially when "alternative interpretations consistent with the legislative purpose are

---

³ To the extent Plaintiffs are making a First Amendment overbreadth challenge (Doc. 14 at 19-20), they must show that a "substantial number" of applications of the EPM subsection are unconstitutional, judged in relation to its plainly legitimate sweep. *Wash. State Grange*, 552 U.S. at 449 n.6 (citation omitted).

⁴ One hopes that Plaintiffs would agree, but that is far from clear. Recently, in the parallel state court proceeding, AFPI and others convinced a judge to adopt the shocking position that *all* of section III(D) is unenforceable. *See Ariz. Free Enter. Club et al. v. Fontes et al.*, No. CV2024-002760 (Maricopa Cnty. Super. Ct.) (Ruling dated 8/5/2024), at pg. 18. This ruling is attached as Exhibit A, and the court's subsequent clarification is attached as Exhibit B. In correspondence after the ruling, Plaintiffs' counsel took the position that the judge properly enjoined the entirety of section III(D) and that they would oppose *any* attempt to narrow the injunction.

available," *Tovar v. Sessions*, 882 F.3d 895, 904 (9th Cir. 2018). Here, as explained in the Attorney General's motion to dismiss, Doc. 31 at 5-8, there is a plain and straightforward construction of A.R.S. § 16-452(C) and section III(D) that avoids any constitutional concerns: Plaintiffs are not regulated by section III(D).

Accordingly, to the extent the Court has questions about the interpretation of section III(D), those questions should be resolved in favor of constitutional rights, especially given the absence of any actual enforcement. For example:

- Plaintiffs say that the EPM subsection "imposes a *strict-liability* criminal prohibition." Doc. 14 at 15 (emphasis in original). It does not.
- Plaintiffs say that the EPM subsection "purports to impose criminal liability for all uses of 'offensive language to a voter or poll worker'—*anywhere* in Arizona and *every single day* of the year." *Id.* at 16 (emphasis in original). It does not.
- Plaintiffs say that the EPM subsection "attempts to criminalize speech based on its potential to offend or 'insult' others." *Id.* It does not.
- Plaintiffs say that the EPM subsection "regulates—and criminalizes—speech in a wide variety of public forums" as well as "non-public forums." *Id.* at 16–18. It does not.

In short, Plaintiffs read section III(D) in combination with A.R.S. § 16-452(C) as a sweeping expansion of criminal liability for members of the public, even though it has never been applied that way, Defendants do not read it that way, and no one else has ever read it that way. At a minimum, Plaintiffs' uncharitable interpretation is not the only plausible reading, so this Court should reject it. *Am. Booksellers Ass'n, Inc.*, 484 U.S. at 397.

**B.     Plaintiffs have not established likelihood of irreparable harm absent an injunction.**

While "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976),

a mere "assertion of First Amendment rights does not automatically require a finding of irreparable injury," *Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir. 1989) (citing *Rushia v. Town of Ashburnham*, 710 F.2d 7, 10 (1st Cir. 1983)). To obtain a preliminary injunction, Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction"—not just possible. *Winter*, 555 U.S. at 22 (emphasis in original).

Here, any claim that irreparable injury is likely absent an injunction is belied by Plaintiffs' delay in bringing this lawsuit and seeking injunctive relief. "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).[5]

Plaintiffs' delay here is lengthy and inexcusable. The language in section III(D) that Plaintiffs challenge has been part of the EPM since 2019. Plaintiffs offer no good explanation as to why they did not seek to enjoin enforcement of that language before July 18, 2024. And they offer no evidence of any harm to anyone arising out of the challenged language during that time period. Indeed, Plaintiffs also delayed in bringing this action with respect to the 2023 EPM. The 2023 EPM was issued on December 30, 2023. Plaintiffs offer no good explanation for why they waited, even after that point, until July 18, 2024 (a seven-month delay) to seek a preliminary injunction here.[6]

Further, to the extent Plaintiffs censor themselves in light of section III(D), that decision is attributable not to the EPM but to their own misunderstanding of it, as explained in the Attorney General's motion to dismiss. *See* Doc. 31 at 13.

---

[5] *See also, e.g.*, *Snider Tire, Inc. v. Chapman*, No. 2:20-cv-1775-AMM, 2021 WL 2497942, at *4 (N.D. Ala. Apr. 27, 2021) (three-month delay); *Taylor v. Biglari*, 971 F. Supp. 2d 847, 853 (S.D. Ind. 2013) (six-month delay); *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 442-43 (E.D.N.Y. 2013) (five-month delay).

