**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| American Encore, et al., | No. CV-24-01673-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| Adrian Fontes, et al., | |
| Defendants. | |

Given the widespread controversy surrounding elections, one would hope the last people responsible for disenfranchising voters and suppressing speech would be the very election officials tasked with ensuring fair and accurate elections.

But, according to Plaintiffs, that is precisely the case here.

Every odd-numbered year, the Arizona Secretary of State publishes an Election Procedures Manual ("EPM") governing the administration of elections in Arizona. Plaintiffs challenge two provisions included in the most recent EPM. The first blanketly prohibits controversial speech at polling places or, perhaps everywhere else in Arizona. This "Speech Provision" mandates that, "Any activity by a person with the intent or effect of threatening, harassing, intimidating, or coercing voters (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location is prohibited." (Doc. 1 ¶ 62; Doc. 16-2 at 195.) The rule goes on to list examples of conduct that "may also be considered intimidating conduct inside or outside the polling place," such as "raising one's voice" or using "insulting or offensive language to a voter or poll worker." (Doc. 16-2 at 196.) If

such activities occur, election officials have the discretion to remove disruptive persons from the polling places and contact law enforcement. (*Id.*)

The second rule, probably unprecedented in the history of the United States, gives the Secretary of State nearly *carte blanche* authority to disenfranchise the ballots of potentially millions of Arizona voters. The Court refers to it as the "Canvass Provision," and it provides:

> If the official canvass of any county has not been received by this deadline, the Secretary of State must proceed with the state canvass without including the votes of the missing county (i.e., the Secretary of State is not permitted to use an unofficial vote count in lieu of the county's official canvass).

(Doc. 16-2 at 266.)

Plaintiffs in this action argue both provisions violate the United States Constitution. Now before the Court are Plaintiffs' two motions for preliminary injunction, Defendants' motions to dismiss, and one motion to abstain from ruling on the Speech Provision. (Docs. 14, 26, 27, 31, 33.) The Motions are fully briefed.

## I.   BACKGROUND

Arizona law gives the Secretary of State authority to draft an Election Procedures Manual to govern and administer elections. A.R.S. § 16-452. After consulting with the county board of supervisors in each county, the Secretary promulgates election rules designed "to achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for [elections]." *Id.*(A). The rules are then outlined in an "official instructions and procedures manual" known as the EPM and "approved by the governor and the attorney general." *Id.*(B). A person who violates any EPM rule "is guilty of a class 2 misdemeanor." *Id.*(C).

The Speech Provision initially became part of the EPM in 2019.[1] The Canvass

---

[1] The Court takes judicial notice of the 2019 EPM language and that its speech provision contains substantially similar language to the 2023 EPM. The fact is "not subject to reasonable dispute" because the information comes from a government agency website. Fed. R. Evid. 201(b); *Gustavson v. Wrigley Sales Co.*, 961 F. Supp. 2d 1100, 1113 n.1 (N.D. Cal. 2013) ("The Court may take judicial notice of materials available on government agency websites.").

Provision is a new addition to the 2023 EPM. Addressing the certification concerns that transpired after the 2022 election, the Secretary of State, Adrian Fontes, modified the EPM to permit the Secretary himself to proceed with the state canvass without the votes of any county that fails to timely canvass the county results.[2] (Doc. 1 ¶¶ 79-80.)

On July 31, 2023, the Secretary published a draft version of the EPM and provided the public fourteen days to comment. (*Id.* ¶¶ 48-49.) During that time, members of the Arizona Legislature expressed concern over several provisions in the draft EPM, including the Speech Provision and that it may violate the First Amendment. (*Id.* ¶ 50.) But the Secretary did not modify the rule. (*Id.* ¶ 52.) After receiving approval from Arizona Governor Katie Hobbs and the Attorney General Kris Mayes, the Secretary issued the final 2023 EPM and published the manual on January 11, 2024. (*Id.* ¶ 54.)

## II.   PROCEDURAL HISTORY

Plaintiffs are America First Policy Institute ("AFPI")—a non-profit advocacy organization focusing on ballot security legislation; American Encore—an Arizona non-profit organization partaking in Arizona election-related activity; and Karen Glennon—an Arizona citizen registered to vote in Apache County. (*Id.* ¶¶ 11-30.) Defendants are Secretary of State Adrian Fontes and Attorney General Kris Mayes. (*Id.* ¶¶ 31, 33.)

On July 8, 2024, Plaintiffs filed their Complaint with this Court, challenging both the Speech and Canvass Provisions of the 2023 EPM. (*See generally* Doc. 1.) Plaintiffs argue the Speech Provision violates the First Amendment and Due Process Clause of the Fourteenth Amendment. (*Id.* ¶¶ 125-41.) Plaintiffs also challenge the Canvass Provision as an unconstitutional burden on Plaintiffs' right to vote. (*Id.* ¶¶ 108-24.)

After filing their Complaint, Plaintiffs moved for a preliminary injunction as to

---

[2] Arizona law requires the county board of supervisors in each Arizona county to canvass the general election results by the third Thursday following the election. A.R.S. § 16-642(A). The Secretary of State must then canvass the statewide results for the general election by the third Monday following the election. *Id.*; § 16-648. Arizona law previously allowed the Secretary to postpone the statewide canvass if the official canvass of any county was not received by the deadline, but those allowances were recently removed. *See* H.B. 2785, 56th Leg., 2nd Reg. Sess. (Ariz. 2024).

1    Count II challenging the Speech Provision. (Doc. 14.) Shortly thereafter, they moved for a

2    preliminary injunction as to Count I challenging the Canvass Provision. (Doc. 26.)

3    Defendants oppose both motions. (Docs. 32, 34.)

4        On August 5, 2024, Defendants moved to stay Count II of the Complaint while

5    state-court proceedings also involving the Speech Provision are pending. (Doc. 27.)

6    Defendant Attorney General also moved to dismiss Count II and Defendant Secretary

7    moved to dismiss Count I pursuant to Federal Rule of Civil Procedure 12(b)(1) and

8    12(b)(6). (Docs. 31, 33.)

9    **III.   SUBJECT MATTER JURISDICTION**

10       **A.   Standing**

11       The Court first assesses whether it has jurisdiction to consider Plaintiffs' claims. As

12   to both challenged provisions, Defendants argue Plaintiffs lack standing. (Docs. 31, 33.) In

13   assessing standing, the Court accepts the allegations in the complaint as true and considers

14   the evidence set forth in Plaintiffs' motions for preliminary injunction. *Warth v. Seldin*,

15   422 U.S. 490, 501-02 (1975) ("[I]t is within the trial court's power to allow or to require

16   the plaintiff to supply, by amendment to the complaint or by affidavits, further

17   particularized allegations of fact deemed supportive of plaintiff's standing.").[3]

18       Article III of the Constitution requires a plaintiff to demonstrate "the core

19   component of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To satisfy

20   Article III's standing requirements, a plaintiff must show that he "(1) suffered an injury in

21   fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is

22   likely to be redressed by a favorable judicial decision." *Lake v. Fontes*, 83 F.4th 1199,

23   1202-03 (9th Cir. 2023) (cleaned up). "The injury in fact must constitute 'an invasion of a

24   legally protected interest which is (a) concrete and particularized, and (b) actual or

25   imminent, not conjectural or hypothetical.'" *Lopez v. Candaele*, 630 F.3d 775, 785 (9th

---

26

27   [3] Defendants' Rule 12(b)(1) motions propound a facial attack on jurisdiction. (*See* Doc. 31
     at 4; Doc. 33 at 6-10.) A "facial" attack asserts that a complaint's allegations are themselves

28   insufficient to establish standing. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th
     Cir. 2004). A "factual" attack on jurisdiction argues that the complaint's allegations are
     untrue, even if adequate on the face of the complaint to invoke jurisdiction. *Id.*

Cir. 2010) (quoting *Lujan*, 504 U.S. at 560). The complaint must "alleg[e] specific facts sufficient" to establish standing. *Schmier v. U.S. Ct. of Appeals for Ninth Cir.*, 279 F.3d 817, 821 (9th Cir. 2002). A complaint that fails to allege facts supporting standing is subject to dismissal. *See, e.g.*, *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1123 (9th Cir. 2010).

### 1.      Count I: Canvass Provision

Defendants contend that all Plaintiffs lack standing to challenge the Canvass Provision. (Doc. 33.) In response, Plaintiffs argue they have standing based on: (1) the downgrading of their right to vote; and (2) a credible threat of disenfranchisement. (Doc. 1 ¶¶ 97-102; Doc. 26 at 9; Doc. 47 at 30-32.) Organizational Plaintiffs AFPI and American Encore assert representational standing on behalf of their members.

#### i.      Injury in Fact

The first prerequisite to Article III standing is that a plaintiff must suffer an "invasion of a legally protected interest"—or an injury in fact. *Lopez*, 630 F.3d at 785. Plaintiffs advance two theories to support an injury in fact, both of which Defendants argue are insufficient. (Doc. 33.) Plaintiffs first contend that the Canvass Provision inflicts ongoing cognizable injury by "downgrading [Plaintiffs'] right to vote from (1) an unqualified right as long as applicable rules are followed to (2) a conditional right, subject to potential disqualification by the actions of elected officials." (Doc. 26 at 10.) Second, Plaintiffs argue standing exists because they face a credible threat of disenfranchisement under the Canvass Provision. (*Id.* at 13-14.) In response, Defendants contend that both theories fail and that Plaintiffs' injuries are: (1) not actual or imminent and not particularized; (2) not fairly traceable to the Canvass Provision, and (3) not redressable.

##### a.      Actual or Imminent

Plaintiffs' first theory of harm is that the existence of the Canvass Provision inflicts ongoing injury by diminishing Plaintiffs' right to vote. (*Id.* at 9-13.) Plaintiffs rely on three sets of precedent to support their argument: (1) felony disenfranchisement, (2) First Amendment permit, and (3) signature mismatch cases. However, Plaintiffs have not

pointed to, nor has this Court found, any case recognizing Plaintiffs' theory of harm as a cognizable injury, and Plaintiffs' analogies do not warrant a different result.

Considering first the felony disenfranchisement precedent, Plaintiffs argue that the effect of a felony disenfranchisement law is to transform the right to vote from one that is unconditional to one that is conditional—the "condition" being whether a public official exercises discretion in restoring a felon's rights. (Doc. 26 at 10-11.) Plaintiffs rely on *Williams v. Taylor*, 677 F.2d 510 (5th Cir. 1982), and *El-Amin v. McDonnell*, No. 3:12-cv-00538-JAG, 2013 WL 1193357 (E.D. Va. Mar. 22, 2013), as support. The Court finds neither persuasive. In *Williams*, the Fifth Circuit expressly acknowledged, the "[a]ppellant's interest in retaining his right to vote is constitutionally distinguishable from the 'right to vote' claims of individuals who are not felons." 677 F.2d at 514. In *El-Amin*, the court held that only the plaintiff's equal protection claim, alleging that the state denied the plaintiff voting rights "to suppress the black vote," was justiciable. 2013 WL 1193357, at *2. The court dismissed the plaintiff's remaining claims challenging the state's voter reinstatement procedures for lack of standing, explaining that the plaintiff suffered no injury because he never applied for reinstatement. *Id.* at *4-5. Neither court relied on the abstract "downgrading" injury Plaintiffs assert here. Moreover, if a convicted felon's right to vote is "downgraded," in Plaintiffs' terms, that function is accomplished by Section 2 of the Fourteenth Amendment, not the reinstatement process. *See Richardson v. Ramirez*, 418 U.S. 24, 42-43 (1974) (explaining that the Fourteenth Amendment authorizes states to deny voting rights to citizens based on "participation in rebellion, or other crime"). Thus, a fair analogy cannot be drawn between standing in those cases and standing here.