[6] Unlike the other plaintiffs, AFPI joined the parallel state court case challenging section III(D) in April 2024 and filed a motion for a preliminary injunction in that case in May 2024. AFPI does not explain why it waited for months after the motion for preliminary injunction in state court to seek a preliminary injunction here.

11

Also, to the extent AFPI and Encore assert that their so-called "compliance costs" constitute irreparable harm, Doc. 14 at 21, they have failed to present sufficient evidence. Even assuming that spending money on training could be a form of irreparable harm, courts have declined to find that alleged compliance costs constituted irreparable harm where plaintiffs failed to "quantify, or clearly explain, their generally alleged compliance costs" and failed to "explain the economic harm in definite enough terms to show the extent of any harm is 'actual and not theoretical.'" *Morehouse Enter., LLC v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023) (citation omitted); *see also Second Amend. Found. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, -- F. Supp. 3d --, 2023 WL 7490149, at *16-17 (N.D. Tex. Nov. 13, 2023) (no irreparable injury where plaintiffs failed to "provide an estimate or any other metric" for measuring compliance costs and failed to provide evidence to "illustrate the nature of [their] compliance costs, let alone that they are more than *de minimis*"). Here, AFPI and Encore provide nothing more than nebulous assertions of increased costs in their declarations. They provide no evidence to quantify their alleged spending increase or demonstrate that it is more than *de minimis* and therefore cannot rely on alleged compliance costs to establish irreparable harm.

And, as mentioned above, AFPI and others recently convinced a state court to issue a preliminary injunction against section III(D), preventing even the possibility of the harm they claim to fear, at least while that injunction is in effect. *See* Ex. A at 18.

But more fundamentally, even if that state court injunction were stayed, Plaintiffs do not face irreparable harm because of the well-established backdrop of current federal law that would be unaffected by any injunction. To explain, consider the three ways that Plaintiffs assert section III(D) goes beyond the prohibitions in A.R.S. § 16-1013 and § 16-1017. *See* Doc. 1 ¶¶ 67-70. They assert that section III(D): (1) "eliminates the mens rea" and "purports to criminalize actions that have either 'the intent or effect of threatening' voters"; (2) "adds a prohibition against harassing speech"; and (3) "eliminates any

requirement that the threatening, harassing, or intimidating actions have any actual nexus to voting itself." *Id.*

As to each of these purported expansions, Plaintiffs face no irreparable harm from section III(D) because federal law already prohibits intimidating conduct in the same way, and therefore an injunction would make no real-world difference.

Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), "does not 'proscribe *only* threatening and intimidating language that successfully prevents a person from voting' as the *attempts to do* so are equally proscribed." *Colo. State Area Conference of NAACP v. U.S. Election Integrity Plan*, 653 F. Supp. 3d 861, 879 (D. Colo. 2023) (emphasis added, citation omitted); *see also, e.g.*, *Nat'l Coalition on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 110 (S.D.N.Y. 2023) ("The statutes also prohibit attempts to intimidate, threaten, or coerce a person for voting or attempting to vote, and thus a violation of the VRA, the KKK Act, or the Civil Rights Act does not require that the intimidation actually succeed in preventing people from voting.").

And "there is no requirement in the language in Section 11(b) that requires [a plaintiff] to establish that [a defendant] acted with the specific intent to intimidate voters." *Colo. State Area Conference*, 653 F. Supp. 3d at 879; *see also Ariz. Dem. Party v. Ariz. Republican Party*, No. CV-16-03752-PHX-JJT, 2016 WL 8669978, at *5 n.3 (D. Ariz. Nov. 4, 2016) ("agree[ing] with Plaintiff that the plain language of the statute does not require a particular mens rea").

Moreover, as a basic linguistic matter, speech that is "harassing" may also be "intimidating," depending on context. *See, e.g.*, *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-cv-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (holding that conduct that allegedly caused "fear of harassment and interference with [people's] right to vote" was "intimidation sufficient to support their § 11(b) claim"); *accord Intimidate*, Merriam-Webster Thesaurus, https://www.merriam-webster.com/thesaurus/intimidate (listing "harass" as a synonym for "intimidate") (last visited August 8, 2024).

For these reasons, Plaintiffs cannot show irreparable harm as a matter of fact or law.

### C. Plaintiffs have not established that the balance of equities or the public interest favor an injunction.

Even when a plaintiff establishes likelihood of irreparable injury, that injury may be "outweighed" by consideration of the equities and the public interest. *Winters*, 555 U.S. at 23-24. These two remaining factors "are pertinent in assessing the propriety of any injunctive relief." *Id.* at 32.