Plaintiffs also contend that the injury in First Amendment permit cases mirrors the injury asserted here. Specifically, Plaintiffs argue that in these cases, the very existence of a permitting scheme is sufficient to confer standing since the right to free speech becomes conditioned on obtaining a permit. (Doc. 26 at 12.) Under this line of precedent, plaintiffs contesting a permit regime "are not required to show that they have applied for, or have been denied, a permit." *Kaahumanu v. Hawaii*, 682 F.3d 789, 796 (9th Cir. 2012). To

satisfy an "injury in fact," however, plaintiffs must allege they "have declined to speak, or have modified their speech, *in response* to the permitting system." *Id.* (emphasis added). Contrary to Plaintiffs' argument, it is the *response* to the permitting system that constitutes the "injury in fact" for standing purposes; rather than the permitting system itself. While Plaintiffs argue the mere existence of the Canvass Provision imposes an abstract harm to the right itself, that "injury" is not supported by First Amendment permitting precedent.

Lastly, Plaintiffs argue that signature mismatch cases involve an analogous harm because courts have found standing where election officials "create a risk of wrongfully disqualifying votes" by mismatching signatures and "fail to provide adequate cure opportunities." (Doc. 26 at 12.) Plaintiffs cite a string of cases as support, all of which involve different harms than the theory of harm Plaintiffs advance here. *See Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1024-25 (N.D. Fla. 2018) (finding representational standing where vote-by-mail ballots would "inevitably" be rejected and in fact were rejected); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1334-35 (N.D. Ga. 2018) (finding direct organizational standing because the plaintiffs would need to divert resources to warn voters of the "risk of signature mismatch"); *Frederick v. Lawson*, 481 F. Supp. 3d 774, 789 (S.D. Ind. 2020) (finding standing where the plaintiffs alleged a "colorable claim" that absentee ballots would be rejected due to signature mismatch); *Ariz. Democratic Party v. Hobbs*, 485 F. Supp. 3d 1073, 1085-87 (D. Ariz. 2020) *rev'd on other grounds* 18 F.4th 1179, 1193 (9th Cir. 2021) (finding standing where it was relatively clear that members would be "adversely affected by [the deadline] for curing missing signatures"). In these cases, the mere imposition of a signature verification requirement did not cause the plaintiffs injury. Again, the relevant injury was the risk of disenfranchisement the verification requirement posed to voters. To the extent these cases support any "injury," it is under Plaintiffs' alternative theory that the Canvass Provision creates a risk of wrongfully disenfranchising voters.

While Plaintiffs' first theory of harm is insufficient to constitute an "injury in fact" under existing precedent, Plaintiffs also allege they face a credible threat of

disenfranchisement if the Canvass Provision is enforced. (Doc. 26 at 13-14.) The Ninth Circuit has recognized that a threatened injury may constitute an injury in fact where there is a credible threat of harm in the future, rather than a speculative fear of hypothetical future harm. *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010). A plaintiff establishes Article III standing if an injury is "certainly impending" or, at the very least, there is a "substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). In this case, the "threat of future harm" Plaintiffs allege is the disqualification of their votes. Plaintiffs view this threat as credible, whereas Defendants view it as speculative and contingent on a long chain of hypothetical events involving third parties and state law Plaintiffs do not challenge. (Doc. 34 at 8-9.)

Plaintiffs offer three reasons as to why the threat of disenfranchisement is credible and not speculative. First, Plaintiffs note that the Canvass Provision textually mandates the Secretary to exclude votes from a county that does not timely canvass. (*See* Doc. 16-2 at 266 ("If the official canvass of any county has not been received by this deadline, the Secretary of State *must proceed* with the state canvass without including the votes of the missing county.") (emphasis added).) Second, Plaintiffs argue that the Secretary's refusal to disavow enforcement bolsters the credibility of the alleged threat. (Doc. 26 at 13-14.) On July 18, 2024, Plaintiffs sent Defendant Secretary a letter asking him to disavow enforcement of the Canvass Provision and "instead commit to some other mechanism for ascertaining the votes of a county whose results are not certified." (Doc. 26-2 at 2.) In response, Defendant Secretary said that he is "committed to enfranchising all Arizona voters" but he cannot and will not "disavow this nondiscretionary statutory duty" to canvass the elections by the deadlines set forth in A.R.S. § 16-648. (Doc. 26-3 at 2-3.)

Lastly, Plaintiffs allege that a county official's failure to timely canvass the county results is likely given that the Cochise County Board of Supervisors refused to certify the 2022 election results. (Doc. 26 at 14.) Specifically, the Complaint alleges that "following the 2022 election, the Cochise County Board of Supervisors refused to certify the election results for Cochise County for a time, resulting in a delay." (Doc. 1 ¶ 45.) The Cochise

County Board only certified the results after the Secretary obtained mandamus relief against the Board in state court.[4] (*Id.* ¶ 46; Doc. 33 at 8.) But under the newly enacted Canvass Provision, "where a county Board of Supervisors refuses or fails to certify election results by the applicable deadline," as was the case in 2022, "the [Canvass Provision] mandates the *complete disenfranchisement* of every voter in that county." (Doc. 1 ¶ 81 (emphasis in original).) Plaintiffs allege that for the threat of disenfranchisement to be realized in the 2024 election, it "would only require the exact circumstances of the 2022 election to reoccur." (*Id.* ¶ 10.)

Citing to *Lake v. Fontes*, 83 F.4th 1199, 1204 (9th Cir. 2023), Defendants argue that Plaintiffs fail the "actual or imminent" requirement to assert an injury in fact. (Doc. 33 at 8-9.) According to Defendants, Plaintiffs' alleged harm (the risk of disenfranchisement) is only triggered by the remote possibility election officials fail to carry out their statutory duties. (*Id.*) The circumstances in *Lake*, however, are distinguishable from those presented here in at least two respects. First, the plaintiffs' asserted injury in *Lake* was a potentially inaccurate vote count if non-governmental actors hacked Arizona's electronic tabulation systems to influence the election results. 83 F.4th at 1202. But there was no way of telling whether the vote count would be off by 500 or 500,000 votes given the speculative nature of the harm alleged. *See id.* at 1204. In this case, however, the Court need not opine on Plaintiffs' harm because the injury is clear and compelled by the EPM in an unprecedented manner: should a county fail to canvass the election, *all votes* in that county will be excluded. This case also differs from *Lake* in that the "hypothetical contingencies" necessary to cause the plaintiffs harm had "never occurred in Arizona." *Id.* In the present case, however, those contingencies are not hypothetical. In fact, they transpired in the 2022 election when the Cochise County Board of Supervisors refused to certify the election results for that county. Had the Canvass Provision been implemented a few years earlier, the Secretary would have had as much a right to exclude all Cochise County's votes as he

---

[4] A writ of mandamus is a legal remedy compelling public officials to perform their nondiscretionary duties if they refuse to act. A.R.S. § 12-2021; *Sears v. Hull*, 192 Ariz. 65, 68 ¶ 11 (1998). The Arizona Supreme Court has original jurisdiction over mandamus actions under the state constitution. Ariz. Const. art. VI, § 5(1).

did to petition for mandamus relief.

Considering the Canvass Provision's mandatory language, the Secretary's refusal to disavow enforcement, and the 2022 election events, the Court finds that Plaintiffs have alleged a substantial risk of enforcement. *See Lopez*, 630 F.3d at 790 (considering the plain language of the harassment policy in determining whether there was a credible threat of enforcement); *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (finding a credible threat where the state refused to disavow enforcement). Therefore, the "actual or imminent" prong for standing is satisfied. *Lopez*, 630 F.3d at 785.

### b.      Concrete and Particularized

Having established that Plaintiffs alleged an "actual or imminent" injury, the Court turns to the second requirement: that the injury be "concrete and particularized." *Id.* Defendants posit that Plaintiffs' injury is a generalized grievance and fails the "particularity" requirements for Article III standing. (Doc. 33 at 9.) According to Defendants, the threat of disenfranchisement is not particular because "every Arizona voter has the same (extremely remote) risk of experiencing" the alleged harm. (*Id.*) An injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. But "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 n.7 (2016).

The Ninth Circuit has determined that an injury derived from a general statewide restriction is nonetheless "particular" if the plaintiff alleges how she is personally affected by the restriction. *See Burdick v. Takushi*, 937 F.2d 415, 418 (9th Cir. 1991) ("The prohibition is a general statewide restriction that affects [the plaintiff] personally, and therefore he has standing to challenge it."). No one disputes that the Canvass Provision is a general statewide restriction. Throughout their Complaint, Plaintiffs allege that the Canvass Provision affects Glennon and AFPI's members personally by making their votes subject to disqualification. (*See, e.g.*, Doc. 1 ¶ 20 ("Glennon's vote is now open to disqualification through no fault of her own."); ¶ 81 (explaining that "the [Canvass

1   Provision] mandates the *complete disenfranchisement* of every voter" in a county where

2   the Board of Supervisors refuses or fails to certify the election results) (emphasis in

3   original); ¶ 99 ("Glennon . . . and Plaintiff AFPI's members similarly will cast votes in the

4   November 5, 2024 general election, where there [sic] vote will likewise be downgraded

5   from unconditional to qualified/subject to potential disqualification.").) As such, Plaintiffs'

6   alleged harm is sufficiently particular for Article III standing. *Burdick*, 937 F.2d at 418.

7                           **ii.    Traceable and Redressable**

8           Plaintiffs must also show that the threat of disenfranchisement is traceable to the

9   Canvass Provision and redressable. *Lake*, 83 F.4th at 1203. Defendants argue that any

10  alleged harm is not fairly traceable to the Canvass Provision because the purported injury

11  is contingent on the independent acts of third parties not before the court. (Doc. 34 at 4.)

12  The Court disagrees. The alleged harm Plaintiffs seek to redress is the threat of

13  disenfranchisement—a harm that the EPM *expressly* directs the Secretary to inflict should

14  the canvass of any county be delayed. (Doc. 16-2 at 266.)

15          It is also Defendants' position that Plaintiffs' alleged harm is not redressable. (Doc.

16  33 at 10; Doc. 34 at 5.) In this case, Plaintiffs seek to enjoin the Canvass Provision in the

17  EPM and not the statutory provisions in Title 16 governing the Secretary's

18  nondiscretionary duty to canvass the election by a certain date. According to Defendants,

19  this creates a standing problem—whereby, even if the Canvass Provision is deemed

20  unconstitutional and enjoined, Plaintiffs' injuries will not be redressed because Title 16

21  nonetheless imposes a nondiscretionary duty upon the Secretary to canvass the election by

22  the deadline. (*Id.*) But Title 16, as amended by H.B. 2785, does not require, nor authorize

23  the Secretary to exclude votes from a county that fails to meet the canvass deadline. *See*

24  *generally* H.B. 2785, 56th Leg., 2nd Reg. Sess. (Ariz. 2024) (removing allowances for

25  postponing a canvass in A.R.S. §§ 16-642, -648.) The law as amended speaks to *when* the

26  Secretary must canvass, but not *how*, which Plaintiffs challenge here.

27          A court order enjoining enforcement of the Canvass Provision will (1) redress

28  Plaintiffs' injuries by removing the threat of disenfranchisement and (2) will not prevent

- 11 -

the Defendant Secretary from otherwise complying with his nondiscretionary duty to canvass the election by the deadline. This latter proposition is bolstered by the fact that Defendants' own briefs concede that mandamus relief and criminal prosecution of unruly county supervisors are viable alternatives to the Canvass Provision's threat of disenfranchisement. (*See* Doc. 33 at 3 (explaining that "the appropriate remedy for a recalcitrant county's failure to carry out its statutory duties is a mandamus action"); Doc. 51 at 7 (stating that "mandamus relief" and "prosecting those members for violating their statutory duties . . . make the prospect of a county not carrying out its mandatory duty at the time required by law even less likely").) Therefore, the Court finds that Plaintiffs' injuries are redressable.