Here, no one disputes that the State has strong interests in protecting speech, both generally and in the elections context. Yet Plaintiffs' expansive reading of section III(D) as extending criminal liability for members of the public, if accepted, may have a chilling effect on speech. Indeed, to the extent Plaintiffs have self-censored, it is because of their own misunderstanding of section III(D).

In addition, no one disputes that the State also has strong interests in protecting the ability of voters to vote safely and securely, free of intimidation. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (finding that 100-foot electioneering-free zone around polling places survived strict scrutiny, and that the right to free speech must yield to the right to vote free from intimidation). Accordingly, election officials must be able to rely on guidance such as the EPM in identifying and addressing potential instances of intimidation. The injunction sought by Plaintiffs would apparently prohibit this.

Moreover, as mentioned, AFPI and others recently convinced a state court to issue a preliminary injunction against enforcement of section III(D). No public interest is served by having overlapping injunctions on the same subject.

Finally, the timing here weighs heavily against an injunction, given the strong public interest in having clear rules in advance of an election. County election offices have already issued their 2024 procedures manuals and begun training poll workers,[7] and

---

[7] *See, e.g.*, Maricopa County 2024 Poll Worker Training Manual, pg. 19, available at

early voting for the November 5 General Election begins on October 9.[8] The U.S. Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 529 U.S. 423, 424 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)); *see also Merrill v. Milligan*, 142 S.Ct. 879, 880 (2022) (Kavanaugh, J., concurring) ("[F]ederal courts ordinarily should not enjoin a state's election laws in the period close to an election."). Given the timing, the eleventh-hour injunction Plaintiffs seek is not in the public interest.

**III. Laches also bars Plaintiffs' request for a preliminary injunction.**

"Laches—unreasonable and prejudicial delay—requires denial of injunctive relief, including preliminary relief." *Arizona Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 922 (D. Ariz. 2016) (citation omitted). To determine whether delay was unreasonable, courts consider the justification for the delay, the extent of the plaintiff's advance knowledge of the basis of the challenge, and whether the plaintiff exercised diligence. *Id.*

Here, Plaintiffs' delay in bringing suit and seeking a preliminary injunction was unreasonable. As explained above, the 2019 EPM had the same language that Plaintiffs complain about now. Indeed, even the months-long delay between the issuance of the 2023 EPM and Plaintiffs' current request for a preliminary injunction is inexplicable.

Plaintiffs' delay has also prejudiced Defendants and the administration of justice. The Secretary and Attorney General are prejudiced by expending resources to respond to this lawsuit during an election year, shortly before the general election begins. *See Arizona Libertarian Party*, 189 F. Supp. 3d at 923 (courts consider "prejudice that stems from the plaintiff's delay in bringing suit," because defendants are "entitled to reasonable

---

https://elections.maricopa.gov/asset/jcr:b6e42412-d5f8-4594-bd9f-0232c58194a8/2024%20Primary%20General%20Manual.pdf; Pima County Poll Worker Handbook, pg. 14, available at https://content.civicplus.com/api/assets/15249fa5-77ea-4a7a-aade-03954e8b88a5.

[8] *See* Arizona Secretary of State Election Calendar 2023-2024, pg. 16 (available at https://apps.azsos.gov/election/2024/2024_Election_Calendar.pdf).

15

time to consider and develop their case"). And the administration of justice is prejudiced because election officials have been using section III(D) as guidance for identifying and addressing potential instances of voter intimidation. *See id.* (courts consider prejudice to "election officials," among others).

In short, rather than seeking relief in 2020, 2021, 2022, 2023, or the first half of 2024, Plaintiffs chose to wait until July 18, 2024, to seek a preliminary injunction. Laches should bar the claim and any injunctive relief.

## CONCLUSION

Even if the Court declines to dismiss Count Two for lack of standing, declines to abstain from considering the merits of Count Two pending resolution of the parallel state court proceedings, and declines to dismiss Count Two for failure to state a claim, the Court should still deny Plaintiffs' motion for a preliminary injunction as to Count Two.

RESPECTFULLY SUBMITTED this 9th day of August, 2024.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**

By /s/ Joshua M. Whitaker
Nathan T. Arrowsmith
Joshua M. Whitaker
Luci D. Davis
Shannon Hawley Mataele
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
Nathan.Arrowsmith@azag.gov
Joshua.Whitaker@azag.gov
Luci.Davis@azag.gov
Shannon.Mataele@azag.gov
ACL@azag.gov

*Attorneys for Arizona Attorney General*
*Kristin K. Mayes*