### iii.   Organizational Standing

The Court now assesses whether Plaintiffs AFPI and American Encore have sufficiently alleged representational standing. An organization may establish standing based on an injury to itself or on behalf of its members. *Warth*, 422 U.S. at 511 (explaining that "an association may have standing in its own right" or "solely as the representative of its members"). Representational standing exists if "(1) [the organization's] members would otherwise have standing to sue in their own right, (2) the interests at stake are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Considering the first factor, AFPI's members consist of registered Arizona voters. (Doc. 1 ¶ 97-99.) The Complaint alleges that Plaintiff AFPI has "about 300,000 members, who are widely dispersed throughout the United States," "routinely advocate for government policies to their peers, including in Arizona," and "face a risk of enforcement from the EPM's provisions." (*Id.* ¶ 29.) AFPI further alleges its members are voters who "will vote in the upcoming July 30, 2024 primary," and "will cast votes in the November 5, 2024 general election" where their right to vote will be downgraded and subject to

potential disqualification. (*Id.* ¶¶ 98-99.) Additionally, the Cypher Declaration explains that "AFPI has approximately 2640 active members in Arizona" who are "distributed throughout the State and reside in all of Arizona's 15 counties" and of that number, "approximately more than half . . . are registered voters" but a "true number is most likely much higher." (Doc. 26-4 at 3.)

As registered voters, AFPI's members would have standing to challenge the Canvass Provision in their own right, based on a credible threat of disenfranchisement. Second, the interests at stake are germane to AFPI's purpose. Here, the interests at stake are AFPI's members' voting rights, and voting rights are germane to AFPI's purpose in "promoting voting in elections[,] and raising voter awareness on important issues." (*Id.*) Lastly, AFPI's members need not participate in this action because Plaintiffs' claims and the relief requested do not require individualized proof. Plaintiffs seek declaratory and injunctive relief, not monetary damages. *See Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d 933, 938 (9th Cir. 1987) (allowing standing "because the [organization] seeks declaratory and prospective relief rather than money damages [and thus] its members need not participate directly in the litigation"). Therefore, AFPI has representational standing on behalf of its members.

Defendants argue that "AFPI cannot establish standing via members it does not name." (Doc. 34 at 4.) But AFPI is not required to name its members in this case. "Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015). AFPI alleges that every Arizona member will be adversely affected by the Canvass Provision. (*See, e.g.*, Doc. 1 ¶¶ 96-99 (explaining that AFPI's members "will cast votes in the November 5, 2024 general election, where there [sic] right to vote will likewise be downgraded from unconditional to qualified/subject to potential

disqualification by actions of government officials").) Therefore, requiring AFPI to name each injured member would serve no purpose.

While AFPI has made a sufficient showing for representational standing, the Court finds that American Encore does not have standing. American Encore has not alleged the existence of a single member, nor that the Canvass Provision would harm any alleged member's right to vote or the organization itself. Instead, American Encore generally claims that its "supporters and/or sympathetic voters" will vote in the primary and general elections, and their right to vote will be downgraded and subject to potential disqualification. (*Id.* ¶¶ 97-99.) American Encore also has not alleged that its "supporters and/or sympathetic voters" function as a member organization. *See Hunt*, 432 U.S. at 344-45 (explaining that an organization may establish associational standing if its "members" "possess all of the indicia of membership" such as conducting elections, serving on a commission, or financing the organization's activities). Therefore, American Encore does not have standing to challenge the Canvass Provision. *See* 15 Moore's Federal Practice § 101.60 (2024) ("[A]n organization that does not have members and does not function as a membership organization may not claim associational standing merely by virtue of the fact that it represents, or claims to represent, the interests of a group of people.").

Accordingly, the Court finds that Plaintiffs AFPI and Glennon have Article III standing. They have alleged a credible threat of enforcement that is traceable to the Canvass Provision and redressable by court order. The Court further finds that Plaintiff American Encore lacks standing.

### 2.        Count II: Speech Provision

The Court now assesses whether Plaintiffs have standing to contest the Speech Provision. In this respect, Defendants argue: (1) Plaintiffs are not regulated parties and are not subject to compliance costs other than those self-inflicted; (2) there is no credible threat of enforcement; and (3) AFPI lacks associational standing to sue on behalf of members it does not name. (Doc. 31 at 9-15; Doc. 32 at 4-9.)

### i.   Injury in Fact

#### a.   Compliance Costs

Plaintiffs AFPI and American Encore allege standing based on their status as regulated parties and the costs they incurred to comply with the EPM's Speech Provision. (Doc. 14 at 12-15; Doc. 1 ¶¶ 15, 26.) Defendants argue that the Speech Provision does not regulate Plaintiffs, and therefore, any "compliance cost" is self-inflicted. (Doc. 31 at 13-15.)

As a threshold matter, the Court concludes that the Speech Provision regulates Plaintiffs. The Speech Provision prohibits "any activities by a person" done with the intent or effect of threatening, harassing, or intimidating voters—including acts such as "raising one's voice" or using "offensive" or "insulting language." (Doc. 16-2 at 195.) The rule lacks any geographic limit, as it prohibits speech both inside and outside the voting location. (*Id.*) Plaintiff AFPI alleges it "regularly engages in the sort of voter engagement and election integrity activities that could easily run afoul of the Speech Restriction's breathtaking scope." (Doc. 14 at 12-13; *see also* Doc. 1 ¶¶ 25-28.) Plaintiff American Encore also participates in electioneering communications and voter contact in Arizona that fall under the EPM's "broad and undefined provisions." (Doc. 1 ¶¶ 12-17; Doc. 14-4 at 3-4.) Because both organizational Plaintiffs engage in speech prohibited by the Speech Provision, they are regulated parties.

Whether Plaintiffs' purported compliance costs are sufficient to constitute an injury in fact is a more difficult question. An injury in fact "can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). "[P]laintiffs who suffer concrete, redressable harms that amount to pennies are still entitled to relief." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 664 (9th Cir. 2021). A plaintiff, however, cannot "spend its way into standing simply by expending money" to address unwarranted fears. *Hippocratic Med.*, 602 U.S. at 394. The Ninth Circuit recently clarified that under *Hippocratic Medicine*, organizational plaintiffs "must do more than merely claim that

- 15 -

Arizona's law caused them to spend money in response to it—they must show that Arizona's actions directly harmed already-existing activities." *Ariz. All. for Retired Ams. v. Mayes*, No. 22-16490, 2024 WL 4246721, at *4 (9th Cir. Sept. 20, 2024).

Therefore, under *Hippocratic Medicine*, this Court must assess whether the Speech Provision directly harms AFPI's and American Encore's already-existing core activities. AFPI's "core activities" consist of advancing or opposing election legislation, promoting voting in elections, and raising voter awareness on important issues. (Doc. 1 ¶ 23; Doc. 14-2 at 3.) To this end, AFPI conducts poll-watcher training sessions in Arizona, where it instructs volunteers and poll watchers on how to comply with Arizona election law. (Doc. 14-2 at 3.) According to AFPI's Deputy Chief of Staff, Catherine Cypher, the organization has been directly harmed by the Speech Provision because it now must modify and administer new trainings to address the rule's unclear and vague restrictions. (*Id.*) American Encore's "core activities" include engaging in electioneering communications and speaking with voters to promote freedom, free markets, economic opportunity, and American ideals of liberty and democracy. (Doc. 14-4 at 3-4.) American Encore's President Sean Noble acknowledged that it paid legal counsel $4,800 in fees to provide guidance on the Speech Provision and will incur additional legal fees and costs to train "volunteers and others who will assist with contacting voters in Arizona." (*Id.*)

AFPI and American Encore have not established direct organizational standing. In *Ariz. All. for Retired Ams.* ("*AARA*"), the Ninth Circuit significantly curtailed its diversion-of-resources line of precedent, explaining that an organization no longer has standing by merely "shift[ing] some resources from one set of pre-existing activities . . . to another, new set of such activities." 2024 WL 4246721, at *10. While AFPI alleges that one of its core activities is training poll watchers, AFPI itself was not formed until 2021—nearly two years after the Speech Provision was promulgated. In gearing up for the 2024 election year, AFPI's training program presumably would have addressed how to comply with the Speech Provision, as any training *post-dates* the challenged rule. To the extent the Speech Provision "flew under the radar"—as Plaintiffs acknowledge (Doc. 47 at 26)—and AFPI

1   has now modified its training to reflect its requirements, that theory of harm is insufficient
2   to support standing pursuant to *Hippocratic Medicine* and *AARA*.

3       American Encore has not alleged the Speech Provision caused it to expend resources
4   to address a pre-existing activity. Its $4,800 in legal expenses and costs to train volunteers
5   to comply with the Speech Provision "is a diversion-of-resources theory by another
6   name."[5] *AARA*, 2024 WL 4246721, at *10. The fact that a plaintiff "will have to 'expend
7   resources,' 'create a training program,' [or] 'divert additional time and resources' represent
8   the same diversion-of-resources and frustration-of-mission injury that *Hippocratic*
9   *Medicine* rejected." *Id.*

10      For these reasons, Plaintiffs' compliance cost theory is insufficient to establish AFPI
11  and American Encore's standing.

12                  **b.      Pre-Enforcement Challenge**

13      All Plaintiffs also assert standing based on a credible threat of enforcement.
14  Plaintiffs AFPI and American Encore allege direct organizational standing and
15  representational standing on behalf of their members. Because this Court has found
16  American Encore has not alleged the existence of any members, the Court will only
17  consider whether it has direct standing.

18      In the context of First Amendment free speech challenges, "the Supreme Court has
19  endorsed what might be called a 'hold your tongue and challenge now' approach rather
20  than requiring litigants to speak first and take their chances with the consequences." *Ariz.*
21  *Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). Thus,
22  "when the threatened enforcement effort implicates First Amendment rights, the inquiry
23  tilts dramatically toward a finding of standing." *LSO, Ltd v. Stroh*, 205 F.3d 1146, 1155
24  (9th Cir. 2000).

25      A plaintiff bringing a pre-enforcement challenge establishes an injury in fact by

26  ─────────────
27  [5] Plaintiffs argue that *AARA* does not alter "the bedrock principle that expenditures for *compliance costs* establish Article III standing." (Doc. 60 at 8 (emphasis in original).) But the caselaw Plaintiffs rely on for this "bedrock principle" recognize Article III standing where a plaintiff must incur costs to comply with a licensing scheme. (Doc. 47 at 25 n.1 (citing cases).) In those cases, the challenged laws themselves impose the monetary injury, whereas, here, the Speech Provision does not require Plaintiffs to incur any costs.

alleging: (1) an "intention to engage in a course of conduct arguably affected with a constitutional interest" (2) "but proscribed by [the challenged] statute," and (3) that there is a credible threat of enforcement. *Driehaus*, 573 U.S. at 159. In assessing the *Driehaus* factors, the court is "to take as true all material allegations in the complaint and construe the complaint in favor of the plaintiff." *Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022). Because standing "in no way depends on the merits," the court must accept as true even those "allegations that [a challenged provision] is unconstitutionally ambiguous and coercive." *Id.* (quoting *Warth*, 422 U.S. at 500). "[D]ifferences in what the [challenged provision] means and how it may be enforced go to the merits of [the plaintiff's claims], and not to whether a court has jurisdiction to hear these claims." *Id.* at 853; *see also Ducey v. Yellen*, 615 F. Supp. 3d 1033, 1041 (D. Ariz. 2022) (explaining that, as to the first *Driehaus* factor, "the Court must accept [p]laintiff's allegations that the ARPA and the Final Rule violate the Constitution and the APA, respectively"). Therefore, and pursuant to *Arizona v. Yellen*, this Court must accept as true Plaintiffs' construction of the Speech Provision for standing purposes.

Considering the first *Driehaus* factor, Plaintiffs intend to engage in protected speech—an interest affected by the First Amendment. Defendants argue that Plaintiffs fail to allege with specificity any intent to violate the Speech Provision in a manner that does not already violate state voter intimidation laws. (Doc. 31 at 10 ("[W]hat specifically will Plaintiffs communicate? Where? And in what manner?").) But this is not required. "[A] plaintiff need not plan to break the law." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024). "The concept of 'intention' [under the first *Driehaus* factor] is more counterfactual than practical," whereby the court "must ask whether the plaintiff would have the intention to engage in the proscribed conduct, were it not proscribed." *Id.*

Plaintiffs have made that showing. Plaintiff AFPI alleged that it "regularly engages in the sort of voter engagement and election integrity activities that could easily run afoul of the Speech Restriction's breathtaking scope and has already engaged in self-censorship" to avoid that result. (Doc. 14 at 12-13; *see also* Doc. 1 ¶¶ 25-28.) AFPI further contends it

has already restricted "much of its speech because many of its positions and policies might offend people who disagree with them politically." (Doc. 14-2 at 6.) Plaintiff Glennon "regularly discuss[es] politics, voting, and many government-related topics," and she "intend[s] to continue to have these discussions surrounding the 2024 elections, including during early voting and on Election Day." (Doc. 14-3 at 3.) The Speech Provision has caused Glennon to second guess and self-censor speech she would otherwise feel comfortable expressing "for fear of offending someone and subjecting [herself] to possible criminal prosecution." (*Id.*; *see also* Doc. 1 ¶ 22.) Plaintiff American Encore engages in electioneering communications in Arizona, including the voter contact prohibited by the "broad and undefined" provisions of the EPM. (Doc. 1 ¶¶ 12-17; *see also* Doc. 14-4 at 3-4.) Plaintiffs' self-censorship is sufficient evidence of an intent to engage in the proscribed conduct (protected speech), were it not proscribed. *Peace Ranch*, 93 F.4th at 488. Accordingly, the first *Driehaus* factor is satisfied.

Second, Plaintiff's intended conduct must be "arguably . . . proscribed by [the challenged] statute." *Driehaus*, 573 U.S. at 162. The Speech Provision prohibits "[a]ny activity . . . with the intent or effect of threatening, harassing, intimidating, or coercing voters." (Doc. 16-2 at 195.) Plaintiffs allege that the Provision restricts otherwise lawful forms of speech such as "raising one's voice," and "using [] insulting, or offensive language" anywhere in Arizona. (Doc. 1 ¶ 131.) Under Plaintiffs' construction of the Speech Provision—which this Court accepts as true pursuant to *Yellen*—such activities could have the "effect of" threatening, harassing, intimidating, or coercing a voter and thus be proscribed by the Speech Provision. *See Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023) ("Plaintiffs' vagueness allegations must be taken as true for the purpose of determining standing and, if those allegations are true, then Plaintiffs' conduct may violate the statute."). Thus, the second *Driehaus* factor is met.

Lastly, the third *Driehaus* factor assesses whether the relevant authorities intend to enforce the challenged law. 573 U.S. at 159. As to this factor, courts consider "whether the enforcement authorities have communicated a specific warning or threat to initiate

proceedings." *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022) (cleaned up). Defendants contend that Plaintiffs have not shown a credible threat of enforcement because "[n]o declaration identifies *any* history of enforcement," nor "a specific warning or threat by an enforcing official," nor do Plaintiffs "identify prosecution of anyone—either an election official or a member of the public—for violating any EPM provision." (Doc. 32 at 7-8 (emphasis in original).) But a specific threat or warning of prosecution is not required. *Valle del Sol v. Whiting*, 732 F.3d 1006, 1015 n.5 (9th Cir. 2013) (explaining that "we have never held that a specific threat is necessary to demonstrate standing"). Indeed, the Ninth Circuit has "taken a broad view of this factor" and found a credible threat of enforcement even in the absence of a specific warning. *Isaacson*, 84 F.4th at 1100. In First Amendment cases, "the plaintiff need only demonstrate that a threat of potential enforcement will cause him to self-censor and not follow through with his concrete plan to engage in protected conduct." *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014). None of Defendants' arguments undermine the credibility of Plaintiffs' fear of enforcement.

As Plaintiffs explain, Defendants failed to modify the Speech Provision after members of the Arizona Legislature commented that the rule violates the First Amendment during the 14-day public comment period. (Doc. 14 at 13.) This infers a threat of enforcement. *See Doe v. Univ. of Mich.*, 721 F. Supp. 852, 859-60 (E.D. Mich. 1989) (recognizing that the plain language of a discrimination policy and its legislative history evidencing an intent to sanction constitutionally protected speech constituted a credible threat). If the Speech Provision does not regulate speech, as Defendants contend, then the Secretary could have modified the language to reflect that intent.

Moreover, Defendants' refusal to disavow enforcement bolsters the credibility of Plaintiffs' fears of enforcement. *See Bonta*, 996 F.3d at 653 ("[T]he state's refusal to disavow enforcement of [the challenged law] against [plaintiffs] . . . is strong evidence that the state intends to enforce the law and that [plaintiffs'] members face a credible threat."). Earlier this year, Plaintiffs sent letters to both the Secretary and Attorney General asking

the state to disavow enforcement of the Speech Provision. (Doc. 1-2.) In response, the Attorney General disavowed enforcement based on her interpretation of the rule and explained that, under her reading, any violation of the Speech Provision would be prosecuted under Title 16 or other applicable statutes, and not A.R.S. § 16-452(C). (Doc. 1-4.) The Secretary did not disavow enforcement, instead asserting that he "views the concerns . . . as having been addressed" by the Attorney General's response. (Doc. 1-3.) Plaintiffs allege that the Secretary will make criminal referrals to the Attorney General for violations of the Speech Provision. (Doc. 1 ¶¶ 56-58.)

The Court finds the Ninth Circuit's opinion in *Isaacson* instructive here. 84 F.4th 1089. In *Isaacson*, the plaintiffs brought a pre-enforcement challenge to a newly enacted Arizona abortion law, criminalizing the performance of abortions "sought solely because of genetic abnormalities." *Id.* at 1094. There, the Arizona Attorney General "expressly disavowed enforcement" and stated she would "prevent county attorneys from enforcing the statute." *Id.* at 1100. Despite this, the Ninth Circuit found that a credible threat of enforcement existed. *Id.* at 1101. The county attorneys in *Isaacson* believed they were not bound by the Attorney General's disavowal and intended to enforce the challenged law despite the Attorney General's assurances. *Id.* Moreover, the plaintiffs faced a credible threat that the law would be civilly enforced if the state's medical board and department of health services should "investigate physicians who run afoul of [the challenged law]." *Id.* Although there was no *specific* threat of enforcement, the Ninth Circuit found the plaintiffs alleged an imminent future injury based on a combination of "potential threats—from the county attorneys, the Arizona health agencies, and private parties." *Id.*

The reasoning in *Isaacson* applies with equal force here. Although the Attorney General claims to disavow enforcement, her "disavowal" is conditioned on Plaintiffs accepting her interpretation of the Speech Provision. But an interpretation of a law is not the law itself, and "officials cannot inoculate laws from review if the disavowal is a 'mere litigation position.'" *AARA*, 2024 WL 4246721, at *12 (quoting *Lopez*, 630 F.3d at 788). Therefore, Plaintiffs cannot reasonably rely on either Defendants' "disavowals." The threat

of enforcement is also credible because county attorneys may prosecute violations of the Speech Provision notwithstanding the Attorney General's position. The Attorney General herself acknowledged this in her letter, explaining that "county attorneys may also enforce provisions of Title 16 and Title 13 as they relate to voting and elections." (Doc. 1-4.) Section 16-452(C), criminalizing violations of any EPM rule, is located in Title 16 of the Arizona Revised Statutes. Arizona's county attorneys are not bound by the Attorney General's "disavowal" nor her interpretation of a law. Therefore, Plaintiffs may nonetheless face prosecution for violating the Speech Provision under A.R.S. § 16-452(C), despite the Attorney General's assurances to the contrary. The fact that no voter or election official has yet to be prosecuted under A.R.S. § 16-452(C) is inapposite because "the lack of past prosecution does not preclude Plaintiffs' standing." *Isaacson*, 84 F.4th at 1101.

Lastly, the threat of enforcement is further bolstered by the likelihood that the Speech Provision will be enforced by election officials and poll workers at voting locations. Defendants argue that "calling the police or asking disruptive people to desist or leave" is not "enforcement power against the public or enforcing a prohibition on speech and expressive conduct." (Doc. 50 at 8.) But as the Ninth Circuit noted in *Isaacson*, civil enforcement by private parties or state agencies is nonetheless enforcement, and it is just as relevant to the credibility determination as criminal enforcement. 84 F.4th at 1101. Indeed, the Ninth Circuit and other courts have recognized that even the threat of investigation by civil or criminal authorities is sufficient to establish an imminent harm. *Id.* (reasoning that the Arizona medical board and health services department's "threat to investigate" supported a threat of enforcement); *see also Hetherington v. Madden*, 640 F. Supp. 3d 1265, 1272-73 (N.D. Fla. 2022) (explaining that even though the state "took no investigative or enforcement action against [the plaintiff]," "a credible threat of investigation or enforcement" existed to establish standing).

Plaintiffs have alleged a credible threat of enforcement, and that as a result, they have "self-censored" their otherwise protected speech. (Doc. 1 ¶¶ 12-17, 22, 25-28; Doc. 14 at 12-13; Doc. 14-3 at 3-4; Doc. 14-4 at 3-4.) While "self-censorship alone is insufficient

to show injury," *Lopez*, 630 F.3d at 792, self-censorship coupled with a credible threat of enforcement constitutes injury. *See Tingley*, 47 F.4th at 1068. Accordingly, Plaintiffs satisfied all three *Driehaus* factor and alleged an imminent future injury sufficient to support Article III standing.

### ii.   Traceable and Redressable

Although not contested, the Court finds that the alleged harm is traceable to the Speech Provision and redressable by a favorable court order. Plaintiffs allege they have self-censored speech they would otherwise engage in but for their fears the Speech Provision will be enforced against them. Thus, the alleged harm is traceable to the challenged election rule. Moreover, an injunction preventing enforcement of the Speech Provision would redress Plaintiff's injuries by removing the threat responsible for chilling Plaintiffs' otherwise protected speech.[6]

### B.   Eleventh Amendment

Defendants argue that Count I contesting the Canvass Provision should be dismissed on Eleventh Amendment grounds. (Doc. 33 at 11-12; Doc. 51 at 9-11.) "The Eleventh Amendment erects a general bar against federal lawsuits brought against a state." *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003). The Eleventh Amendment, however, does not bar actions for prospective declaratory or injunctive relief against state officials for their alleged violations of federal law, provided the official has "some connection with the enforcement of the [challenged law]." *Ex parte Young*, 209 U.S. 123, 157 (1908).

According to Defendants, Count I is a state law claim "cloaked as [a] federal violation" and, therefore, the *Ex parte Young* exception to Eleventh Amendment immunity does not apply because Plaintiffs' claim "turn[s] on application of state law" that Plaintiffs do not challenge. (Doc. 33 at 11-12.) But Count I of the Complaint seeks injunctive and declaratory relief for alleged violations of 42 U.S.C. § 1983—a federal claim. (Doc. 1 ¶¶ 142-48.)

---

[6] Because the Court finds AFPI has successfully alleged direct organizational standing to challenge Count II, addressing AFPI's alternative representational theory of standing is unnecessary.

Concededly, Plaintiffs do not challenge the state laws that require the Secretary to canvass the election by the statutory deadline. But this is not fatal to *Ex parte Young*'s application here because those laws do not inflict the constitutional harm for which Plaintiffs seek redress. Indeed, the Arizona laws Defendants reference require only that the Secretary canvass the election by the statutory deadline. (Doc. 51 at 10 (explaining that "only A.R.S. §§ 16-642(A)(2), -645(B)-(F), -646(B), and -648 set forth the Secretary's duties" and impose the mandatory statutory duty to canvass by a certain date).) Hence, the Secretary has a "nondiscretionary duty" to meet the deadline, but *how* the Secretary meets that deadline is entirely up to his discretion. At oral argument, the parties agreed that mandamus relief or vote nullification under the Canvass Provision are both means by which the Secretary can execute his duty to timely canvass. Plaintiffs' claim here is that the latter means of discretion is unconstitutional. Therefore, Count I does not "turn on application of state law" as Defendants argue.

Likewise, Defendant Secretary has more than just "some connection with the enforcement" of the Canvass Provision. *Ex parte Young*, 209 U.S. at 157. Indeed, "[t]he 'connection' required under *Ex parte Young* demands merely that the implicated state official have a relevant role that goes beyond 'a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision.'" *Mecinas v. Hobbs*, 30 F.4th 890, 903-04 (9th Cir. 2022) (quoting *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004)). The Canvass Provision was promulgated by the Secretary of State, a defendant in this action. *See* A.R.S. § 16-452(A). Additionally, the Secretary is charged with enforcing the EPM and executing elections in accordance with relevant statutes and the EPM. (*See, e.g.*, Doc. 51 at 11; Doc. 33 at 10.) The Ninth Circuit has recognized that the Secretary satisfies the "connection" requirement under *Ex parte Young* when a plaintiff challenges a provision in the EPM. *Mecinas*, 30 F.4th at 904 ("[G]iven the Secretary's role in promulgating the Election Procedures Manual, that modest requirement [was] far exceeded" and Secretary was "properly named as a defendant."). Accordingly, Count I is not barred by the

- 24 -

1    Eleventh Amendment.

2        **C.    Ripeness**

3        Defendants also argue that Count I challenging the Canvass Provision is not ripe

4    because it is uncertain when, or if, a county's votes will be excluded from the statewide

5    canvass. (Doc. 33 at 10; Doc. 34 at 3-5.)

6        Ripeness and standing are closely related doctrines. *See Thomas v. Anchorage Equal*

7    *Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) ("Sorting out where standing ends and

8    ripeness begins is not an easy task."); *see also Driehaus*, 573 U.S. at 157 n.5 ("The

9    doctrines of standing and ripeness 'originate' from the same Article III limitation."). 

10   Indeed, the Ninth Circuit has characterized the ripeness inquiry as "standing on a timeline."

11   *Thomas*, 220 F.3d at 1138. Thus, whether the Court addresses justiciability under the rubric

12   of standing or ripeness, the analysis is materially the same. *See Mont. Env't Info. Ctr. v.*

13   *Stone-Manning*, 766 F.3d 1184, 1189 (9th Cir. 2014). In assessing whether a case is ripe

14   for adjudication, the Court must ask "whether the plaintiffs face 'a realistic danger of

15   sustaining a direct injury as a result of the [challenged law's] operation or enforcement,'

16   or whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction."

17   *Thomas*, 220 F.3d at 1139 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S.

18   289, 298 (1979)).[7]

19       Accordingly, Plaintiffs' claims are ripe for the same reasons this Court finds

20   Plaintiffs have standing. *Id.* at 1138 ("[R]ipeness coincides squarely with standing's injury

21   in fact prong.").

22   **IV.    ABSTENTION**

23       Having determined the Court has jurisdiction to consider both of Plaintiffs' claims,

24   the Court now turns to Defendants' motion to abstain from deciding the Speech Provision

25   issue. (Doc. 27.) Earlier this year, a similar lawsuit was filed in Arizona state court,

26

27   _____

[7] Defendants have not raised prudential ripeness concerns, and the Court finds that none
exist. The present dispute is fit for judicial decision as "the issues raised are primarily legal,
do not require further factual development, and the challenged action is final." *Winter v.*
28   *Cal. Med. Rev., Inc.*, 900 F.2d 1322, 1325 (9th Cir. 1989). Defendants also have not argued
that withholding review would result in direct and immediate hardship. *Id.*

challenging the Speech Provision amongst several other EPM rules. (Doc. 27-1.) On August 5, 2024, the state trial court granted the plaintiffs preliminary relief and enjoined all of Section III(D) of the EPM, including the Speech Provision. (Doc. 32-1.) That decision is currently pending before the Arizona Court of Appeals. (Doc. 48.) Defendants move to stay Count II of Plaintiffs' Complaint concerning the Speech Provision pursuant to *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), and ask this Court to defer a hearing on Plaintiffs' federal claims until the parallel state-law issues are resolved and the state appellate proceedings are exhausted. (Doc. 27 at 3-5.) Plaintiffs oppose the request. (Doc. 41.)

Federal courts were cautioned early on that the judiciary has "no more right to decline the exercise of jurisdiction that is given, than to usurp that which is not given"— lest the courts commit "treason to the [C]onstitution." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821). As such, "[p]arallel state-court proceedings do not detract from" a federal court's "virtually unflagging" obligation to hear and decide cases. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). *Pullman* abstention is one of the "extraordinary and narrow exception[s] to the duty of a district court to adjudicate a controversy." *Wolfson v. Brammer*, 616 F.3d 1045, 1066 (9th Cir. 2010) (cleaned up). A district court has discretion to abstain pursuant to *Pullman* only when: (1) the case touches on a sensitive area of social policy upon which the federal courts ought not enter unless no alternative to its adjudication is open, (2) constitutional adjudication plainly can be avoided if a definite ruling on the state issue would terminate the controversy, and (3) the proper resolution of the possible determinative issue of state law is uncertain. *Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003) (cleaned up); *see also Potrero Hills Landfill, Inc. v. Cnty. of Solano*, 657 F.3d 876, 889 (9th Cir. 2011) ("*Pullman* is a discretionary doctrine that flows from the court's equity powers.").

In the First Amendment context, the Ninth Circuit has counseled that "[i]t is rarely appropriate for a federal court to abstain under *Pullman*" given the risk "that the delay that

1    results from abstention will itself chill the exercise of the rights that the plaintiffs seek to

2    protect by suit." *Porter*, 319 F.3d at 486-87; *see also Chula Vista Citizens for Jobs & Fair*

3    *Competition v. Norris*, 782 F.3d 520, 528 (9th Cir. 2015) (noting that *Pullman* abstention

4    "is strongly disfavored in First Amendment cases"). Nonetheless, "there is no absolute rule

5    against abstention in first amendment cases." *Almodovar v. Reiner*, 832 F.2d 1138, 1140

6    (9th Cir. 1987) (holding that abstention was warranted because there were no fears of

7    chilling speech).

8            Defendants argue that this Court should abstain under *Pullman* because the parties

9    in the state case overlap, the First Amendment claims are nearly identical, and all three

10   *Pullman* factors support abstention. (Doc. 27 at 3-5.) As emphasized above, the Ninth

11   Circuit has recognized that, "[i]n first amendment cases, the first of [the] factors will *almost*

12   *never* be present because the guarantee of free expression is always an area of particular

13   federal concern." *Ripplinger v. Collins*, 868 F.2d 1043, 1048 (9th Cir. 1989) (emphasis

14   added). Defendants claim this case is the exception to the Ninth Circuit's "almost never"

15   prohibition and rely heavily on *Almodovar v. Reiner*, 832 F.2d 1138 (9th Cir. 2014). But

16   even the Ninth Circuit has recognized that *Almodovar* "was procedurally aberrational."

17   *Courthouse News Serv. v. Planet*, 750 F.3d 776, 784 (9th Cir. 2014). In *Almodovar*, the

18   constitutional issues were already before the state supreme court, and therefore, there were

19   "few dangers of first amendment chill." 832 F.2d at 1140. This "unusual procedural

20   setting" is absent here. *Porter*, 319 F.3d at 493-94; *see also Courthouse News Serv.*, 750

21   F.3d at 784 (reversing a district court's abstention pursuant to *Pullman* when the

22   "exceptional factors" of *Almodovar* were lacking).

23           If this Court abstained, as Defendants request, there is a risk that protected speech

24   would be chilled, especially if the Arizona Court of Appeals stays the superior court's

25   injunction in the state proceedings. The resulting delay incurred by another appeal to the

26   Arizona Supreme Court would take a considerable amount of time to reach a final decision

27   and chill first amendment speech in the interim. Considering the gravity of the First

28   Amendment interests at stake, the sweeping nature of the Speech Provision, and the chilling

effect resulting from a delay in litigation at the state courts, the first *Pullman* factor is not met. Accordingly, the Court declines to abstain. *See C-Y Dev. Co. v. City of Redlands*, 703 F.2d 375, 377 (9th Cir. 1983) ("[T]here is little or no discretion to abstain in a case [that] does not meet traditional abstention requirements.").

V.     **MOTIONS TO DISMISS**

Defendants also challenge the sufficiency of the Complaint's allegations pursuant to Federal Rule of Civil Procedure 12(b)(6).

A.     **Legal Standard**

A complaint must assert sufficient factual allegations that, when taken as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At the pleading stage, the Court's duty is to accept all well-pleaded complaint allegations as true. *Id.* Dismissal is "proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quotations and citation omitted).

B.     **Count I: Canvass Provision**

Defendant Secretary moved to dismiss Count I, claiming that Plaintiffs failed to state a cognizable constitutional claim under *Anderson-Burdick*. (Doc. 33 at 12.) The inquiry under *Anderson-Burdick* is twofold. First, the plaintiff must allege that the challenged regulation imposes a burden on the right to vote. *Mecinas*, 30 F.4th at 904. If the burden is severe, the regulation must meet strict scrutiny, but a non-severe burden triggers less exacting review. *Id.* (citations omitted). Second, the court is to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018) (quotation and citation omitted).

Plaintiffs make several plausible allegations that the Canvass Provision places an undue burden on the right to vote. Plaintiff Glennon alleges she is a registered voter in Arizona, and that she plans to vote in the upcoming election. (Doc. 1 ¶¶ 19, 99.) Plaintiff AFPI alleges that several of its members are registered voters in Arizona, who also plan to

vote in the upcoming election. (*Id.* ¶ 99.) Because the Canvass Provision threatens to disenfranchise all voters in a county where a local canvass is untimely, Plaintiffs contend their votes are "open to disqualification through no fault of [their] own, based solely on the discretion" of government officials. (*Id.* ¶¶ 20-21.) Plaintiffs further allege that the Canvass Provision imposes "the severest possible burden: nullification of a citizen's vote through no fault of that citizen and doing so for every voter in a given county." (*Id.* ¶ 112.) According to Plaintiffs, the Canvass Provision imposes a mandatory duty on the Secretary to disenfranchise voters. (*Id.* ¶ 144.) Plaintiffs also assert that the rule is not narrowly tailored to support any state interest because there are several less burdensome alternatives, such as (1) appointing an auditor, (2) initiating a mandamus action, or (3) using the unofficial results. (*Id.* ¶¶ 146-47.)

Considering the above, the Court finds that Plaintiffs have plausibly alleged a severe burden on their right to vote. The right to vote is fundamental. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966). "A state law or practice that unduly burdens or restricts that fundamental right violates the Equal Protection Clause of the Fourteenth Amendment." *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1082 (9th Cir. 2024). Plaintiffs allege that the plain terms of the Canvass Provision require the Secretary to nullify a county's votes if the county board of supervisors fails to timely canvass. Courts have routinely recognized that disenfranchisement is a severe burden on the right to vote. *See, e.g.*, *Fla. Democratic Party v. Detzner*, No. 16-CV-607, 2016 WL 6090943, at *6 (N.D. Fla. Oct. 16, 2016) ("If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does."). Plaintiffs also detail less burdensome alternatives such as mandamus relief, which served as an adequate remedy in 2022 when the Cochise County Board of Supervisors failed to timely canvass the county results. (Doc. 1 ¶ 46.) Therefore, Plaintiffs plausibly alleged the Canvass Provision fails strict scrutiny because it is not narrowly tailored. Because Plaintiffs stated a claim for relief under *Anderson-Burdick*, the Court will not dismiss Count I.

To the extent that Count I is asserted against Defendant Attorney General, the Court

1   will grant Defendant's motion to dismiss. The Complaint alleges that Defendant Secretary

2   is responsible for enforcing the Canvass Provision and inflicting the harm alleged. The

3   Complaint does not contain any well-pled allegations detailing how the Defendant

4   Attorney General has or will impair Plaintiffs' right to vote. Accordingly, Defendant

5   Attorney General is dismissed as to Count I, but in all other respects, Defendants' motion

6   to dismiss will be denied.

7       ## C.      Count II: Speech Provision

8       The Court now turns to Defendant Attorney General's motion to dismiss, arguing

9   Count II fails to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6).

10  (Doc. 31 at 14-17.)

11      Plaintiffs allege the Speech Provision is facially unconstitutional in several respects.

12  (Doc. 1 ¶¶ 125-39.) Ordinarily, "litigants mounting a facial challenge to a statute normally

13  must establish that no set of circumstances exists under which the statute would be valid."

14  *United States v. Hansen*, 599 U.S. 762, 769 (2023) (cleaned up). Under the First

15  Amendment overbreadth doctrine, however, courts are instructed "to hold a statute facially

16  unconstitutional even though it has lawful applications." *Id.* Therefore, "[i]f the challenger

17  demonstrates that the statute prohibits a substantial amount of protected speech, relative to

18  its plainly legitimate sweep, then society's interest in free expression outweighs its interest

19  in the statute's lawful applications, and a court will hold the law facially invalid." *Tucson*

20  *v. City of Seattle*, 91 F.4th 1318, 1327 (9th Cir. 2024) (cleaned up).

21      Plaintiffs assert they engage in constitutionally protected activities that are

22  prohibited by the Speech Provision, and that they "must chill (and have chilled) their

23  otherwise lawful speech." (Doc. 1 ¶¶ 9, 22, 153.) Plaintiffs claim the Speech Provision

24  violates the Free Speech Clause for several reasons. (*Id.* ¶¶ 125-41.) First, Plaintiffs argue

25  it violates Supreme Court precedent by criminalizing speech without a culpable mental

26  state. (*Id.* ¶¶ 134-35.) Plaintiffs next contend it improperly prohibits speech merely for

27  being offensive, contrary to well-established First Amendment principles. (*Id.* ¶ 136.)

28  Plaintiffs also allege the Speech Provision is an unlawful content-based and

viewpoint-based restriction that violates the public forums doctrine. (*Id.* ¶¶ 137-38.)

By its plain terms, the Speech Provision prohibits any speech that offends or insults another if it has the intent or effect of intimidating, harassing, or threatening a voter or poll worker. (Doc. 16-2 at 195.) The rule also provides *no* geographic limitation, as the prohibition extends to any activity "inside or outside the 75-foot limit at a voting location." (*Id.*) Thus, speech that a listener finds too loud, too offensive, or too insolent—potentially *anywhere* in Arizona—is prohibited. But it has long been established that "speech may not be prohibited because it concerns subjects offending our sensibilities." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002). While a Court is not required to accept legal conclusions as true, the Court nonetheless finds Plaintiffs plausibly alleged the Speech Provision unlawfully infringes on their rights to free speech.

Plaintiffs also argue the law is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment. (Doc. 1 ¶¶ 140-41, 156.) A law is unconstitutionally vague if it does not give "a person of ordinary intelligence fair notice of what is prohibited" or if it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Plaintiffs allege the Speech Provision is so vague it fails to "provide proper notice of the conduct that it criminalizes." (Doc. 1 ¶ 156.) Specifically, Plaintiffs argue that the rule prohibits speech more broadly than state intimidation laws, which violates fair notice principles because a reasonable person would not know what conduct is actually prohibited. (*Id.* ¶ 140.)

Under A.R.S. §§ 16-1013, -1017, speech knowingly made to intimidate or coerce voters is prohibited. But under the Speech Provision, speech is prohibited solely based on the reaction it elicits on the part of the listener. Because the Speech Provision is inconsistent with state intimidation laws, Plaintiffs do not have fair notice of what speech is prohibited. Moreover, the rule prohibits "offensive" or "insulting" speech without defining what categories of speech rise to the requisite level of offense or insult. Without any limitation, election officials and poll-workers have nearly unfettered discretion in categorizing and

regulating a voter's speech. The failure to ascribe meaningful standards to the categories of prohibited speech increases the likelihood the Speech Provision will be arbitrarily enforced. *City of Chicago v. Morales*, 527 U.S. 41, 64 (1999) (holding that a law is unconstitutionally vague if it "does not provide sufficiently specific limits on the enforcement discretion of the police to meet constitutional standards for definiteness and clarity") (internal citations omitted). The Court finds that Plaintiffs have plausibly alleged that the Speech Provision is unconstitutionally vague.

Accordingly, the Court will deny Defendants' motion to dismiss for failure to state a claim. (Doc. 31.)

## VI. MOTIONS FOR PRELIMINARY INJUNCTION

The Court now turns to Plaintiffs' motions seeking preliminary relief as to Counts I and II of the Complaint.

### A. Legal Standard

A party facing irreparable harm prior to the conclusion of litigation may ask the court to grant preliminary injunctive relief. Fed. R. Civ. P. 65. Preliminary relief is appropriate where a plaintiff establishes she is (1) likely to succeed on the merits, (2) likely to suffer irreparable harm without an injunction, (3) that the balance of the equities tips in her favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Supreme Court has observed that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation and citation omitted).

Employing a sliding scale analysis, the Ninth Circuit has counseled that where the moving party "can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the [moving party's] favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135

(9th Cir. 2011)) (cleaned up). "Serious questions are substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc) (internal quotations and citation omitted).

### B.  Count I: Canvass Provision

The Court first addresses whether Plaintiffs have established they are entitled to preliminary relief as to Count I.

### 1.  Likelihood of Success on the Merits

No one disputes that the right to vote is fundamental. *Harper*, 383 U.S. at 667. Indeed, "voting is of the most fundamental significance under our constitutional structure." *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). At the same time, the Constitution empowers States to prescribe election laws, and "the Court therefore has recognized that States retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). "Election laws will invariably impose some burden upon individual voters." *Id.* "But not all election rules or practices impose constitutionally suspect burdens on the right to vote." *Election Integrity Project Cal.*, 113 F.4th at 1082. "A state law or practice that unduly burdens or restricts that fundamental right violates the Equal Protection Clause of the Fourteenth Amendment." *Id.*

Given these competing concerns, courts employ a flexible sliding-scale standard known as the *Anderson-Burdick* framework when assessing the constitutionality of election rules. *Tedards v. Ducey*, 951 F.3d 1041, 1066 (9th Cir. 2020). "At one end of the spectrum, severe restrictions must be narrowly drawn to advance a state interest of compelling importance. At the other end of the spectrum, important state regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions. Thus, the burdening of the right to vote always triggers a higher level of scrutiny than rational basis review, but does not always trigger strict scrutiny." *Id.* (cleaned up). As the Court previously noted, *Anderson-Burdick* involves a two-step inquiry, whereby the court first determines the severity of the burden imposed by the challenged rule. *Mecinas*, 30 F.4th at

904. Severe burdens trigger strict scrutiny, but non-severe burdens must meet a less exacting review. *Id.* At step two, the court assesses the interests advanced by the State to justify the rule's burden. *Short*, 893 F.3d at 676.

### i.    Burden on the Right to Vote

The Canvass Provision is utterly without precedent. If the right to vote "is the right of qualified voters within a state to cast their ballots and have them *counted*," *United States v. Classic*, 313 U.S. 299, 315 (1941) (emphasis added), then the Canvass Provision imposes the most severe burden: state-sanctioned disenfranchisement. Indeed, Defendants even agree on this point, stating, "[I]f Plaintiffs in fact voted, and their votes were not included in the final results for the races that are included in the state canvass, that could constitute a severe burden on their right to vote." (Doc. 51 at 11.) The magnitude of harm the Canvass Provision stands to pose, if triggered, is severe. At oral argument, Defendants stated there are approximately 2.4 million registered voters in Maricopa County. (Doc. 56 at 11:12-13.) Under the Canvass Provision, all 2.4 million votes could be *excluded* from the statewide canvass based on the actions of a quorum of the Maricopa County Board of Supervisors and the Defendant Secretary.

Other jurisdictions have similarly recognized that disenfranchising even thousands of voters is a severe burden under *Anderson-Burdick*. *See, e.g.*, *Fla. Democratic Party*, 2016 WL 6090943, at *6 ("If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does."); *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 593 (6th Cir. 2012) (affirming holding that policy disqualifying thousands of votes based on poll-worker error imposed a "substantial burden on provisional voters"); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1321-22 (11th Cir. 2019) (holding that Florida's signature mismatch scheme, resulting in "only about 4,000 ballots [being] rejected" imposed "at least a serious burden on the right to vote"); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (commenting that it is a "basic truth that even one disenfranchised voter—let alone several thousand—is too many").

The burden here is also properly classified as severe because it operates *without fault* of the voter. This court has recognized that "the burden of an election law is measured by the cost of compliance, not the consequence of noncompliance." *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at * 48 (D. Ariz. Feb. 29, 2024) (cleaned up). That is why courts have routinely held that voting prerequisite laws often impose only a slight or minimal burden on voters, notwithstanding the fact that noncompliance may result in a form of "disenfranchisement."[8] For instance, in *Crawford*, the Supreme Court characterized the burden imposed by Indiana's voter-ID law not as disenfranchisement, but rather, "the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph," and ultimately reasoned that these acts could "not qualify as a substantial burden on the right to vote." 553 U.S. at 198. In this case, however, the Canvass Provision's burdens are levied against voters with no regard to their actions. This is not a case where a voter's "plight" of "disenfranchisement" is caused by "their own failure to take timely steps" to vote. *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973). Rather, this is a case of threatened disenfranchisement *en masse*—a threat realized by the actions of public officials and at the discretion of the Secretary of State. A registered voter in Arizona may perfectly comply with all voting requirements and obligations but nonetheless have her vote excluded based on the mal- or nonfeasance of public officials. Therefore, the burden is severe.

Defendants agree that if the Secretary effectuates the Canvass Provision, the burden on voters is severe.[9] (Doc. 51 at 11.) It is Defendants' position, however, that the burden is not *realistically* severe because the Canvass Provision will likely never be enforced.

---

[8] *See, e.g.*, *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1085 (9th Cir. 2020) (affirming holding that "signature deadline imposes, at most, a 'minimal' burden on those who seek to exercise their right to vote"); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 203 (2008) (holding that a photo identification requirement imposed "a limited burden"); *Short*, 893 F.3d at 677 ("To the extent that having to register to receive a mailed ballot could be viewed as a burden, it is an extremely small one, and certainly not one that demands serious constitutional scrutiny."); *Mi Familia Vota*, 2024 WL 862406, at * 48-49 (holding that a law requiring documentary proof of citizenship to vote imposed a slight burden on the plaintiffs' right to vote).

[9] At oral argument, Defendants reaffirmed this position, stating: "We agree that not including the votes of a group . . . in the final results would be a severe burden, but that doesn't mean that we've agreed that it's unconstitutional." (Doc. 56. at 70:9-12.)

According to Defendants, this Court must presume the board of supervisors will meet the canvassing deadline and must believe the Secretary's promise that, should they fail, he will use all lawful alternatives to prevent disenfranchisement under the Canvass Provision. (Doc. 26-3; Doc. 51 at 11.) But the Court will not abdicate its judicial responsibility based on presumptions or a fleeting litigation position.

Under *Anderson-Burdick*, courts assess the *character* and *magnitude* of the threatened injury perpetrated by the challenged law. *Anderson*, 460 U.S. at 789 (emphasis added). Defendants emphasize the probability of harm over the substantive nature of the harm. But this is wrong. A nuclear weapon does not become any less dangerous simply because a world leader avows never to unleash it. Similarly, the substance of a law is not altered based on the willingness of the enforcer to give effect to it. The Canvass Provision imposes a nuclear-level burden on voting rights. It is a weapon in the Secretary's arsenal that he has *discretion* to use should the circumstances present themselves—a weapon that does not become any less threatening simply because the Secretary is self-professedly "committed" to not pulling the trigger. In fact, the Canvass Provision *intentionally* carries severe burdens to deter counties into compliance, as Defendants explained at oral argument, "[T]he provision notifies the counties of the consequence of their failure, should it happen, to carry out their nondiscretionary statutory duty." (Doc. 56 at 12:16-18.)

This Court previously found that Plaintiffs alleged a credible threat of enforcement, the Court determines that if enforced, the burden threatened on voters is severe.[10]

## ii.   State's Asserted Justifications

At step two, the relevant inquiry is whether the State's asserted interests "make it necessary to burden the plaintiff's rights." *Burdick*, 503 U.S. at 434 (citations omitted). Defendants offer two justifications for the Canvass Provision, namely that it: (1) ensures finality of election results; and (2) prevents the disenfranchisement of all Arizona voters.

---

[10] Even in the unlikely case the burden imposed by the Canvass Provision is not severe enough to trigger strict scrutiny, it is nonetheless "serious enough to require an assessment of whether alternative methods would advance the proffered governmental interests." *Soltysik v. Padilla*, 910 F.3d 438, 445 (9th Cir. 2018) (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1114 n.27 (9th Cir. 2011)). Because there are less burdensome alternatives to advance the State's interests, Plaintiffs also likely prevail under a less exacting review.

(Doc. 34 at 6.)

While the Court agrees that finality and preventing state-wide disenfranchisement are important government interests, Defendants have not met their burden in showing why the Canvass Provision is *necessary* to advance those goals. Defendants' position is that it is better for election results to be final, as opposed to accurate, and, in true utilitarian fashion, it is better to disenfranchise "a few" (potentially millions), as opposed to all. But what value does finality accomplish when it is attained at the expense of democracy? Defendants have not provided this Court an answer, nor have Defendants demonstrated why it is *necessary* to burden Plaintiffs' rights given the various alternatives available to the State to ensure finality and prevent disenfranchisement of all voters.

Even if Defendants' proffered justifications were sufficiently compelling, the Canvass Provision likely fails strict scrutiny because it is not narrowly tailored to achieve the State's objectives. In fact, Defendants have acknowledged less burdensome alternatives at every stage of this case. For instance, during this Court's July 19, 2024 status conference, the Court asked counsel for Defendants:

> [C]an't the EPM, instead of disenfranchising voters, say something like in the case of a county [] where the county officials don't certify, the Secretary of State shall be designated to make that certification in place of the county board of supervisors. Wouldn't that be an appropriate remedy?

(Doc. 21 at 18:11-16.) To which Defendants' counsel replied, "[I]t is possible." (*Id.* at 18:17.) Since then, Defendants' briefs reiterate there are other less nuclear alternatives such as mandamus relief or criminal prosecution of unruly county supervisors. For example, Defendants observed that if the Canvass Provision is triggered, "the appropriate remedy . . . is a mandamus action in state court." (Doc. 33 at 3; *see also* Doc. 51 at 7.) Most recently, during oral argument, Defendants' counsel explained:

> [T]he Secretary has committed that he will do everything within his power, including filing a mandamus action seeking other court intervention, to avoid that result.
>
> . . .
>
> I don't disagree that mandamus is [] the way to solve this

- 37 -

1

2

> problem.
>
> . . .
>
> [A]ll of those other things that you have proposed . . . are things that the Secretary might be able to do, or depending on the situation, could put into practice. The Secretary has said that he will do that [and] . . . use the tools at his disposal to avoid what the Court has called the nuclear bomb.

3

4

5

6

(Doc. 56 at 72:3-15; 74:7-15.) In addition to the two alternatives Defendants credit— mandamus and criminal prosecution—Plaintiffs propose three other less restrictive options, including: (1) allowing the Secretary to certify the county canvass in lieu of a board that fails to meet the deadline; (2) seeking a declaratory judgment from a court as to the correct vote counts; and (3) providing for the appointment of an auditor or special master to certify the vote totals if a county fails to do so. (Doc. 26 at 17-19.)

Under any of these alternatives, the State would achieve finality in election results by the statutory deadline, and in a manner that ensures *all* voters are enfranchised. Therefore, Defendants have not demonstrated why the State's interests "make it necessary to burden the plaintiff's rights." *Burdick*, 503 U.S. at 434 (citations omitted). The Court finds that the Canvass Provision is unlikely to satisfy strict scrutiny because it is not narrowly tailored. Plaintiffs have shown they are likely to succeed on the merits as to Count I.

### 2. Irreparable Harm

Next, the Court determines whether Plaintiffs are likely to suffer irreparable injury in the absence of preliminary relief. "Irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial." *Optinrealbig.com, LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004) (citing *Public Util. Comm'n v. FERC*, 814 F.2d 560, 562 (9th Cir. 1987)). It is well established that the abridgement or interference with the right to vote constitutes irreparable injury. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (stating that the right to vote is "a fundamental political right, because [it is] preservative of all rights"); *Touchston v. McDermott*, 234 F.3d 1133, 1158-59 (11th Cir. 2000) (Birch, J., dissenting) ("[B]y finding an abridgement to the voters' constitutional

right to vote, irreparable harm is presumed and no further showing of injury need be made."); *Cardona v. Oakland Unified Sch. Dist.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgment or dilution of a right so fundamental as the right to vote constitutes irreparable injury.").

Defendants contend that Plaintiffs must establish "immediate threatened injury" to obtain injunctive relief, and Plaintiffs cannot clear that bar given the "hypothetical" nature of their claim. (Doc. 34 at 6-10.) In analyzing this factor, however, "the Court does not assess the likelihood that such harm will occur, but, if such harm does occur, whether it will be irreparable." *Ariz. Democratic Party v. Ariz. Republican Party*, No. CV-16-03752-PHX-JJT, 2016 WL 8669978, at *11 (D. Ariz. Nov. 4, 2016). If the Secretary enforces the Canvass Provision, as written, the harm (mass disenfranchisement) will be irreparable. Plaintiffs have established that absent an injunction, they risk having their votes excluded from the final election results. Accordingly, Plaintiffs have satisfied the second *Winter* factor.

### 3.    Balance of Equities and Public Interest

Under the last two *Winter* factors, a plaintiff must show "that the balance of equities tips in his favor" and "that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "The public interest and the balance of the equities favor prevent[ing] the violation of a party's constitutional rights." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) (citations and quotations omitted). There is no constitutional right "more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

Defendants argue that the last two *Winter* factors tilt in their favor because the Secretary has a duty to canvass by the statutory deadline and the Canvass Provision (1) ensures the Secretary will meet the deadline, and (2) protects the public at large by guaranteeing "that not all votes in Arizona are discounted." (Doc. 34 at 10-11.) Notably, however, the Secretary can accomplish both objectives if the Canvass Provision is enjoined given the ample alternatives available to the Secretary. Considering the gravity of harm

threatened to Plaintiffs' constitutional rights, the balance of equities and public interest tip in Plaintiffs' favor.

Therefore, because all four *Winter* facts weigh in favor of granting Plaintiffs preliminary relief, the Court will enjoin Defendants from enforcing the Canvass Provision during the pendency of these proceedings.

### C.    Count II: Speech Provision

Next, the Court considers whether Plaintiffs have demonstrated they are entitled to preliminary relief as to Count II.

#### 1.    Likelihood of Success on the Merits

Before the Court can assess the merits, however, the Court must resolve the parties' diverging interpretations of the Speech Provision. Plaintiffs contend the rule "is unequivocally written as a *general prohibition* on the conduct of *everyone, everywhere*," (Doc. 14 at 9 (emphasis in original)) whereas Defendants see it as "important instructions and guidance" to poll workers and election officials, having no binding effect on the general public (Doc. 31 at 5-8).

This Court's analysis begins with the challenged text. *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012) ("The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there.") (cleaned up). Words are "given their ordinary meaning unless it appears from the context or otherwise that a different meaning is intended." *Arizona ex rel. Brnovich v. Maricopa Cnty. Cmty. Coll. Dist. Bd.*, 243 Ariz. 539, 541 ¶ 7 (2018) (citation omitted). If the text is unambiguous, the court looks no further to ascertain its meaning. *See United States v. Lewis*, 67 F.3d 225, 228 (9th Cir. 1995).

The text reads: "Any activity by a person with the intent or effect of threatening, harassing, intimidating, or coercing voters (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location is prohibited." (Doc. 16-2 at 195.) The rule then cites to A.R.S. § 16-1013, an Arizona statute defining and classifying voter intimidation as a class one misdemeanor. Defendants argue that this first sentence is not a

prohibition, but rather a concise paraphrase of relevant law to make it easier for lay officials to address voter intimidation. (Doc. 31 at 5-6.) By its plain terms, however, the Speech Provision is a prohibition. The rule expressly says certain activities are "prohibited," and "prohibit" means "to forbid by authority" or "to prevent from doing something." *Prohibit*, Meriam-Webster, https://www.merriam-webster.com/dictionary/prohibit (last visited Sept. 26, 2024). By citing to A.R.S. § 16-1013, the rule also incorporates the notion that a violation of the Speech Provision can be prosecuted as a class one misdemeanor.

The prohibition applies to "any activity by a person," encompassing a broad category of conduct. (Doc. 16-2 at 195.) "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). Defendants argue that "person" in this context means only poll workers. (Doc. 31 at 5-6, 16-17; Doc. 32 at 10-11.) But the Court disagrees. The Speech Provision incorporates Arizona's voter intimidation law by reference, and that statute also uses the word "person" to prohibit *any person* from intimidating a voter. *See* A.R.S. § 16-1013. Moreover, in the sentence immediately following, the EPM provides: "[t]he officer in charge of elections has a responsibility to train poll workers and establish policies to prevent and promptly remedy any instances of voter intimidation." (Doc. 16-2 at 195.) Courts "usually 'presume differences in language like this convey differences in meaning.'" *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 279 (2018) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017)). Therefore, if "person" was intended to mean "election official" or "poll worker," the EPM would say so expressly.

The final clause narrows the rule's reach by limiting the category of prohibited activities to encompass those that have the "intent or effect of threatening, harassing, intimidating, or coercing voters." (Doc. 16-2 at 195.) It does not provide any geographic or temporal limitation, however, as it states the prohibition applies to any activities "inside *or* outside the 75-foot limit at a voting location." (*Id.* (emphasis added).) Accordingly, by its plain terms, the Speech Provision is a broad prohibition on activities, including speech

or other expressive conduct occurring anywhere and at any time, so long as it is done with the intent or effect of threatening, harassing, intimidating, or coercing a voter. Because the text is unambiguous, the Court looks no further to determine its meaning. *Lewis*, 67 F.3d at 228.

At the heart of their textual arguments, Defendants take issue with the notion that a violation of the Speech Provision, or its accompanying examples, may be punishable as a class two misdemeanor under A.R.S. § 16-452(C). But the appropriate punishment has no bearing on whether the Speech Provision regulates Plaintiffs' speech by its plain terms. Even accepting Defendants' position that only an election official may be prosecuted under A.R.S. § 16-452(C), those very officials are nonetheless responsible for preventing voter intimidation, and voter intimidation may be carried out by a poll worker, a voter, or any other individual near a polling place. Thus, the Speech Provision may be enforced by prosecutorial actions or non-prosecutorial actions—such as removing a voter from a polling location or calling local authorities—based on the "intent or effect" of a person's speech. Defendants acknowledged this in their briefs and at oral argument. (*See, e.g.*, Doc. 32 at 10 ("[I]f a self-appointed poll observer tries to physically block a voter from voting, or points at a voter and shouts 'Vote for Harris or I will bury you!' . . . an election official may ask the poll observer to cut it out . . . [and] may ask law enforcement to help handle the situation."); Doc. 56 at 55:7-11 ("[I]f a voter comes into the polling place and says, hey, there's some guy in the parking lot yelling . . . [and] that person then alerts the marshal and then the marshal contacts law enforcement . . . .").) Thus, the Speech Provision plainly regulates speech.

Defendants contend that reading the Speech Provision according to the plain text Defendants themselves drafted would lead to absurd results. (Doc. 31 at 8.) Because absurd results should generally be avoided, Defendants ask this Court to apply the canon of constitutional avoidance and ascribe a narrower construction to the Speech Provision. (*Id.*; Doc. 32 at 10-11.) "It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that

would make it constitutional, it will be upheld." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) (citations omitted). But courts "will not rewrite a state law to conform it to constitutional requirements." *Id.* Defendants invitation requires just that. Where the Speech Provision states, "any activity by a person with the intent or effect of [voter intimidation] is prohibited," Defendants ask the Court to construe it to mean "any activity by a *poll worker* with the intent or effect of [voter intimidation] *may be prohibited by Arizona's voter intimidation laws*." The Court will not rewrite the law to cure its constitutional infirmities.

Because this first sentence broadly prohibits speech, the accompanying list of examples implementing the prohibition also regulate Plaintiffs' speech, as they "may also be considered" activities that have the intent or effect of voter intimidation. (Doc. 16-2 at 196.) Consequently, an individual may be removed from a polling location, reported to law enforcement, or prosecuted criminally for acts such as "raising one's voice" or using "offensive language"—provided the act is done with the "intent or effect of" threatening or harassing other voters or election workers. (*Id.*)

Plaintiffs argue the Speech Provision is facially unconstitutional for several reasons, including that it: (1) lacks any *mens rea* requirement; (2) attempts to ban speech based on it being "offensive;" (3) regulates speech impermissibly on both content and viewpoint and fails strict scrutiny; (4) violates the public and non-public forum doctrines; and (5) is facially overbroad. (Doc. 14 at 15-20.)

As this Court previously noted, the First Amendment overbreadth doctrine permits courts "to hold a statute facially unconstitutional even though it has lawful applications." *Hansen*, 599 U.S. at 769 "If the challenger demonstrates that the statute prohibits a substantial amount of protected speech, relative to its plainly legitimate sweep, then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Tucson*, 91 F.4th at 1327 (cleaned up). A plaintiff must allege "realistic, not fanciful" unconstitutional applications, and "their number must be substantially disproportionate to the statute's lawful sweep."

1    *Hansen*, 599 U.S. at 770.

2          The Speech Provision broadly encroaches on a substantial amount of
3    constitutionally protected speech. Courts have repeatedly recognized that "[i]f there is a
4    bedrock principle underlying the First Amendment, it is that the government may not
5    prohibit the expression of an idea simply because society finds the idea itself offensive or
6    disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (citing cases). Yet, the Speech
7    Provision here prohibits just that by empowering election officials to use their "sound
8    judgment" to remove voters for using "offensive" or "insulting speech." Under the Speech
9    Provision, speech that is either too loud or too offensive in the eyes of an election official
10   is now forbidden. But it is a fundamental tenet in First Amendment law that "speech may
11   not be prohibited because it concerns subjects offending our sensibilities." *Ashcroft*, 535
12   U.S. at 245. While the Speech Provision has a plainly legitimate sweep in preventing voter
13   intimidation, it prohibits a grossly disproportionate amount of speech relative to that end.

14         The Provision also imposes liability for speech that has the "effect of" threatening,
15   harassing, or intimidating voters, in violation of Supreme Court precedent. *Counterman v.*
16   *Colorado*, 600 U.S. 66 (2023). In *Counterman*, the Supreme Court recognized that any
17   imposition of criminal liability for threatening speech requires proof of a *mens rea* of at
18   least recklessness. 600 U.S. at 79-82. Whether as an independent EPM rule or as an
19   inaccurate recitation of state intimidation laws, the Speech Provision threatens criminal
20   penalties for those who violate it. The former prohibited by A.R.S. § 16-452(C), which
21   lacks a *mens rea*, and the latter by A.R.S. § 16-1013, which requires a *mens rea* of
22   knowledge. Speech that has the "effect of" harassing, threatening, or intimidating a voter
23   has that effect without regard to the speaker's mental state. Therefore, the Speech
24   Provision—in addition to being overbroad—likely violates the requirements of
25   *Counterman* for failing to condition liability on a *mens rea* of at least recklessness. For
26   these reasons, Plaintiffs have demonstrated that the Speech Provision likely violates the
27   First Amendment.

28         Plaintiffs also challenge the Speech Provision as void for vagueness under the Due

Process Clause of the Fourteenth Amendment. (Doc. 1 ¶¶ 140-41; Doc. 14 at 20-21.) A law is unconstitutionally vague if it does not give "a person of ordinary intelligence fair notice of what is prohibited" or if it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. "When First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly, requiring statutes to provide a greater degree of specificity and clarity than would be necessary under ordinary due process principles." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001). But "perfect clarity is not required." *Id.*

Plaintiffs have demonstrated the Speech Provision likely violates the Due Process clause in both respects. First, the rule likely violates fair notice principles by prohibiting speech based on the effect it produces in the listener, contrary to the state intimidation laws it purports to implement. "The operative question under the fair notice theory is whether a reasonable person would know what is prohibited by the law." *Tingley*, 47 F.4th at 1089. Under state intimidation laws, speech knowingly made to intimidate or coerce an individual into voting (or not voting) is prohibited. A.R.S. §§ 16-1013, -1017. But the Speech Provision proscribes speech that merely has the effect of intimidating its listener. Given this incongruity, the Speech Provision does not give fair notice of what conduct is prohibited. Second, the rule lacks any meaningful standard for defining aggressive behavior, or offensive and insulting speech, such that it encourages arbitrary enforcement. The rule empowers election officials to use their "sound judgment" in determining whether an individual's speech is so offensive or insulting that the individual should be removed from the polling location. But the Speech Provision does not meaningfully define what constitutes "offensive" or "insulting" speech—and even if it attempted to, such standards would likely violate the First Amendment for the reasons stated above.

Defendants' arguments on the merits largely reaffirm their interpretation of the Speech Provision as non-binding guidance to election officials that does not regulate speech. (Doc. 32 at 9-11.) Defendants also contend that Plaintiffs cannot succeed on the merits because their claim is barred by laches. (*Id.* at 16-17.) "Laches is an equitable

defense that prevents a plaintiff, who with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001) (cleaned up). To establish laches, one must show: "(1) there was inexcusable delay in the assertion of a known right and (2) the party asserting laches has been prejudiced." *O'Donnell v. Vencor Inc.*, 466 F.3d 1104, 1112 (9th Cir. 2006). "To determine whether delay was unreasonable, a court considers the justification for the delay, the extent of the plaintiff's advance knowledge of the basis for the challenge, and whether the plaintiff exercised diligence in preparing and advancing his case." *Ariz. Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 923 (D. Ariz. 2016).

Although the Speech Provision was adopted in 2019, Plaintiffs did not become aware of it, nor the threat it posed, until August of 2023, when members of the Arizona Legislature publicly expressed concern that the rule violates the First Amendment. (Doc. 14-2 at 10-18.) The threat of harm materialized in January 2024 when the Secretary published the EPM without modifying the Speech Provision to address the legislative members' concerns. In May 2024, Plaintiffs' fears were further solidified by Defendants' refusal to disavow enforcement. Plaintiffs then brought this suit in July, a few months after it became clear that Defendants intended to enforce the Speech Provision in violation of the First Amendment. Therefore, Plaintiffs did not unjustifiably delay in bringing suit.

Defendants argue they are prejudiced by "expending resources to respond to this lawsuit during an election year." (Doc. 32 at 16.) But the Court is not persuaded. Had Plaintiffs sued before the 2023 EPM was promulgated, Plaintiffs' claims would be unripe. Therefore, the fact that Defendants must incur these costs during an election year is merely a difficulty caused by the fact of having been sued—and not prejudice. *Shouse v. Pierce Cnty.*, 559 F.2d 1142, 1147 (9th Cir. 1977) ("Difficulties caused by the pendency of a lawsuit, and not by delay in bringing the suit do not constitute prejudice within the meaning of the laches doctrine."). Defendants also posit that the administration of justice is prejudiced because "election officials have been using section III(D) as guidance" in identifying voter intimidation. (Doc. 32 at 17.) Again, the Court is not persuaded. Plaintiffs

challenge only a few sections of the EPM, while its nearly 380 other pages remain unaffected. Election officials can rely on the unaffected portions of the EPM and other sources of law, such as A.R.S. § 16-1013 which defines voter intimidation, to carry out their election responsibilities. For these reasons, Count II is not barred by laches.

Plaintiffs have demonstrated a likelihood of success on the merits, or at minimum, presented a serious question as to the Speech Provision's constitutionality, which is sufficient to support preliminary relief provided the other *Winter* factors are satisfied.

### 2.    Irreparable Harm

Next, the Court considers whether Plaintiffs have established they are likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20. "Irreparable harm is relatively easy to establish in a First Amendment case." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). "[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 973 (9th Cir. 2002) (citation omitted), *abrogated on other grounds by Winter*, 555 U.S. 7. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Defendants argue Plaintiffs cannot show they are irreparably harmed by the Speech Provision given the "well-established backdrop of current federal law" that already prohibits the activities proscribed by the Speech Provision. (Doc. 32 at 13-14.) Considering the Voting Rights Act, the Civil Rights Act, and the Ku Klux Klan Act, Defendants contend "an injunction would make no real-world difference." (*Id.*) This "well-established backdrop" of federal law, however, does not prohibit offensive or insulting speech, nor does it forbid speech based on the effect it produces in the listener. Moreover, the cases Defendants cite predate the Supreme Court's decision in *Counterman*, and are therefore not persuasive as *Counterman* unequivocally holds that any imposition of criminal liability for threatening speech requires the State to prove a culpable mental state of at least

1    recklessness. 600 U.S. at 79-82.

2        Plaintiffs have established a colorable First Amendment claim and sufficiently

3    alleged that they have self-censored their speech as a result. Intangible injuries such as the

4    ones alleged here constitute irreparable harm because such injuries "generally lack an

5    adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir.

6    2014). Accordingly, the second *Winter* factor is met.

7                    **3.    Balance of Equities and Public Interest**

8        As to the final two *Winter* factors, Plaintiffs must show that the balance of equities

9    tips in their favor and that an injunction is in the public interest. *Winter*, 555 U.S. at 20. If

10   a plaintiff shows a likelihood of success on the merits of a constitutional claim, that "tips

11   the merged third and fourth factors decisively in his favor." *Baird v. Bonta*, 81 F.4th 1036,

12   1042 (9th Cir. 2023). On the one hand, "it is always in the public interest to prevent the

13   violation of a party's constitutional rights." *De Jesus Ortega Melendres v. Arpaio*, 695 F.3d

14   990, 1002 (9th Cir. 2012) (cleaned up). At the same time, the public undoubtedly has a

15   compelling interest in maintaining the integrity of the voting place and preventing voter

16   intimidation. *Burson v. Freeman*, 504 U.S. 191, 198-99 (1992).

17       Defendants provide three reasons as to why an injunction would not serve the public

18   interest. (Doc. 32 at 15-16.) First, Defendants contend that an injunction will prevent

19   election officials from being able to rely on the EPM as guidance. (*Id.*) Second, Defendants

20   assert that because the Arizona state court has already enjoined Defendants from enforcing

21   the Speech Provision, "[n]o public interest is served by having overlapping injunctions."

22   (*Id.*) Lastly, Defendants argue the public interest in having clear rules in advance of an

23   election weighs against preliminary relief. (*Id.*)

24       Given the narrow scope of the injunction, however, none of these reasons are

25   sufficient to tilt the balance in Defendants' favor. Defendants are only enjoined from

26   enforcing the Speech Provision—the nearly 380 unaffected pages remain guidance for

27   election officials and poll workers. Additionally, the public interest is served by

28   overlapping injunctions in this case because "even a temporary lag between the lifting of

[the state court's] injunction . . . and entry of an injunction by this Court would likely entail some irreparable harm" to Plaintiffs' constitutional rights. *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 59-60 (D.D.C. 2020). Lastly, the Court finds that the public's interest in preventing "eleventh-hour injunctions" of election laws does not overpower the public's interest in preventing the violation of a person's constitutional rights—especially when the challenged law implicates the speech of all Arizona voters. For these reasons, the Court finds that the balance of equities and public interest tilt in favor of Plaintiffs.

Because all four *Winter* facts weigh in favor of granting Plaintiffs preliminary relief, the Court will grant Plaintiffs' motion (Doc. 14) and enjoin Defendants from enforcing the Speech Provision during the pendency of these proceedings.[11]

## VII.   CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Abstain as to Count II (Doc. 27) is **denied**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss Count I (Doc. 33) is **granted in part**. American Encore is dismissed as a plaintiff for lack of standing. The Attorney General is dismissed as a defendant pursuant to Federal Rule of Civil Procedure 12(b)(6).

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss Count II (Doc. 31) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction as to Count I (Doc. 26) is **granted**. Defendants are enjoined from enforcing the Canvass Provision during the pendency of this litigation.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction as to Count II (Doc. 14) is **granted**. Defendants are enjoined from enforcing the Speech Provision during the pendency of this litigation.

---

[11] The Court will not order Defendants to "promulgate a revised election procedure manual that removes the offending provisions." (Doc. 14 at 8.) The Court is not consolidating the motions with a trial on the merits under Fed. R. Civ. P. 65(a)(2), and therefore, a mandatory injunction of this nature is premature.

**IT IS FINALLY ORDERED** that Defendants must answer the Complaint within fourteen (14) days of the date of this Order.

Dated this 27th day of September, 2024.

Michael T. Liburdi
United States District Judge